**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**
**ex rel. THOMAS WOLF**,

Plaintiff-Relator,

v.

**OMEGA WIRELESS LLC**
455 N. Cityfront Plaza Dr.,
Suite 2755
Chicago, IL 60611;

**M/C PARTNERS**
75 State Street
Suite 2500
Boston, MA 02109;

**SHAMROCK CAPITAL ADVISORS, LLC**
1100 Glendon Ave
#1600
Los Angeles, CA 90024;

**PEPPERTREE CAPITAL ADVISORS, LLC**
86 West Street
Chagrin Falls, OH 44022;

**18th STREET GROUP, LLC**;

**GLENMEDE TRUST COMPANY**;

And

**JOHN DOES #1-50, FICTITIOUS NAMES**,

Defendants.

Civil Action No.: 1:21-cv-02346-JMC

**DEFENDANTS OMEGA WIRELESS, LLC'S, M/C PARTNERS', SHAMROCK CAPITAL ADVISORS, LLC'S, AND PEPPERTREE CAPITAL FUND VI QP, LP'S MOTION TO DISMISS RELATOR'S COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(4), 12(b)(5), 12(b)(6), and 9(b), Defendants Omega Wireless, LLC ("Omega"), M/C Partners, and Shamrock Capital Advisors, LLC ("Shamrock"), and non-defendant Peppertree Capital Fund VI QP, LP, hereby move this Court to dismiss with prejudice the *qui tam* relator Thomas Wolf's Complaint (ECF No. 1). In support of this motion, Defendants Omega, M/C Partners, Shamrock, and non-defendant Peppertree Capital Fund VI QP, LP respectfully refer this Court to the Memorandum of Law filed herewith.

WHEREFORE, Omega, M/C Partners, Shamrock, and Peppertree Capital Fund VI QP, LP respectfully request that the Court grant this motion and dismiss the Complaint with prejudice.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Sara McLean*

Anthony T. Pierce, D.C. Bar No. 415263
Sara McLean, D.C. Bar No. 90033827
Laura Hill, D.C. Bar No. 90041083 (*admission pending*)
Allison T. Coffin, D.C. Bar No. 1600869
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4069
smclean@akingump.com
apierce@akingump.com
lhill@akingump.com
acoffin@akingump.com

*Counsel for Omega Wireless LLC, M/C Partners, Shamrock Capital Advisors, LLC, and Peppertree Capital Fund VI QP, LP*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. THOMAS WOLF,<br><br>Plaintiff-Relator,<br><br>v.<br><br>OMEGA WIRELESS, LLC et al.,<br><br>Defendants. | Civil Action No.: 1:21-cv-02346-JMC |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS OMEGA WIRELESS, LLC'S, M/C PARTNERS', SHAMROCK CAPITAL ADVISORS, LLC'S, AND PEPPERTREE CAPITAL FUND VI QP, LP'S MOTION TO DISMISS RELATOR'S COMPLAINT**

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 2

A. Procedural History .......... 2

B. FCC Auction .......... 3

C. Relator's Allegations .......... 7

i. The FCC and the Named Defendants .......... 7

ii. Auction 1002 .......... 8

iii. Omega's Investors .......... 10

iv. Omega's Filings with the FCC and Auction Results .......... 10

v. Congressional Hearing and Revised Disclosures .......... 11

III. ARGUMENT .......... 13

A. Relator's Complaint Should Be Dismissed Under Federal Rules of Civil Procedure 12(b)(2), 12(b)(4) and 12(b)(5) as to Peppertree Capital Advisors, LLC Because This Entity Does Not Exist. .......... 13

B. Relator's Complaint Should Be Dismissed Against All Defendants Under Federal Rules of Civil Procedure 12(b)(6) and 9(b). .......... 14

i. The Complaint Should Be Dismissed as to All Defendants Because It Engages in Impermissible Group Pleading Per Rule 9(b). .......... 17

ii. Relator Fails to Adequately Plead Counts I and II Under Rule 12(b)(6) and Rule 9(b). .......... 18

iii. Relator Fails to Plead an FCA Conspiracy in Count III. .......... 21

iv. Relator Fails to Plead "Reverse" FCA Liability in Count IV. .......... 22

1. Relator Fails to Adequately Allege Reverse False Claim Liability Under the Avoid or Decrease Theory. .......... 23

2. Relator Fails to Adequately Allege a Reverse False Claim Under the False Record or Statement Theory. .......... 27

C. The Public Disclosure Bar Requires Dismissal of Relator's Claims. .......... 29

D. The John Doe Defendants Must Be Dismissed. .......... 34

E. Neither Disgorgement Nor Injunctive Relief Is an Available Remedy for a Relator Under the FCA. .......... 35

F. Relator's Prosecution of These Claims Is Unconstitutional. .......... 36

1. Allowing a Self-Interested Private Party to Initiate a Government Investigation and Prosecute Claims on Behalf of the United States Violates the Vesting and Take Care Clauses. .......... 36

2. Allowing a Self-Interested Private Party to Prosecute Claims on Behalf of the United States Violates the Appointments Clause. ....................38

IV. CONCLUSION ....................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmadi v. Scharpf*,
No. 23-cv-953 (DLF), 2024 WL 551542 (D.D.C. Feb. 12, 2024)....14

*Allison Engine Co. v. U.S. ex rel. Sanders*,
553 U.S. 662 (2008)....15

*Anderson v. USAA Cas. Ins. Co.*,
221 F.R.D. 250 (D.D.C. 2004)....15, 33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....19

*U.S. ex rel. Bailey v. Veterans Med. Transcription Servs., Inc.*,
No. 23-7171, 2024 WL 4864480 (D.C. Cir. Nov. 22, 2024)....21

*U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*,
251 F. Supp. 2d 28 (D.D.C. 2003)....20

**U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*,
686 F. Supp. 2d 46 (D.D.C. 2010)....15, 16, 33

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002)....14

*Buckley v. Valeo*,
424 U.S. 1 (1976)....38, 39

*Canuto v. Mattis*,
273 F. Supp. 3d 127 (D.D.C. 2017)....13

*Conant v. Wells Fargo Bank, N.A.*,
24 F. Supp. 3d 1 (D.D.C. 2014)....15, 33

*The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1868)....39

**U.S. ex rel. Conteh v. IKON Office Sols., Inc.*,
103 F. Supp. 3d 59 (D.D.C. 2015)....16, 21

*U.S. ex rel. Davis v. Dist. of Columbia*,
679 F.3d 832 (D.C. Cir. 2012)....29

*U.S. ex rel. Davis v. Dist. of Columbia*,
793 F.3d 120 (D.C. Cir. 2015)....14

*U.S. ex rel. Doe v. Staples, Inc.*,
773 F.3d 83 (D.C. Cir. 2014) ....................................................................................29

*U.S. ex rel. El Amin v. George Washington Univ.*,
26 F. Supp. 2d 162 (D.D.C. 1998) ........................................................................21, 22

**U.S. ex rel. Farmer v. City of Houston*,
523 F.3d 333 (5th Cir. 2008) ....................................................................................21

**U.S. ex rel. Finney v. NextWave Telecom, Inc.*,
337 B.R. 479 (S.D.N.Y. 2006) ...................................................................................19

*U.S. ex rel. Folliard v. Hewlett-Packard Co.*,
272 F.R.D. 31 (D.D.C. 2011) ...............................................................................16, 18

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ..........................................................................................36, 37

**U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
842 F.3d 430 (6th Cir. 2016) ....................................................................................25

**U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) ....................................................................................35

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) ...................................................................................14

*Hilska v. Jones*,
217 F.R.D. 16 (D.D.C. 2003) .....................................................................................13

**Joseph v. Cannon*,
642 F.2d 1373 (D.C. Cir. 1981) ............................................................................15, 16

*U.S. ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
929 F.3d 721 (D.C. Cir. 2019) ...................................................................................21

*Kenley Emergency Med. v. Schumacher Grp. of La. Inc.*,
No. 20-cv-03274-SI, 2025 WL 1359065 (N.D. Cal. May 9, 2025) ..........................35

**U.S. ex rel. Kini v. Tata Consultancy Servs.*,
146 F.4th 1184 (D.C. Cir. 2025) ................................................................................23

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ...................................................................................14

*Light v. Wolf*,
816 F.2d 746 (D.C. Cir. 1987) ...................................................................................13

*Lucia v. SEC*,
585 U.S. 237 (2018)....................38

*Manley v. HCA Holdings, Inc.*,
No. 17-cv-2699 (APM), 2025 WL 1707678 (D.D.C. June 17, 2025)....................14

*U.S. ex rel. Mergent Servs. v. Flaherty*,
540 F.3d 89 (2d Cir. 2008)....................38

*Miller v. Holzmann*,
No. 95-1231, 2006 WL 568722 (D.D.C. Mar. 9, 2006) (R&R), *adopted in part, overruled in part*, 2007 WL 710134 (D.D.C. Mar. 6, 2007)....................20

*U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
133 F.4th 395 (5th Cir. 2025)....................39

**Morrison v. Olson*,
487 U.S. 654 (1988)....................37, 39

*Munz v. Parr*,
758 F.2d 1254 (8th Cir. 1985)....................33

*Ndondji v. InterPark Inc.*,
768 F. Supp. 2d 263 (D.D.C. 2011)....................3

*New Mexico v. Musk*,
824 F. Supp. 3d 80 (D.D.C. 2026)....................39

*U.S. ex rel. O'Connor v. U.S. Cellular Corp.*,
153 F.4th 1272 (D.C. Cir. 2025)....................15, 30

*U.S. ex rel. Oliver v. Philip Morris USA Inc.*,
826 F.3d 466 (D.C. Cir. 2016)....................29

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987)....................13

*Pappas v. District of Columbia*,
513 F. Supp. 3d 64 (D.D.C. 2021)....................3

*U.S. ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
No. 15-750 (RC), 2020 WL 686009 (D.D.C. Feb. 11, 2020)....................15, 33

*U.S. ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)....................38

*Robertson v. U.S. ex rel. Watson*,
560 U.S. 272 (2010)....................37

*U.S. ex rel. Scollick v. Narula*,
215 F. Supp. 3d 26 (D.D.C. 2016) ........ 20

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........ 36, 37, 38

**Si v. Laogai Research Found.*,
71 F. Supp. 3d 73 (D.D.C. 2014) ........ 16, 20, 21

*SNR Wireless LicenseCo, LLC v. FCC*,
868 F.3d 1021 (D.C. Cir. 2017) ........ 5

*United States v. Donziger*,
38 F.4th 290 (2d Cir. 2022) ........ 39

*United States v. Honeywell Int'l, Inc.*,
798 F. Supp. 2d 12 (D.D.C. 2011) ........ 16

*United States v. Sriram*,
147 F. Supp. 2d 914 (N.D. Ill. 2001) ........ 35

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
579 U.S. 176 (2016) ........ 15

*Velasco Briseno v. Mktg. & Mgmt. Sols., LLC*,
No. 18-02482-CM-JPO, 2019 WL 2646661 (D. Kan. June 27, 2019) ........ 13

*Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) ........ 34

*Wagdy v. Sullivan*,
316 F. Supp. 3d 257 (D.D.C. 2018) ........ 14

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*,
685 F. Supp. 2d 129 (D.D.C. 2010) ........ 21

*U.S. ex rel. Winnon v. Lozano*,
146 F.4th 1197 (D.C. Cir. 2025) ........ 29

**Statutes**

31 U.S.C.
§ 3729(a)(1)(A) ........ 18, 19, 20, 21
§ 3729(a)(1)(B) ........ 18, 19, 20, 21
§ 3729(a)(1)(G) ........ 18, 22, 23, 25, 26, 28

§ 3730(b)(1) ....................37
§ 3730(c)(3) ....................36
§ 3730(c)(4) ....................36
§ 3730(e)(4) ....................28
§ 3730(e)(4)(A) ....................28, 30
§ 3730(e)(4)(A)(ii) ....................32
§ 3730(e)(4)(B) ....................29, 33

47 U.S.C.
§ 309(j)(1) ....................3
§ 309(j)(3)(B) ....................3
§ 309(j)(4)(D) ....................3

Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, § 6002, 107 Stat. 312 ....................3

**Rules and Regulations**

47 C.F.R.
§ 1.2105(a) ....................6
§ 1.2105(a)(2)(iv) ....................6
§ 1.2105(a)(2)(viii) ....................6
§ 1.2105(a)(4)(ii) ....................6
§ 1.2105(a)(4)(iii) ....................6
§ 1.2107 ....................6
§ 1.2107(d) ....................6
§ 1.2110(a) ....................3, 7
§ 1.2110(b) ....................3
§ 1.2110(b)(1) ....................23
§ 1.2110(b)(1)(i) ....................4
§ 1.2110(c)(2)(i) ....................4
§ 1.2110(c)(2)(ii)(H) ....................5
§ 1.2110(f) ....................3
§ 1.2110(f)(2)(i)(B) ....................5
§ 1.2110(f)(2)(i)(N) ....................5
§ 27.1301(a) ....................5
§ 27.1301(a)(1) ....................4
§ 27.1301(a)(2) ....................5
§ 27.1301(c)(1) ....................5

Federal Rules of Civil Procedure
Rule 9(b) .................... *passim*
Rule 12(b)(2) ....................1, 12, 13
Rule 12(b)(4) ....................1, 12, 13
Rule 12(b)(5) ....................1, 12, 13
Rule 12(b)(6) ....................1, 14, 15, 18

**FCC Public Records**

*62 Applicants Qualified to Bid in the Forward Auction (Auction 1002) of the Broadcast Television Incentive Auction; Clock Phase Bidding to Begin on August 16, 2016*, Public Notice, 31 FCC Rcd. 7628 (2016) ....................................................9

*Application Procedures for Broadcast Incentive Auction; Technical Formulas for Competitive Bidding*, Public Notice, 30 FCC Rcd. 11034 (2015) ..................................5, 8, 23

*Auction of Flexible-Use Service Licenses in the 3.45-3.55 GHz Band for Next-Generation Wireless Services; Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 110; Bidding to Begin October 5, 2021*, Public Notice, 36 FCC Rcd. 9272 (2021)..........................9

*Baker Creek Commc'ns, L.P.*, Mem. Op. and Order, 13 FCC Rcd. 18709, DA 98-1921 (1998) .............................................5

*Broadcast Incentive Auction Scheduled to Begin on March 29, 2016; Procedures for Competitive Bidding in Auction 1000, Including Initial Clearing Target Determination, Qualifying to Bid, and Bidding in Auctions 1001 (Reverse) and 1002 (Forward)*, Public Notice, 30 FCC Rcd. 8975 (2015) ..............................................8

FCC, Auction Application Details: Omega Wireless, LLC, https://aap.fcc.gov/search/results/a1fe683d-455c-4188-a731-4f2ec01c0595?..................30, 31

FCC, Universal Licensing System Application Details: Omega Wireless, LLC, https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=10958206..................................................................................................31, 32, 34

*Forward Auction Application Filing Window Opens Today at Noon After One-Day Weather Delay*; *FCC Form 175 Deadline Extended to February 10, 2016*, Public Notice, 31 FCC Rcd. 313 (2016) ..............................................................8

*Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd. 5532 (1994) ..............................................................................4

*Incentive Auction Closing and Channel Reassignment Public Notice; Incentive Auction Closes; Reverse Auction and Forward Auction Results Announced; Final Television Band Channel Assignments Announced; Post-Auction Deadlines Announced*, Public Notice, 32 FCC Rcd. 2786 (2017) .........................................11

*Intermountain Microwave*, Public Notice, 12 F.C.C. 2d 559 (1963).............................................5

*Status of Applications to Participate in the Broadcast Television Spectrum Incentive Forward Auction (Auction 1002); Applications Deemed Incomplete Must Be Resubmitted By April 6, 2016*, Public Notice, 31 FCC Rcd. 1962 (2016) ........................................................................................................................9

*Updating Part 1 Competitive Bidding Rules*,
Report and Order, 30 FCC Rcd. 7493 (2015) ............................................................7

**Other Authorities**

*Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207 (1989) ............................................................37

*Oversight of the FCC, Hearing Before the Subcomm. on Commc'ns and Tech. of the H. Comm. on Energy and Commerce*, 115th Cong. (2018) ............................................32

U.S. Const.
art. II, § 1, cl. 1 ............................................................35, 38
art. II, § 2, cl. 2 ............................................................38
art. II, § 3 ............................................................35, 38

*Wolf v. Omega Wireless, LLC*, FINRA Arb. No. 17-00336 (2018) (Skewes, Davis, Bottoms, Arbs.), https://www.finra.org/sites/default/files/aao_documents/17-00336.pdf ............................................................3

# I. INTRODUCTION

Defendants Omega Wireless, LLC ("Omega"), M/C Partners, and Shamrock Capital Advisors, LLC ("Shamrock"), and non-defendant Peppertree Capital Fund VI QP, LP, making a limited appearance to address claims against non-existent entity Peppertree Capital Advisors, LLC ("Peppertree"),[1] respectfully move to dismiss this Complaint under Federal Rules of Civil Procedure 12(b)(2), 12(b)(4), 12(b)(5), 12(b)(6) and 9(b). This action is a gross misuse of the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, by a disgruntled business associate pursuing a decade-old personal vendetta. The FCA *qui tam* relator, Thomas Wolf, played almost no role in the business deal he reports as fraudulent. After a personal friend, as a favor, gave him a chance to generate investments for Omega in return for commissions, he cold-called investors without success. When one of these investors was later separately recruited to invest by someone else, Wolf claimed credit for that work, refused reasonable offers of compensation for his minimal role, and pursued arbitration with the Financial Industry Regulatory Authority ("FINRA"), securing an award no greater than what had been offered to him in settlement.

Not satisfied, Wolf filed this *qui tam* Complaint under the FCA, contending that Omega improperly obtained spectrum license bidding credits reserved for small businesses and that the other defendant investors played some part in that scheme. At bottom, he characterizes normal, transparent business dealings as intentional fraud on the Government. In fact, as the Complaint itself alleges, the Federal Communications Commission ("FCC") reviewed the underlying issues

---

[1] Peppertree Capital Fund VI QP, LP joins this motion as to non-existent entity Peppertree Capital Advisors, LLC, *see infra* Section III.A.

at the time and identified no wrongdoing. The Department of Justice ("DOJ") has now had five years to investigate his allegations, and it too has declined to intervene.

His Complaint should not proceed to litigation. Fundamentally, it fails to set forth an FCA violation, as each of his counts fails to state a claim upon which relief can be granted. Moreover, it violates the essential threshold requirement that complaints alleging fraud, from the very outset, plead with particularity the who, what, when, where, and how of the fraud committed by each individual defendant. It parrots public disclosures, in violation of the FCA's restrictions on who can serve as a *qui tam* relator and receive a *qui tam* relator's bounty. If allowed to proceed, this case would serve as a textbook example of how the FCA's *qui tam* provisions unconstitutionally cede executive power to private parties, unchecked by the accountability the Government owes to its companies and citizens.

Neither the FCA nor the Federal Rules of Civil Procedure give individuals the power to pursue their personal grievances in the name of the United States based on broad, speculative allegations. Relator's allegations do not meet the threshold pleading requirements to proceed to discovery, and the Court should end his harassment campaign and dismiss Relator's Complaint with prejudice.

## II. STATEMENT OF FACTS

### A. Procedural History

Relator Wolf alleges he worked for Omega for a short time,[2] raising capital for the wireless spectrum auction at issue and assisting Omega in obtaining an investment from Shamrock. Compl.

---

[2] Relator alleges that he began working for Omega on June 1, 2015, Compl. ¶ 106, and continued work for Omega through the first quarter of 2016, *id.* ¶ 108.

¶¶ 107, 120.[3] In February 2017, Relator filed an action before the FINRA Office of Dispute Resolution, and the arbitration panel issued a final decision on July 17, 2018.[4] Wolf, unwilling to let FINRA's decision end his dispute with Omega, filed this Complaint under seal on August 30, 2021. ECF No. 1. On March 9, 2026, after years of investigation, the DOJ declined to intervene in this action, ECF No. 20, and on April 7, 2026, the Court unsealed it, publicly revealing for the first time the now five-year-old Complaint about decade-old conduct filed against Omega and the other Defendants, ECF No. 22.

### B. FCC Auction

In 1993, Congress authorized the FCC to use auctions to allocate spectrum licenses. 47 U.S.C. § 309(j)(1); *see also* Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, § 6002, 107 Stat. 312. The Communications Act of 1934 requires the FCC, when designing the spectrum license auctions, to promote "economic opportunity and competition and ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses[.]" 47 U.S.C. § 309(j)(3)(B); *see also id.* § 309(j)(4)(D) (requiring the FCC to ensure small businesses are "given the opportunity to participate in the provision of spectrum-based services" when prescribing regulations). In furtherance of this mandate, the FCC created a "designated entity" ("DE") program. 47 C.F.R. § 1.2110(a). Small businesses or very

---

[3] The Complaint includes two sets of paragraphs numbered 8 through 14. As such, citations to paragraphs in that range include the Complaint's internal page number.

[4] *Wolf v. Omega Wireless, LLC*, FINRA Arb. No. 17-00336 (2018) (Skewes, Davis, Bottoms, Arbs.), https://www.finra.org/sites/default/files/aao_documents/17-00336.pdf. Defendants supplement Relator's allegations with publicly available information, which the Court may consider in motion to dismiss proceedings. *See, e.g.*, *Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 76 n.3 (D.D.C. 2021) (in an EEOC matter, the court considered an EEOC complaint and Notice of Charge "because such records are public documents of which a court may take judicial notice." (quoting *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 272 (D.D.C. 2011))).

small businesses may obtain DE status, entitling them to bidding credits if they are successful in a spectrum auction. *Id.* §§ 1.2110(b), (f). **The FCC offers bidding credits to small businesses "to encourage large companies to invest in" the DE companies.** *Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd. 5532, ¶ 15 (1994) ("[T]o encourage large companies to invest in designated entities . . . we will make bidding credits available to designated entities. . . . [B]y adopting bidding credits, which are explicitly authorized by Section 309(j)(4)(D), the Commission seeks to promote economic opportunity and to counterbalance the tendency of auctions to concentrate license ownership in the hands of several very large companies.").

The definitions of "small business" and "very small business" vary by wireless service and are governed by FCC service-specific rules. 47 C.F.R. § 1.2110(b)(1)(i). A small business in the 600 MHz band, as is relevant here, is an entity "that, together with its affiliates, its controlling interests, and the affiliates of its controlling interests, has average gross revenues not exceeding $55 million for the preceding three (3) years." *Id.* § 27.1301(a)(1). An applicant's "controlling interest" includes "individuals or entities with either *de jure* or *de facto* control of the applicant." *Id.* § 1.2110(c)(2)(i). "*De jure* control is evidenced by holdings of greater than 50 percent of the voting stock of a corporation." *Id.* "*De facto* control is determined on a case-by-case basis. An entity must disclose its equity interest and demonstrate at least the following indicia of control to establish that it retains *de facto* control of the applicant:

> (A) The entity constitutes or appoints more than 50 percent of the board of directors or management committee;
>
> (B) The entity has authority to appoint, promote, demote, and fire senior executives that control the day-to-day activities of the licensee; *and*
>
> (C) The entity plays an integral role in management decisions."

*Id.* (emphasis supplied).

The regulation further provides:

> Any person who manages the operations of an applicant or licensee pursuant to a management agreement shall be considered to have a controlling interest in such applicant or licensee if such person, or its affiliate, has authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence:
>
> (1) The nature or types of services offered by such an applicant or licensee;
>
> (2) The terms upon which such services are offered; or
>
> (3) The prices charged for such services.

*Id.* § 1.2110(c)(2)(ii)(H). In determining whether *de facto* control exists, the FCC also looks to the six-factor test set out in two administrative decisions, *Intermountain Microwave* and *Baker Creek*. The test asks: (1) who controls the daily operations of the small business; (2) who employs, supervises, and dismisses the small business's employees; (3) whether the small business has "unfettered" use of all its facilities and equipment; (4) who covers the small business's expenses, including its operating costs; (5) who receives the small business's revenues and profits; and (6) who makes and carries out the policy decisions of the small business. *See Intermountain Microwave*, Public Notice, 12 F.C.C. 2d 559, 560 (1963); *Baker Creek Commc'ns, L.P.*, Mem. Op. and Order, 13 FCC Rcd. 18709, DA 98-1921 (1998); *see also SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1027 (D.C. Cir. 2017); Compl. ¶¶ 63-64.

Winning bidders that qualify as small businesses are entitled to bidding credits. 47 C.F.R. §§ 1.2110(f)(2)(i)(B), 27.1301(a), (c)(1). For Auction 1002, "a bidder with attributed average annual gross revenues that did not exceed $20 million for the preceding three years was eligible to receive a 25 percent discount on its winning bid." *Application Procedures for Broadcast Incentive Auction; Technical Formulas for Competitive Bidding*, Public Notice, 30 FCC Rcd. 11034, ¶ 120 (2015) (citing 47 C.F.R. §§ 1.2110(f)(2)(i)(B), (N), 27.1301(a)(2), (c)(1)); Compl. ¶ 52.

Applicants participating in the FCC spectrum auctions must complete a short-form application, or FCC Form 175, providing certain information about the applicant and the applicant's eligibility to bid. 47 C.F.R. § 1.2105(a). In its short form, the applicant must provide "a brief description of" and the identification of each party to "any partnerships, joint ventures,[5] consortia[6] or other agreements, arrangements or understandings of any kind relating to the licenses being auctioned, including any agreements that address or communicate directly or indirectly bids (including specific prices), bidding strategies (including the specific licenses on which to bid or not to bid), or the post-auction market structure, to which the applicant, or any party that controls as defined in paragraph (a)(4) of this section or is controlled by the applicant, is a party." *Id.* § 1.2105(a)(2)(viii). If seeking qualification as a designated entity, the entity must also include in its short-form application "a certification that the applicant is qualified as a designated entity under § 1.2110." *Id.* § 1.2105(a)(2)(iv).

After the auction, successful bidders must also submit a long-form application to demonstrate their qualifications to hold spectrum licenses and their eligibility for claimed bidding credits. 47 C.F.R. § 1.2107. "As an exhibit to its long-form application, the applicant must provide a detailed explanation of the terms and conditions and parties involved in any bidding consortia, joint venture, partnership or other agreement or arrangement it had entered into relating to the competitive bidding process prior to the time bidding was completed. Such agreements must have

[5] Joint venture is defined as "a legally cognizable entity formed to apply as a single applicant to bid at auction pursuant to an agreement by two or more separate and distinct legal entities, provided that no member of the joint venture may be a nationwide provider." 47 C.F.R. § 1.2105(a)(4)(iii).

[6] Consortium is defined as "an entity formed to apply as a single applicant to bid at auction pursuant to an agreement by two or more separate and distinct legal entities that individually are eligible to claim the same designated entity benefits under § 1.2110, provided that no member of the consortium may be a nationwide provider." 47 C.F.R. § 1.2105(a)(4)(ii).

been entered into prior to the filing of short-form applications pursuant to § 1.2105." *Id.* § 1.2107(d).

### C. Relator's Allegations

Relator devotes most of his Complaint to setting forth background on the FCC and its auction process. He alleges that, prior to participating in the auction or making any representations to the FCC, Omega sought investors and, over time, changed its strategy for raising capital. He describes standard forms that the FCC requires from bidders, without outlining any specific representations in any forms actually made and submitted by Omega or caused to be submitted by any other Defendant. And he alleges that the FCC publicly raised questions about investor control of Omega that Omega resolved as the FCC directed. According to Relator, these allegations, which are primarily general allegations about the process, somehow amounted to a scheme among the Defendants to intentionally defraud the Government because investors exercised impermissible control over Omega.

#### i. The FCC and the Named Defendants

Relator alleges the FCC issues licenses to commercial companies for the exclusive privilege of offering wireless service to the American public. Compl. ¶ 47. According to Relator, after the FCC identifies new frequency bands of radiofrequency spectrum that are suitable for commercial use, it conducts auctions for the spectrum licenses. *Id.* ¶¶ 47-78. One of the FCC's objectives in carrying out the auction is to ensure that DEs—certain categories of entities including small businesses[7]—"have the opportunity to participate in competitive bidding and the provision of spectrum-based services."[8]

---

[7] 47 C.F.R. § 1.2110(a).

[8] *Updating Part 1 Competitive Bidding Rules*, Report and Order, 30 FCC Rcd. 7493, ¶ 9 (2015).

Relator alleges that Omega Wireless, LLC is an investment fund established in 2016 for the purpose of acquiring licenses in the FCC's Broadcast Incentive Auction of 600 MHz spectrum (the "Auction" or "Auction 1002"). Compl. ¶¶ 10 (p. 4), 89. According to Relator, between 2016 and 2017, Omega raised capital from several larger investment firms, including named defendants M/C Partners, Shamrock, and the non-existent[9] Peppertree. *See, e.g.*, *id.* ¶¶ 3, 19, 22-23, 116, 120. He lodges allegations against these Defendants collectively, together with 18th Street Group, LLC ("18th Street") and Glenmede Trust Company ("Glenmede"), as "the Large Business Defendants." *Id.* ¶ 3. Relator alleges Omega sought to participate in the Auction as a DE "small business" in order to receive a 25% discount off Omega's gross winning bids. *Id.* ¶¶ 52, 111.

**ii. Auction 1002**

During Auction 1002, Relator alleges, companies bid to acquire wireless licenses. Compl. ¶ 74. The FCC set out the final procedures for Auction 1002 on August 11, 2015, and released the procedures for participation in the Auction on October 15, 2015.[10] The Auction 1002 procedures specified that participants were required to submit a short-form auction application (FCC Form 175) before January 28, 2016, which was later extended to February 10, 2016.[11] Relator alleges that in the short-form application, the potential applicant must disclose "any agreements, arrangements, or understandings of any kind relating to the licenses that may arise from the

[9] *See* footnote 1; Relator has not named an actual entity.

[10] *See Broadcast Incentive Auction Scheduled to Begin on March 29, 2016; Procedures for Competitive Bidding in Auction 1000, Including Initial Clearing Target Determination, Qualifying to Bid, and Bidding in Auctions 1001 (Reverse) and 1002 (Forward)*, Public Notice, 30 FCC Rcd. 8975 (2015); *Application Procedures for Broadcast Incentive Auction Scheduled to Begin on March 29, 2016; Technical Formulas for Competitive Bidding*, Public Notice, 30 FCC Rcd. 11034 (2015).

[11] *Application Procedures*, 30 FCC Rcd. 11034, ¶ 90; *Forward Auction Application Filing Window Opens Today at Noon After One-Day Weather Delay*; *FCC Form 175 Deadline Extended to February 10, 2016*, Public Notice, 31 FCC Rcd. 313 (2016).

auction, including any agreements relating to post-auction market structure," Compl. ¶ 66, and "any agreements that address or communicate directly or indirectly bids (including specific prices), bidding strategies (including the specific licenses on which to bid or not to bid), or the post-auction market structure," *id.* ¶ 69(b). According to Relator, the short-form application also requires potential applicants to provide a declaration that "the applicant is a qualified designated entity eligible for bidding credits as either a 'small business' or 'very small business' if the applicant applies as such." *Id.* ¶ 69(a). Along with the short-form application, the FCC also required applicants to "submit an upfront payment," which is a refundable deposit to establish the bidder's eligibility to bid on licenses.[12] On July 15, 2016, the FCC announced the list of qualified bidders, which included Omega.[13] According to Relator's allegations, bidding in Auction 1002 began on August 16, 2016,[14] and concluded on March 30, 2017. Compl. ¶¶ 77, 134. Following the announcement of the Auction results, winning bidders submitted long-form applications (FCC Form 601) and remitted payment on the licenses purchased.[15]

---

[12] *Id.* ¶ 157.

[13] *62 Applicants Qualified to Bid in the Forward Auction (Auction 1002) of the Broadcast Television Incentive Auction; Clock Phase Bidding to Begin on August 16, 2016*, Public Notice, 31 FCC Rcd. 7628, Attach. A (2016). The Complaint alleges, "The FCC is required to review tens of thousands of applications and license related filings every year from thousands of licensees and the staff cannot independently investigate and corroborate the truthfulness, completeness, candor, and accuracy of the statements made by each of its licensees." Compl. ¶ 56. The FCC announced on March 18, 2016, that it received only 104 applications from bidders seeking to participate in the Auction. *See Status of Applications to Participate in the Broadcast Television Spectrum Incentive Forward Auction (Auction 1002); Applications Deemed Incomplete Must Be Resubmitted By April 6, 2016*, Public Notice, 31 FCC Rcd. 1962, ¶ 1 (2016).

[14] *62 Applicants Qualified to Bid in the Forward Auction*, 31 FCC Rcd. at 7635 ¶ 33.

[15] *Auction of Flexible-Use Service Licenses in the 3.45-3.55 GHz Band for Next-Generation Wireless Services; Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 110; Bidding to Begin October 5, 2021*, Public Notice, 36 FCC Rcd. 9272, ¶¶ 254-55 (2021).

**iii. Omega's Investors**

Relator alleges that Omega, as an investment fund, began raising funds from investors for participation in the Auction in 2015, including, allegedly, from five named Defendants—M/C Partners, Peppertree, Shamrock, 18th Street, and Glenmede. Compl. ¶ 12 (p. 4); *id.* ¶ 87. Relator further alleges that M/C Partners holds a 16.34% interest in Omega, *id.* ¶ 16, and, in another paragraph of the Complaint, that an entity called M/C VII Funds holds a 16.34% interest in Omega, *id.* ¶ 12 (p. 4). Relator claims that "Peppertree IV Funds" holds a 21.79% interest in Omega, *id.*, and, in another paragraph of the Complaint, that an entity he names as a Defendant called "Peppertree Capital Advisors, LLC" put together a family of six funds, which Relator alleges hold a 22.895% interest in Omega. *Id.* ¶¶ 20, 22, 23. Relator alleges that Shamrock Capital Advisors, LLC holds a 21.79% interest in Omega. *Id.* ¶¶ 12 (p. 4), 19. Finally, Relator alleges that 18th Street holds an 8.72% interest in Omega and Glenmede holds a 5.562% interest in Omega through three funds. *Id.* ¶¶ 26, 29.

The Complaint alleges that M/C Partners expressed an interest in Omega's bidding strategy beginning in January 2016. *Id.* ¶ 115. M/C Partners allegedly provided "max prices" for various licenses and shared its perspective on "bidding tactics." *Id.* The Complaint includes no alleged facts regarding input expressed or control exercised by Peppertree, Shamrock, 18th Street, or Glenmede over Omega. *See generally* Compl.

**iv. Omega's Filings with the FCC and Auction Results**

Under these Auction procedures, Relator alleges "Defendants conspired to have Omega file Short-Form and Long-Form applications with the FCC." Compl. ¶ 152. The Complaint does not identify the dates of these forms or a single false statement on these forms, alleging only generally that "Omega represented in its Form 175 application that its respective average gross annual revenues, aggregated with the gross revenues of its affiliates, controlling interests, the

affiliates of those controlling interests, and the entities with which it had an attributable material relationship, did not exceed $20 million for the three years preceding its Form 175 application," *id.* ¶ 141, without specifying what about that representation was untrue. Further, Relator alleges that "Omega knowingly failed to disclose all of its instruments, agreements, and understandings with the Large Business Defendants." *Id.* ¶ 153. The Complaint does not identify the supposed "instruments, agreements, and understandings" that were not disclosed to the FCC, alleging only that they "were false." *Id.* ¶¶ 153-154.

On April 13, 2017, the FCC announced the Auction results.[16] At the conclusion of the Auction, Omega allegedly won approximately $131 million in licenses, for a net bid total of approximately $99 million, after application of the small business designated entity discount of approximately $32 million (or, as alleged, 25%). Compl. ¶ 136.

**v. Congressional Hearing and Revised Disclosures**

Following the Auction, the Complaint alleges the FCC conducted an additional review of Omega's bidding application. Compl. ¶¶ 142-144. Specifically, on June 4, 2018, in a public letter, the FCC sought additional information regarding control over Omega. *Id.* ¶ 142.[17] The FCC's June 4, 2018, letter requested "a written explanation as to how the specific provisions of [Omega's Amended and Restated Limited Liability Company Agreement] identified in Appendix A, both individually and in the aggregate, are consistent with" Omega's assertion that "Controlling Members of the LLC[] and members of the LLC's Board of Managers have both *de jure* and *de*

---

[16] *See Incentive Auction Closing and Channel Reassignment Public Notice; Incentive Auction Closes; Reverse Auction and Forward Auction Results Announced; Final Television Band Channel Assignments Announced; Post-Auction Deadlines Announced*, Public Notice, 32 FCC Rcd. 2786 (2017).

[17] The FCC's June 4, 2018 letter is publicly available at: https://www.congress.gov/115/meeting/house/108599/witnesses/HHRG-115-IF16-Wstate-PaiA-20180725-SD015-U15.pdf at 25-27.

*facto* control of the Applicant." Compl. ¶ 142 (quoting June 4, 2018, letter). Appendix A identified (1) provisions regarding management activities that require authorization by a supermajority of Managers, and (2) provisions that require the consent of the Majority Institutional Investors before the Company may engage in certain activities or transactions.[18] Compl. ¶¶ 143-144. As a result of the FCC's outreach, on July 26, 2018, Omega revised its Amended and Restated Limited Liability Company Agreement to address the FCC's concerns regarding control. *Id.* ¶ 147. The Complaint alleges that "Omega's Revised Agreement intentionally concealed the fact that the Large Business Defendants had never actually ceded *de facto* control over Omega" and "the Revised Agreement contained language specifically tailored to make it falsely appear that Omega was eligible for the small business bidding credits at issue." *Id.* ¶ 148. The Complaint does not identify a single provision in the Revised Agreement that purportedly concealed or misrepresented Omega's relationships with the Large Business Defendants. *See id.*

On July 25, 2018, FCC Chairman Ajit Pai testified before the U.S. House of Representatives Subcommittee on Communications and Technology. Compl. ¶ 145. In an August 31, 2018, follow-up communication to the Congressional Subcommittee, the FCC Chairman confirmed, "The Broadband Division has identified two DE bidders raising control issues (although not necessarily issues of *de facto* control)—Bluewater Wireless II, L.P. and Omega Wireless, LLC," and noted the bidders chose to address these potential control issues with revised agreements. *Id.* ¶ 146.

[18] *Id.* at 27 (Appx. A).

## III. ARGUMENT

### A. Relator's Complaint Should Be Dismissed Under Federal Rules of Civil Procedure 12(b)(2), 12(b)(4) and 12(b)(5) as to Peppertree Capital Advisors, LLC Because This Entity Does Not Exist.

As a threshold matter, because Peppertree Capital Advisors, LLC does not exist, Relator's claims as to that entity should be dismissed under Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5) for insufficient process and insufficient service of process, and under Rule 12(b)(2) for lack of personal jurisdiction.

Relator's Complaint attempts to state claims against an entity named "Peppertree Capital Advisors, LLC." *See, e.g.*, Compl. ¶¶ 20–23. Relator also attempted service on this entity on August 31, 2026. *See* ECF No. 37. But Peppertree Capital Advisors, LLC does not exist and has never existed, as reflected on the Ohio Secretary of State website. *See* https://businesssearch.ohiosos.gov/; *see also Canuto v. Mattis*, 273 F. Supp. 3d 127, 133 n.7 (D.D.C. 2017) (noting court may take judicial notice of secretary of state filings).

It is well established that "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). "If the plaintiff does not properly effect service on a defendant, then the defendant may move to dismiss the complaint under Rule 12(b)(4) and/or (5) . . . Upon such a motion, the plaintiff carries the burden of establishing that he has properly effected service." *Hilska v. Jones*, 217 F.R.D. 16, 20 (D.D.C. 2003) (citing *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987)).

Because proper service has not been effectuated against Peppertree Capital Advisors, LLC, Federal Rules of Civil Procedure 12(b)(2), 12(b)(4), and 12(b)(5) each present an independent ground for dismissal. To the extent Relator intended to sue and serve a different entity as a defendant in the above-captioned action, process was insufficient as to that entity under Rule

12(b)(4) because the summons did not properly contain the name of the entity to be served. *See* ECF No. 37.

Relator's service of process was similarly insufficient because Peppertree Capital Advisors, LLC does not exist and therefore has no agent to accept service of process. *See, e.g.*, *Velasco Briseno v. Mktg. & Mgmt. Sols., LLC*, No. 18-02482-CM-JPO, 2019 WL 2646661, at *6 (D. Kan. June 27, 2019) (finding that process was insufficient under Rule 12(b)(4) because "the person or entity served was not properly named," and under Rule 12(b)(5) because "whomever was served . . . was not [the] defendant" and "[w]ithout sufficient process or service of process on defendant, the court cannot exert personal jurisdiction"). Accordingly, this Court should dismiss the Complaint as to Peppertree Capital Advisors, LLC for lack of personal jurisdiction, insufficient process, and insufficient service of process.

### B. Relator's Complaint Should Be Dismissed Against All Defendants Under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

As to all Defendants, the Complaint fails to state a claim under Rule 12(b)(6) and does not meet Rule 9(b)'s heightened pleading standard. "Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for failure to state a claim upon which relief can be granted." *Ahmadi v. Scharpf*, No. 23-cv-953 (DLF), 2024 WL 551542, at *3 (D.D.C. Feb. 12, 2024). To survive such a motion, a complaint "must have facial plausibility, meaning it must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wagdy v. Sullivan*, 316 F. Supp. 3d 257, 261 (D.D.C. 2018) (citation modified) (quoting *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012)).

When considering a motion to dismiss, the Court must give the plaintiff "the benefit of all inferences that can be derived from the facts alleged. . . . But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint."

*Hettinga*, 677 F.3d at 476 (internal citations omitted). Nor must the Court accept "legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

To adequately plead an FCA claim, a relator must plead not only that the defendant submitted or caused the submission of a false claim, "but also that the defendant knew it was false" and that the alleged falsehood was material. *Manley v. HCA Holdings, Inc.*, No. 17-cv-2699 (APM), 2025 WL 1707678, at *4 (D.D.C. June 17, 2025) (quoting *U.S. ex rel. Davis v. Dist. of Columbia*, 793 F.3d 120, 124 (D.C. Cir. 2015)). "Thus, an FCA claim requires the trifecta of falsity, materiality, and scienter." *Id.* These elements, particularly knowledge and materiality, are "demanding" and "rigorous" because the FCA "is not 'an all-purpose antifraud statute' . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016) (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

A complaint alleging violations of the FCA must also clear the still higher hurdle of pleading with particularity pursuant to Federal Rule of Civil Procedure 9(b). *See U.S. ex rel. O'Connor v. U.S. Cellular Corp.*, 153 F.4th 1272, 1277 (D.C. Cir. 2025) ("Because the FCA is an antifraud statute," the complaint also must satisfy "the heightened 'particularity' standard of Rule 9[b]," i.e., "state with particularity the circumstances constituting fraud.").

This means "the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." *Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981). The relator must plead as to each defendant "the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (citation omitted);

*see also Conant v. Wells Fargo Bank, N.A.*, 24 F. Supp. 3d 1, 15 (D.D.C. 2014) (finding failing to plead "substantive allegations" against a defendant does not meet Rule 9(b)'s heightened pleading requirements); *U.S. ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, No. 15-750 (RC), 2020 WL 686009, at *23 (D.D.C. Feb. 11, 2020) ("Without any facts alleging how any allegedly-affiliated defendant submitted a claim or caused such a claim to be submitted, Relator has not established a plausible claim for relief as required by Rule 12(b)(6) or Rule 9(b)."); *U.S. ex rel. Bender v. N. Am. Telecomms., Inc.*, 686 F. Supp. 2d 46, 50-51 (D.D.C. 2010) (dismissing case because complaint failed to identify "who precisely was involved in the fraudulent activity," and finding specifically that "[a] complaint must make specific allegations against each individual defendant rather than collective allegations against each of the above-named Defendants") (internal quotation marks and citation omitted).

Rule 9(b) plays an essential gatekeeping function in *qui tam* cases. It prevents private *qui tam* relators with inadequately pled theories from setting out on a discovery "fishing expedition, with the hope that [they] will discover incriminating information [they do] not possess nor ha[ve] any credible reason to believe exists." *U.S. ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 68-69 (D.D.C. 2015).

"Rule 9(b) permits knowledge to be pled generally," but "the practical difficulties of proving scienter do[] not absolve plaintiffs of their duty to plead some facts from which the court may reasonably infer knowledge." *United States v. Honeywell Int'l, Inc.*, 798 F. Supp. 2d 12, 22 (D.D.C. 2011) (citation omitted). Mere conclusory statements of knowledge, or, as in this case, mere conclusory statements of intentional misconduct, do not suffice.

#### i. The Complaint Should Be Dismissed as to All Defendants Because It Engages in Impermissible Group Pleading Per Rule 9(b).

The Complaint should be dismissed in its entirety because it relies on impermissible group pleading, rather than pleading the who, what, when, where and how of fraud causes of action as to each individual defendant. "A complaint must make specific allegations against each individual defendant rather than collective allegations . . . since one of the main rationales behind Rule 9(b)'s particularity requirement is to 'guarantee all defendants sufficient information to allow for preparation of a response.'" *Bender*, 686 F. Supp. 2d at 50 (quoting *Cannon*, 642 F.2d at 1385); *see also Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 85 (D.D.C. 2014); *U.S. ex rel. Folliard v. Hewlett-Packard Co.*, 272 F.R.D. 31, 35 (D.D.C. 2011).

Throughout his Complaint, Relator repeatedly attributes allegedly fraudulent conduct to "Defendants" and "Large Business Defendants" without identifying which Defendant allegedly engaged in which conduct. Relator lodges accusations that the "Large Business Defendants" exercised control over Omega, dictated bidding strategy, did not tell the FCC, and participated in some fraudulent scheme, without explaining each Defendant's role with particularity. *See, e.g.,* Compl. ¶¶ 123-125, 128-133, 137-140, 150-154. Relator refers to the collective "Defendants" in no fewer than 39 paragraphs throughout the Complaint. *See* Compl. ¶¶ 1, 2, 3, 4, 6, 8 (p. 2), 10 (p. 3), 11 (p. 3), 12 (p. 3), 13 (p. 3), 14 (p. 4), 30, 31, 34, 36, 37, 113, 123, 124, 125, 128, 129, 131, 133, 137, 140, 148, 149, 150, 151, 159, 160, 162, 163, 164, 166, 167, 169, 170. Relator also refers collectively to M/C Partners, Shamrock Capital Advisors, LLC, Peppertree Capital Advisors, LLC, 18th Street Group, LLC, and Glenmede Trust Company as "Large Business Defendants" in 24 paragraphs. *See id.* ¶¶ 3, 4, 5, 6, 9 (p. 3), 10 (p. 3), 11 (p. 3), 120, 123, 124, 125, 128-133, 137-140, 148, 150, 151.

The Complaint includes just a smattering of allegations against M/C Partners, which, at bottom, amount to a claim that it made a considered investment in Omega. Compl. ¶¶ 114-16, 117-24, 126-27. Aside from alleging that Shamrock, Peppertree, 18th Street, and Glenmede invested in Omega and held ownership interests, the Complaint contains no particularized factual allegations regarding these entities' specific conduct in support of FCA liability. The Complaint's occasional references to "Large Business Defendants *like* M/C Partners" and "the Large Business Defendants led by M/C Partners" underscore this ambiguity. Compl. ¶¶ 123-24 (emphasis supplied). That formulation leaves the remaining Defendants to guess at the accusations against them.

Rule 9(b) does not permit a relator to plead fraud by lumping distinct defendants together and attributing collective misconduct to the group. The Complaint fails to differentiate among the Defendants or plead each Defendant's role with particularity, and, for that reason alone, the claims must be dismissed.

**ii. Relator Fails to Adequately Plead Counts I and II Under Rule 12(b)(6) and Rule 9(b).**

Relator fails to allege a claim upon which relief can be granted in Counts I and II under Rule 12(b)(6), let alone consistent with Rule 9(b)'s particularity requirement. Those Counts require a claim *to* the Government—as the FCA provisions relied upon impose liability on a defendant that "knowingly presents, or causes to be presented, a false or fraudulent *claim* for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent *claim*," *id.* § 3729(a)(1)(B) (emphasis supplied).

Relator broadly alleges as the basis for both Counts I and II that Omega submitted, and the Large Business Defendants caused the submission of, "claims for payment," Compl. ¶ 159, *see*

*also id.* ¶ 162, but his Complaint does not point to actual claims for payment, much less set them out with any particularity. *See Folliard*, 272 F.R.D. at 35 (dismissing FCA presentment of false claim counts for failing to "identify who made the false claims, when those claims were made, and any additional details about the content of the claims").

Underpayments of money owed to the Government are addressed—when properly pled—under 31 U.S.C. § 3729(a)(1)(G), the FCA's "reverse" false claims provision, not §§ 3729(a)(1)(A) or 3729(a)(1)(B), which require affirmative claims for payment. An allegation that Omega paid less money to the Government than it owed, due to improper bidding credits, is not an allegation that it made a claim for payment from the Government that could give rise to a violation of §§ 3729(a)(1)(A) or 3729(a)(1)(B). *See U.S. ex rel. Finney v. NextWave Telecom, Inc.*, 337 B.R. 479, 488 (S.D.N.Y. 2006) (by alleging that defendants attempted to "decrease or avoid an obligation to make payments to the government" for certain FCC spectrum licenses, the relator "failed to identify a 'claim' within the meaning of the FCA"). Having failed to allege a "claim," Relator has failed to allege a violation under §§ 3729(a)(1)(A) or 3729(a)(1)(B).

Moreover, because Relator fails to allege a "claim," he necessarily fails to adequately plead the remaining elements of the alleged violations of Sections 3729(a)(1)(A) or 3729(a)(1)(B) in Counts I and II—falsity, scienter, materiality, and causation. Put differently, absent an alleged claim, there is nothing that can be false, knowingly submitted or caused to be submitted by any Defendant, or material to any payment by the Government, nor can there be any statements material to a false claim.

The Complaint never identifies a falsehood. Though Relator alleges that Omega's Short-Form and Long-Form applications "included numerous fraudulent statements and omissions" and that the disclosed "instruments, agreements, and understandings" were "false," Compl. ¶¶ 152-

154, he fails to plead how any applications or disclosures were false or what was false. As to scienter, Relator offers only a recitation of the statutory standard—"reckless disregard or deliberate ignorance . . . or . . . actual knowledge," *id.* ¶¶ 159, 162. He separately pleads that Defendants acted "intentionally," i.e., with actual knowledge, *id.* ¶¶ 10 (p. 3), 88, 139, 148, yet fails to allege any facts to support that allegation. A "formulaic recitation of the elements of a cause of action" cannot survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Relator similarly fails to allege causation as to the Large Business Defendants. Relator alleges only that Defendants "conspired to have Omega file" its applications. Compl. ¶ 152. He pleads no facts showing that any Large Business Defendant prepared, reviewed, directed, or otherwise had a role in any particular submission. As to materiality, absent the allegation of a false claim, it is impossible to assess the basis upon which the falsity would be material. Further, by his own allegations, the FCC investigated the very control issue Relator now challenges, and rather than deny Omega's bidding credits or impose any penalty, granted the credits and awarded Omega the spectrum licenses. *Id.* ¶¶ 142-149. And DOJ investigated the allegations and declined to intervene.

And, certainly, because Relator fails to allege the most basic elements of an FCA violation in support of Counts I and II, he also fails to plead such violations with particularity—the who, what, when, where, and how of these FCA violations allegedly committed by each individual Defendant. The Complaint's general statements that the Defendants presented or caused the presentment of false claims (and are continuing to do so) at an unknown time without any additional detail, with no allegations as to what the "claim" entailed and when the purported claims were submitted, *see* Compl. ¶¶ 159, 162, do not suffice for purposes of Rule 9(b). For all of these reasons, the Court must dismiss Counts I and II.

**iii. Relator Fails to Plead an FCA Conspiracy in Count III.**

Relator alleges that Defendants conspired to violate 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). To allege such a conspiracy, a relator must plead "(1) that 'an agreement existed to have false or fraudulent claims allowed or paid' to the government, (2) that each alleged member of the conspiracy 'joined that agreement,' and (3) that 'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'" *U.S. ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 35 (D.D.C. 2016) (quoting *Si*, 71 F. Supp. 3d at 89). Relators must plead an FCA conspiracy allegation with particularity pursuant to Rule 9(b), including who participated in the agreement and when that agreement was made. *Miller v. Holzmann*, No. 95-1231, 2006 WL 568722, at *8 (D.D.C. Mar. 9, 2006) (R&R), *adopted in part, overruled in part*, 2007 WL 710134 (D.D.C. Mar. 6, 2007); *U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 34-36 (D.D.C. 2003) (Rule 9(b) applies to FCA actions, including claims of conspiracy to violate the FCA).

As a threshold matter, because Relator does not allege the required "claim," or any other elements of an FCA violation under either 31 U.S.C. § 3729(a)(1)(A) or (a)(1)(B) (*see supra* Section III.B.ii), he necessarily does not allege a conspiracy to violate those provisions. *See U.S. ex rel. Bailey v. Veterans Med. Transcription Servs., Inc.*, No. 23-7171, 2024 WL 4864480, at *1 (D.C. Cir. Nov. 22, 2024); *see also U.S. ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728-29 (D.C. Cir. 2019) (noting that to state an FCA conspiracy claim, relator "had to establish an underlying FCA violation," and the court's "rejection of all of [the relator's] underlying theories of liability mandates" that it dismiss the relator's conspiracy claim); *Si*, 71 F. Supp. 3d at 98 ("[T]here can be no conspiracy to commit fraud in violation of the FCA if an underlying false claim has not been adequately alleged.").

Relator also fails to plead the other elements of FCA conspiracy, including the existence of an agreement to defraud the Government, that each Defendant willfully joined an agreement, and what overt acts, if any, any Defendant allegedly took in furtherance of the unlawful agreement. *See U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343-44 (5th Cir. 2008); *U.S. ex rel. El Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 164-65 (D.D.C. 1998).

At best, Relator alleges that each Large Business Defendant invested in Omega. But this alleged investment decision, standing alone, is not an agreement to defraud the Government. *Conteh*, 103 F. Supp. 3d at 68 ("[A]t the motion to dismiss stage of a case, a plaintiff/relator must 'identify any agreement between the parties to defraud the government.'") (quoting *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 141 (D.D.C. 2010)); *see also Farmer*, 523 F.3d at 343-44 (finding that relator's allegation that "both defendants signed certain forms in arguably suspicious circumstances does not demonstrate—or even reasonably intimate—a shared unlawful objective to obtain payment on false claims"); *El Amin*, 26 F. Supp. 2d at 164-65.

Relator alleges "Defendants committed overt acts in furtherance of the conspiracy," Compl. ¶ 166, but does not identify the overt acts, which Defendant allegedly committed an overt act, let alone the most central overt act, the "claim," or how those acts furthered the conspiracy's supposed unlawful objective. As such, Count III must be dismissed.

#### iv. Relator Fails to Plead "Reverse" FCA Liability in Count IV.

Section 3729(a)(1)(G) of the FCA creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Relator again provides no particulars while alleging in

a conclusory fashion: "Defendants knowingly avoided or decreased their obligation to pay or transmit money to the government. Specifically, Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false." Compl. ¶ 169. Accordingly, Relator appears to rely on two separate theories under § 3729(a)(1)(G)—knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government (the "Avoid or Decrease Theory") and knowingly making or using (or causing to be made or used) a false record or statement material to an obligation to pay or transmit money or property to the Government (the "False Record or Statement Theory"). Relator fails to state a claim under either theory and again fails to satisfy Rule 9(b), including Rule 9(b)'s requirement to allege the "obligation and its effect(s) 'with particularity.'" *U.S. ex rel. Kini v. Tata Consultancy Servs.*, 146 F.4th 1184, 1188 (D.C. Cir. 2025) (quoting Fed. R. Civ. P. 9(b)).

### 1. Relator Fails to Adequately Allege Reverse False Claim Liability Under the Avoid or Decrease Theory.

To plead an FCA reverse false claim under the Avoid or Decrease Theory, Relator must allege that each Defendant "knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). As to Omega, Relator appears to contend that Omega decreased its obligation to pay the full amount of its winning bid by securing a $32 million bidding credit to which it was not entitled. *See, e.g.*, Compl. ¶¶ 88, 150. But Relator fails to set forth plausibly, let alone with particularity, that Omega was not entitled to DE status. He alleges only that Omega changed its investment strategy over time by allowing investors to have input in Omega's bidding strategy, and then lodges the conclusory

allegation that this means the Large Business Defendants exercised impermissible control over Omega. Compl. ¶¶ 88, 140.

This allegation falls far short of pleading that Omega had any obligation to pay more for the licenses than it did, no less that Omega, or any other Defendant, acted knowingly and improperly to avoid that obligation. As Relator sets out in his Complaint, a bidder with attributed average annual gross revenues—i.e., gross revenue of the "applicant (or licensee), its affiliates, its controlling interest, and the affiliates of its controlling interests," 47 C.F.R. § 1.2110(b)(1)—that did not exceed $20 million was "eligible to receive a 25 percent discount on its winning bid." 30 FCC Rcd. 11034, ¶ 120; Compl. ¶ 52. But Relator fails to allege how the Large Business Defendants had *de jure* or *de facto* control over Omega, such that the Large Business Defendants' annual gross revenue should be attributed to the bidder in this calculation, or how this caused Omega's attributed average gross revenue to exceed $20 million. *See* Compl. ¶ 52.

As to *de jure* control, Relator alleges, "*De jure* control typically is evidenced by ownership of more than 50% of an applicant's voting interests." Compl. ¶ 62. He does not allege, however, that any of the Large Business Defendants owned more than 50% of Omega's voting interests. *See* Compl. ¶ 12 (p. 5) ("Other investors in Omega included M/C VII Funds (16.34% interest), Peppertree IV Funds (21.79% interest), Shamrock Capital Advisors, LLC (21.79%), and 18th Street Group, LLC (8.72% interest).").

Relator similarly fails to plead how the Large Business Defendants had *de facto* control over Omega. Relator alleges that indicia of *de facto* control include:

> (a) who makes management and policy decisions for the applicant, including who determines the applicant's activities and actions; (b) who is in charge of financing of the applicant's business activities; (c) who controls the day-to-day operations; (d) who is in charge of employment decisions; (e) whether the applicant shares facilities and equipment; (f) the existence and nature of business and social relationships; and (g) the nature of stock ownership, contractual, employment, and

> other business relationships between the applicant and another entity or entities, including lenders, investors, and limited partners.

Compl. ¶ 64. But then he makes allegations at most as to only two of those factors ((a) and (g)) of this multi-factor determination. Under factor (a), "who makes management and policy decisions" for Omega, Relator lodges the conclusory allegation that the Large Business Defendants "led by M/C Partners" were in charge of Omega's approach to its bidding strategy, which even viewed most favorably to Relator is at most a single management or policy decision that the Large Business Defendants ("led by M/C Partners") purportedly made on behalf of Omega. *Id.* ¶ 123. Relator notably does not allege M/C Partners was involved at all in the actual bidding or in any other day-to-day function at Omega; rather, Relator merely alleges that M/C Partners, an investor, acted as an investor and sought to understand what it was investing in. *See id*. Regarding factor (g), Relator alleges that "Large Business Defendants *like* M/C Partners" received what Relator frames as favorable investment terms. *See id.* ¶ 124 (emphasis supplied). Relator pleads certain terms of M/C Partners' investment were more favorable to M/C Partners than those Omega initially sought, but does not allege how that translates into M/C Partners exercising impermissible control over Omega, or whether the same terms applied to any, much less each, of the other Large Business Defendants. *Id.* ¶¶ 116-124. Relator does not allege, plausibly or with particularity, even *de facto* control, no less any other requirements of an obligation to be avoided or decreased in violation of 31 U.S.C. § 3729(a)(1)(G). *See generally* Compl.

The Complaint also lacks any other facts to support that Defendants acted "knowingly and improperly" as required under the Avoid or Decrease Theory. Under 31 U.S.C. § 3729(a)(1)(G), "knowingly" refers to a "defendant's awareness of both an obligation to the United States and his violation of that obligation. . . . [T]he requirement should be interpreted to apply to both the existence of a relevant obligation and the defendant's own avoidance of that obligation." *U.S. ex*

*rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436 (6th Cir. 2016). Relator contends that these Defendants acted "intentionally," Compl. ¶¶ 10 (p. 3), 88, 139, 148, but offers no facts that would support the Court crediting that conclusory allegation. Relator alleges Ed Moise, who he alleges is Omega's managing director but is actually a controlling member,[19] told Relator that M/C Partners was "dictating Omega's strategy for Auction 1002." *Id.* ¶ 121. Relator, without identifying any source or other basis, alleges that Mr. Moise "avoided putting his concerns in writing" because he "knew that this approach would put the designated entity discount at risk." *Id.* ¶ 122. He makes no allegation that Mr. Moise expressed this concern even to Relator, no less shared it with anyone else at Omega or any other Defendant. Relator's speculation that one manager had a concern about a regulatory risk, *id.* ¶¶ 121-122, does not allege plausibly that Omega, let alone any other Defendant, actually knew Omega was ineligible for the bidding credit, knew of an obligation to pay more than the discounted amount, or in any way "knowingly and improperly" acted to avoid such an obligation.

Beyond these few statements, Relator offers no specific facts that would make plausible his allegation of intent as to the Large Business Defendants and relies instead entirely on conclusory statements. Compl. ¶ 10 (p. 3) (Defendants "intentionally created a complex chain of *de jure* controls to hide *de facto* control" without identifying the chain of *de jure* controls), ¶ 88 (by claiming DE status, Omega "intentionally defrauded the government," though failing to explain how), ¶ 139 ("Omega intentionally misrepresented the nature of its relationship with the Large Business Defendants," but failing to identify the misrepresentations), ¶ 148 (Revised

[19] *See* FCC, Auction Application Details: Omega Wireless, LLC, Attachments, https://aap.fcc.gov/search/results/a1fe683d-455c-4188-a731-4f2ec01c0595?tab=attachments (*see* attachment labeled as Second Amendment to Indirect Ownership and Affiliates at 1) (hereinafter "Short Form").

Agreement "intentionally concealed" the Large Business Defendants' control but failing to allege what information was "concealed"). His Complaint does not allege plausibly, or with any particularity, an obligation in support of Count IV, or one that any, no less each, of the Defendants knowingly and improperly avoided.

**2. Relator Fails to Adequately Allege a Reverse False Claim Under the False Record or Statement Theory.**

To the extent Relator relies on the False Record or Statement Theory under the FCA reverse false claims provision—that Defendants knowingly made or used (or caused to be made or used) a false record or statement material to an obligation to pay or transmit money or property to the Government—that allegation also fails because, as noted above, Relator has not alleged an obligation and because Relator fails to allege a material false record or statement. *See* 31 U.S.C. § 3729(a)(1)(G).

Relator does not plausibly, or with any particularity, allege that any Defendant made, used, or caused to be made or used a material false record or statement. Relator alleges that Omega filed "Short-Form and Long-Form applications with the FCC for Auction 1002 that included numerous fraudulent statements and omissions," Compl. ¶ 152, yet he never identifies those alleged "fraudulent statements and omissions."

As to affirmative false statements, the Complaint offers two conclusory and general allegations: *first*, that Omega falsely certified that it was eligible for DE status, Compl. ¶¶ 8 (p. 2), 151, and *second*, that "the instruments, agreements, and understandings with the Large Business Defendants that Omega disclosed to the FCC were false," *id.* ¶ 154. The first fails because, for the reasons set out above, Relator has not adequately pled that Omega was ineligible for DE status. *See supra* Section III.B.iv.1. The second fails because Relator identifies no specific instruments, agreements, or understandings that were allegedly false and cites nothing in any of these

documents that was false. *See generally* Compl. Relator alleges that the Revised LLC Agreement includes language "specifically tailored to make it falsely appear that Omega was eligible for the small business bidding credits at issue," Compl. ¶ 148, but fails to identify any such language. Moreover, and to the contrary, the Complaint acknowledges that the FCC reviewed specific provisions of Omega's LLC Agreement, asked Omega to explain how those provisions were consistent with its claimed eligibility, and found Omega's application complete and in conformance with FCC rules. *Id.* ¶¶ 142-148.

As to omissions, Relator alleges that Omega "knowingly failed to disclose all of its instruments, agreements, and understandings with the Large Business Defendants," Compl. ¶ 153, but, again, he does not identify a single instrument, agreement, or understanding that Omega failed to disclose. Relator also alleges that the Revised LLC Agreement "did not reflect the true control the Large Defendants maintained, and continued to maintain, over Omega at all relevant times." Compl. ¶ 147. Again, Relator fails to plead how each of the Large Business Defendants allegedly maintained control over Omega, *see supra* Section III.B.iv.1, what Omega should have disclosed that it did not, and how or why the information Omega included was insufficient. And with no allegation of any specific omission, he has no allegation that any omission was material to an obligation to pay money to the Government.

With respect to the Large Business Defendants, again, Relator's allegations fall especially short. Relator never pleads that any Large Business Defendant directly made or used any material false record or statement or took any affirmative acts sufficient to cause Omega to make or use a false record or statement material to an obligation to pay or transmit money to the Government. *See generally* Compl. Relator has not plausibly, or with particularity, alleged a violation of 31

U.S.C. § 3729(a)(1)(G) under the Avoid or Decrease Theory or the False Record or Statement Theory he alleges. Count IV must be dismissed as to all Defendants.

**C. The Public Disclosure Bar Requires Dismissal of Relator's Claims.**

The FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4), independently requires dismissal of Relator's claims because he does not meet the threshold to qualify as a relator, pursue claims under the *qui tam* provisions of the FCA and demand a share of any recovery. Under the FCA's public disclosure bar, "[t]he court shall dismiss [a *qui tam*] action or claim . . . if substantially the same allegations or transactions . . . were publicly disclosed," unless the plaintiff was an "original source of the information." 31 U.S.C. § 3730(e)(4)(A). In considering whether the public disclosure bar applies, courts apply a two-part test. First, the court asks whether "substantially the same allegations or transactions" alleged in the complaint were publicly disclosed before the action was filed. *Id.* For purposes of this bar, public disclosures include disclosures in Federal reports, hearings, audits, or investigations. *Id.* Allegations are "substantially the same" when the public record has provided the government "enough information 'to investigate the case and to make a decision whether to prosecute' or where the information 'could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.'" *U.S. ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 472 (D.C. Cir. 2016) (quoting *U.S. ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012)); *U.S. ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 86 (D.C. Cir. 2014). Once the alleged fraud or the elements of the alleged fraud are publicly disclosed, "[m]erely providing 'more specific details' about what happened does not negate substantial similarity." *Oliver*, 826 F.3d at 472 (quoting *Davis*, 679 F.3d at 836).

Second, courts ask whether the relator is an "original source," defined as an individual who either (1) "prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or (2) "has

knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). A relator whose allegations are already publicly disclosed does not qualify as an "original source" by simply "contributing speculation, background information or collateral research to existing public information." *U.S. ex rel. Winnon v. Lozano*, 146 F.4th 1197, 1211 (D.C. Cir. 2025) (citation omitted).

As explained above, Relator has not alleged FCA liability plausibly or with particularity. But what he has done is attempt to recast public information as fraudulent. The minimal facts he sets forth in his Complaint were known to the Government from statutory "public disclosures" well before he filed, as is clear because those public disclosures are recited in his Complaint. And he is not an original source because his sparse and legally insufficient allegations fail to materially add to that information in the public domain.

Relator's allegations, such as they are, were publicly disclosed before he filed his Complaint, and his Complaint does not materially add to them. Years before Relator filed the Complaint, Omega's short- and long-form applications were filed in, and publicly posted as part of, the FCC's Auction 1002 licensing proceeding. The disclosures in that proceeding were "public disclosures" under the FCA, as the licensing proceeding constitutes an "other Federal . . . hearing" for purposes of the bar on a relator trying to get a bounty for bringing public claims. 31 U.S.C. § 3730(e)(4)(A); *see O'Connor*, 153 F.4th at 1276, 1278 (holding that FCC spectrum-licensing proceedings, in which an applicant filed its short-form, long-form, and annual eligibility reports, "qualify as an 'other Federal . . . hearing'" under 31 U.S.C. § 3730(e)(4)(A), because a "hearing" includes informal paper proceedings). Omega publicly filed its Short Form on February 10, 2016,

and later amended it on April 6 and July 20, more than five years before Relator filed suit.[20] The Short Form disclosed Omega's ownership structure, investor relationships, and DE eligibility representations, including the very representations Relator now attacks as false. *See, e.g.*, Short Form, Applicant Information; *id.*, Attachs., Description of Omega Wireless Bidding Schedule at 1 (governance structure); Second Amendment to Indirect Ownership and Affiliates at 1-5, 1 n.1; Compl. ¶¶ 10 (p. 3), 12 (p. 5), 16, 19, 23 n.1, 26, 125, 137, 139, 140-141, 152-155. Omega also disclosed in its Short Form that its Board "established a bidding committee," which had adopted "a schedule that sets forth the licenses Omega may bid on in the Auction and the maximum bids for each license," and that investors were making investment decisions based on these maximum bids (i.e., the schedule "has been shared with certain of the Applicant's disclosable interest holders to allow them to evaluate the Managers' business plan in determining the size of their investment"). Short Form, Attach., Description of Omega Wireless Bidding Schedule at 1.

Omega's publicly disclosed Long Form[21] certified Omega's DE eligibility and publicly summarized the governance terms now re-alleged and cast as suspect in Relator's Complaint. *See, e.g.*, Long Form (Amended June 14, 2018), Attachs., Small Business Bidding Credits at 1-3, 3 n.2,

---

[20] *See* Short Form, Attachs., Description of Omega Wireless Bidding Schedule; Indirect Ownership and Affiliates; Amended Indirect Ownership and Affiliates; Second Amendment to Indirect Ownership and Affiliates, https://aap.fcc.gov/search/results/a1fe683d-455c-4188-a731-4f2ec01c0595?tab=attachments.

[21] FCC, Universal Licensing System Application Details: Omega Wireless, LLC, https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=10958206 (hereinafter "Long Form"). Omega's Long Form and its three amendments may be searched for by File Number (0007754732) on the FCC Universal Licensing System website: https://wireless2.fcc.gov/UlsApp/ApplicationSearch/searchAppl.jsp. There are four separate entries, and for each entry, a "Reference Copy" may be downloaded to view the Certifications made. For simplicity, the Long Form citation above links to Omega's final June 14, 2018 amendment, which includes a list of all attachments. Omega also submitted a first and second amended A&R LLC Agreements; the citation in text is to the second amended Agreement, dated June 14, 2018.

Summary of Bidding Agreements, Redacted Second A&R LLC Agreement (June 14, 2018), at Recitals at 1, 29, 31, 36, 38, 42; Compl. ¶¶ 152-155; *compare* Long Form (Amended June 14, 2018), Attach. Redacted Second A&R LLC Agreement at 11, 26-27, https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAttachments.jsp?applID=10958206# (disclosing that the amended and restated LLC agreement required a cumulative 8% annual preferred return and Omega's Controlling Members, who hold Series B-1 and B-2, receive 17% of residual distributions (15% and 2%)), *with* Compl. ¶¶ 116 (alleging that Omega accepted unusually investor-favorable financing terms, including an 8.5% preferred return and a reduced 17% carry, to secure financing), 124 (same).

The Long Form record also recounts publicly the FCC's own scrutiny of certain governance terms: the Broadband Division's June 4, 2018, letter[22]—which Relator quotes at Compl. ¶¶ 142-144—and Omega's 2018 Second A&R LLC Agreement and redline, which deleted the budget, budget-deviation, and debt supermajority items and narrowed investor consent rights.[23] Well before Relator made his allegations about some supposedly nefarious change in investment strategy to give investors more influence on bidding, Compl. ¶¶ 115, 120, 123, these documents disclosed that Omega's bidding was governed by a pre-set schedule determining the licenses Omega could bid on and the maximum bids for each license that investors were relying on in determining the size of their investments.

---

[22] *See* Long Form (Amended June 14, 2018), Letter, BScinto Chief BD to TDavidson COL Omega Wireless, LLC, https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAttachments.jsp?applID=10958206#.

[23] *See* Long Form (Amended June 14, 2018), Attachs., Redacted Second A&R LLC Agreement, at 34-35, 56; Redacted Redline 2nd A&R v A&R LLC Agreement, at 34-36, 57 https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAttachments.jsp?applID=10958206#.

Well before Relator filed, it was also public that the FCC had asked questions about control of Omega in another statutory public disclosure, the U.S. House of Representatives Subcommittee hearing,[24] that Relator specifically references in his Complaint. Compl. ¶¶ 145-146. *See* 31 U.S.C. § 3730(e)(4)(A)(ii) (public disclosures include a "congressional . . . report, hearing, audit, or investigation"). On July 25, 2018, following Omega's submission to the FCC of its amended agreement, then-FCC Chairman Ajit Pai testified before the U.S. House of Representatives Subcommittee on Communications and Technology. After the hearing, Chairman Pai was asked, in a written question for the record, to identify DE bidders "afforded opportunities to cure *de facto* control issues." *See* Compl. ¶¶ 145-146. On August 31, 2018, Chairman Pai responded that the FCC "has identified two DE bidders raising control issues (although not necessarily issues of *de facto* control)—Bluewater Wireless II, L.P. and Omega Wireless, LLC—and asked each to provide written explanations as to how specific provisions in their agreements were consistent with their eligibility for a small business bidding credit. In response, both applicants chose to revise their agreements." *See id.* ¶ 146. Relator's only addition to this public material is his general and conclusory allegation that Omega failed to cure the deficiency in its revised agreement. Compl. ¶ 148.

Relator is not an "original source" under 31 U.S.C. § 3730(e)(4)(B) because he does not even purport to have disclosed his information prior to the public disclosures that he recounts had already occurred by the filing of his Complaint. *Cf.* Compl. ¶ 9 (p. 4) (alleging he provided his information to the Government before filing the Complaint, but not before the public disclosures). His vague and conclusory allegations do not materially add to the public disclosures, nor can they

[24] *Oversight of the FCC, Hearing Before the Subcomm. on Commcn's and Tech. of the H. Comm. on Energy and Commerce*, 115th Cong. (2018), https://www.govinfo.gov/content/pkg/CHRG-115hhrg35951/pdf/CHRG-115hhrg35951.pdf.

when they lack the particulars of any fraud scheme or any plausible allegation of an FCA violation. The FCA's public disclosure bar requires dismissal of Relator's claims.

**D. The John Doe Defendants Must Be Dismissed.**

By naming John Doe Defendants, Relator inherently fails to meet Rule 9(b)'s particularity requirement that he plead "the '*who*, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson*, 221 F.R.D. at 253 (emphasis supplied); *see Bender*, 686 F. Supp. 2d at 50; *PCA Integrity Assocs.*, 2020 WL 686009, at *23; *Conant*, 24 F. Supp. 3d at 15. Even if Rule 9(b) did not control, this is not a case in which the John Doe Defendants' conduct is known and only their names remain to be discovered. *Cf. Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985) (allowing John Doe defendant where complaint alleged specific acts of John Doe—defined misconduct of the specific John Doe police officer—and discovery was likely to uncover the name of the John Doe defendant). In fact, the opposite is true. Omega publicly disclosed the identity of every one of its investors.[25] Relator, therefore, already knows who the investors are; what he lacks is any factual basis to allege that any of those investors violated the FCA.

A relator cannot simply list John Doe Defendants and amend his Complaint to add new defendants to ten-year-old allegations at his convenience. The statute of limitations for new defendants has run, and it would be completely inconsistent with the FCA's *qui tam* provisions to let private relators who fail even to name a defendant for the Government to investigate, to add defendants at will after the Government's declination and litigate against them in the Government's name to try to exact, and claim a piece of, a government recovery.

---

[25] *See* Long Form (Amended June 14, 2018), Attach., Redacted Schedule A (current as of 09-01-17), https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAttachments.jsp?applID=10958206#.

### E. Neither Disgorgement Nor Injunctive Relief Is an Available Remedy for a Relator Under the FCA.

Relator seeks improper relief under the *qui tam* provisions of the FCA, in particular that "Defendants be ordered to cease and desist from submitting any more false claims"; that "Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct"; and that "the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein." Compl. at Prayer for Relief ¶¶ A, C, E. The FCA's *qui tam* provisions do not grant a relator free rein to assert any and all claims and seek any and all relief on behalf of the Government; the *qui tam* provisions serve as a limited assignment of FCA claims to the relator. *See Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000) ("The FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim.").

Because a relator's standing derives entirely from the statute, a relator may assert only those claims and seek only those forms of relief—treble damages, civil penalties, and payment of the relator's reasonable expenses, fees, and costs—that the statute authorizes. *See* 31 U.S.C. §§ 3729-3733. Relator's demand for relief beyond that explicitly provided for in the statute is improper. *See U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 923 (4th Cir. 2003) (disgorgement of all government payments on a fraudulently obtained contract was an inappropriate remedy under the FCA); *see also Kenley Emergency Med. v. Schumacher Grp. of La. Inc.*, No. 20-cv-03274-SI, 2025 WL 1359065, at *15 (N.D. Cal. May 9, 2025) ("[I]njunctive relief is not the proper remedy under the False Claims Act."); *United States v. Sriram*, 147 F. Supp. 2d 914, 946 n.21 (N.D. Ill. 2001) (noting an FCA amendment to provide injunctive relief was considered but rejected). The Court should dismiss his claims for disgorgement and injunctive relief.

### F. Relator's Prosecution of These Claims Is Unconstitutional.

Finally, this case should be dismissed because the *qui tam* provisions of the FCA are unconstitutional under the Constitution's Vesting, Take Care, and Appointments Clauses to the extent they permit relators to proceed after the Government has declined to intervene, and all the more so when a relator offers only an improperly pled *qui tam* complaint like this one. Article II of the U.S. Constitution vests the Executive Power exclusively in the President and requires that the President "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; art. II, § 3. The FCA's *qui tam* provisions, however, permit a private relator to initiate a Government investigation, prosecute fraud claims on behalf of the United States, make fundamental enforcement decisions, and seek recovery for injuries suffered by the Government, while remaining outside the Executive Branch and beyond the President's direct supervision or removal authority. As a result, the FCA transfers core executive enforcement power to private individuals in a manner that is irreconcilable with the Vesting and Take Care Clauses. The constitutional problem is compounded by the Appointments Clause, because relators exercise significant governmental power on behalf of the United States without having been appointed as Officers of the United States in the manner Article II requires.

#### 1. Allowing a Self-Interested Private Party to Initiate a Government Investigation and Prosecute Claims on Behalf of the United States Violates the Vesting and Take Care Clauses.

This case violates Article II's Vesting and Take Care Clauses, which require that executive power remain subject to Presidential supervision and removal. Without such oversight, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 514 (2010). Article II therefore forbids arrangements that "concentrat[e] [executive] power in a

unilateral actor insulated from Presidential control." *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020).

But that is exactly what has occurred here, in spades, because the Complaint is inadequately pled. In seeking "daunting monetary penalties against private parties on behalf of the United States," Relator exercises "quintessentially executive power" while remaining "accountable to no one." *Seila Law*, 591 U.S. at 219, 224. He is "neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is." *Id.* at 224-25. Yet he was able to "*unilaterally*, without meaningful supervision," decide whether to bring suit on behalf of the United States, where to bring that suit, and what claims to bring. *See id.* at 225. And without intervening, the Government has no control over how Relator litigates this case. It cannot limit the arguments made or discovery sought. The Government is permitted only to receive copies of pleadings and deposition transcripts at its own expense, seek a temporary stay of discovery, and object to dismissal. 31 U.S.C. § 3730(b)(1), (c)(3)-(4). Even if the Government later sought to enter the case and gather the measure of control that doing so would provide, it could do so only upon a showing of "good cause." *Id.* § 3730(c)(3). That wholesale displacement of Presidential authority is inconsistent with Article II.

This level of "supervision" falls far short of the "constitutional[ly] . . . permissible" minimum outlined in *Morrison v. Olson*, 487 U.S. 654 (1988). *Seila Law*, 591 U.S. at 218. In *Morrison*, although Congress had authorized an "independent counsel" to perform "law enforcement functions" with limited oversight by the Attorney General (and thus the President), the independent counsel was still appointed only at the Attorney General's request, removable for "good cause," and subject to Department of Justice policy. 487 U.S. at 691, 696. The Attorney General could also define the independent counsel's jurisdiction. *Id.* at 696. "[T]hese features . . .

give the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id.*

No comparable control exists here—which is particularly concerning given that Relator's power is not "trained inward to high-ranking Governmental actors identified by others," but instead wielded against "private parties," through the pursuit of civil actions in the name of the United States. *Seila Law*, 591 U.S. at 219-20; *see also Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 211 (1989) ("The rationale for the special prosecutor statute at least can be restricted to narrow circumstances. *Qui tam* is far more dangerous: there is simply no way to cage this beast.").

At bottom, "[a] basic step in organizing a civilized society is to take the sword [of law enforcement] out of private hands and turn it over to an organized government, acting on behalf of all the people." *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 282-83 (2010) (Roberts, C.J., dissenting from dismissal of certiorari as improvidently granted). Our Constitution gives that sword to the President, who can "rely on subordinate officers for assistance," *Seila Law*, 591 U.S. at 203-04, but has the ultimate "responsibility to take care that the laws be faithfully executed." *Free Enter. Fund*, 561 U.S. at 493. By "[v]esting significant governmental power in the hands of" Relator, the FCA undermines that carefully calibrated design. *Seila Law*, 591 U.S. at 224.

#### 2. Allowing a Self-Interested Private Party to Prosecute Claims on Behalf of the United States Violates the Appointments Clause.

Article II provides that "'the executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203–04. Anyone who (1) exercises significant executive authority pursuant to the laws of the

United States and (2) occupies a "continuing position established by law" qualifies as such an officer, and so must be appointed consistent with the Appointments Clause. *Lucia v. SEC*, 585 U.S. 237, 245 (2018); U.S. Const. art. II, § 2, cl. 2. As a *qui tam* relator, Wolf satisfies both conditions yet lacks proper appointment—and for that reason as well, his prosecution of this case is unconstitutional.

Relator, if allowed to proceed, will be exercising significant executive authority. He is litigating this case in the name of the United States. *U.S. ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 93 (2d Cir. 2008). The power to "vindicat[e] public rights" of the United States by bringing litigation for and on its behalf is one of the most significant executive duties. *Buckley v. Valeo*, 424 U.S. 1, 138–40 (1976); *U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting). Indeed, the prosecutorial decisionmaking duty lies at the core of the Executive's responsibilities, which is why the Supreme Court has long held that "courts will not recognize any suit, civil or criminal, . . . if prosecuted in the name and for the benefit of the United States," unless the United States is represented by the Executive Branch, *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1868); *see Buckley*, 424 U.S. at 140 (members of the Federal Election Commission were officers because they had the authority to "conduct[] civil litigation in the courts of the United States for vindicating public rights"); *Morrison*, 487 U.S. at 671 & n.12 (citing *Buckley*, 424 U.S. at 126 & n.162) (independent counsel was an "officer" because, under *Buckley*, she exercised substantial prosecutorial discretion pursuant to federal law).

Relator also holds a "continuing position established by law." *Lucia*, 585 U.S. at 245. A position is "continuing" if (1) it is "not transient or fleeting"; (2) it is "not personal to a particular individual"; and (3) the relevant duties are "more than incidental." *New Mexico v. Musk*, 824 F. Supp. 3d 80, 101 (D.D.C. 2026) (quoting *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir.

2022)). A relator's position "checks all three boxes." *U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 411 (5th Cir. 2025) (Duncan, J., concurring). "Anyone can sue under the FCA, so the position is not personal to a particular individual. The position is not transient because [as here] it can last years. [Relator], after all, sued over [five] years ago. Lastly, [he is] conduct[ing] litigation on behalf of the United States, so [his] duties are not 'incidental.'" *Id.* (citation modified); *see also Donziger*, 38 F.4th at 297–98 (special prosecutor position "is analogous to the independent counsel position in *Morrison*").

In short, as an FCA relator, Relator is exercising quintessential executive power from a statutorily established, continuing position. Relator's prosecution of this case through self-appointment rather than constitutional appointment violates the Appointments Clause.

Under the Take Care, Vesting, and Appointments Clauses, private *qui tam* plaintiffs wield unconstitutional authority. Here, where Relator has failed to set forth an actual violation of law, much less the particulars of that violation by each of the named Defendants, the Court should not allow this case to proceed because it unconstitutionally appropriates executive power and because it violates Rules 12 and 9(b).

## IV. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss the Complaint with prejudice.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Sara McLean*
Anthony Pierce
D.C. Bar No. 415263
Sara McLean
D.C. Bar No. 90033827
Laura Hill (*admission pending*)

D.C. Bar No. 90041083
Allison T. Coffin
D.C. Bar No. 1600869
AKIN GUMP STRAUSS HAUER & FELD, LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 887-4069
Email: apierce@akingump.com
smclean@akingump.com
lhill@akingump.com
acoffin@akingump.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies a true and accurate copy of the foregoing was served this 30th day of October 2026, by electronically filing the same with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

*/s/ Sara McLean*
Sara McLean
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4069
smclean@akingump.com

*Counsel for Omega Wireless, LLC, M/C Partners, and Shamrock Capital Advisors, LLC, and non-defendant Peppertree Capital Fund VI QP, LP*