# EXHIBIT A

# OMEGA WIRELESS, LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

April 6, 2016

REDACTED FOR PUBLIC INSPECTION

## TABLE OF CONTENTS

[TO BE UPDATED]

**Page**

ARTICLE I DEFINED TERMS .... 1
Section 1.1. Definitions .... 1
Section 1.2. Headings .... 13
ARTICLE II FORMATION AND ORGANIZATION .... 14
Section 2.1. Name and Formation .... 14
Section 2.2. Registered Office and Registered Agent .... 14
Section 2.3. Term .... 14
Section 2.4. No State Law Partnership .... 14
ARTICLE III PURPOSE AND POWERS OF THE COMPANY .... 14
Section 3.1. Purpose .... 14
Section 3.2. Powers of the Company .... 15
ARTICLE IV UNITS, CONTRIBUTIONS, NATURE OF INTERESTS AND ESTABLISHMENT OF CAPITAL ACCOUNTS .... 16
Section 4.1. Units .... 16
Section 4.2. Members' Contributions .... 16
Section 4.3. Nature Of Interests .... 19
Section 4.4. Capital Accounts .... 19
Section 4.5. Negative Capital Accounts .... 20
Section 4.6. Refund .... 20
Section 4.7. Loans From Members .... 22
ARTICLE V ALLOCATIONS AND DISTRIBUTIONS .... 22
Section 5.1. Allocations of Net Incomes and Net Losses .... 22
Section 5.2. Tax Allocations .... 25
Section 5.3. Distributions .... 26
ARTICLE VI MANAGEMENT OF COMPANY .... 29
Section 6.1. Management by Board of Managers .... 29
Section 6.2. Compensation of Managers; Auction Contributions; Success Contribution .... 31
Section 6.3. Restrictions on Non-Controlling Members .... 32
Section 6.4. Member Approval Required; Supermajority Vote Required .... 34

**TABLE OF CONTENTS**
(continued)

**Page**


Section 6.5. Manager's Duties ... 36
Section 6.6. Meetings of Board of Managers; Consent of Members ... 36
Section 6.7. Officers ... 37
Section 6.8. FCC Rules ... 37
Section 6.9. Institutional Member Rights ... 38
ARTICLE VII MEMBER RIGHTS ... 38
Section 7.1. Limited Liability ... 39
Section 7.2. No Agency or Authority ... 39
Section 7.3. Power of Attorney ... 39
Section 7.4. Transfers of Units ... 39
Section 7.5. Designated Entity ... 41
Section 7.6. Control by Eligibles ... 42
Section 7.7. Preemptive Rights ... 42
Section 7.8. Sale of the Company; Drag-Along Rights ... 44
ARTICLE VIII CONVERSION TO CORPORATE SOLUTION ... 46
Section 8.1. Conversion to Corporation ... 46
ARTICLE IX BOOKS AND RECORDS; CONFIDENTIALITY ... 47
Section 9.1. Books, Records and Financial Statements ... 47
Section 9.2. Accounting System ... 47
Section 9.3. Tax Matters Partners ... 47
Section 9.4. Information Rights ... 49
Section 9.5. Confidentiality ... 49
ARTICLE X LIABILITY, EXCULPATION AND INDEMNIFICATION ... 50
Section 10.1. Liability ... 50
Section 10.2. Exculpation ... 50
Section 10.3. Indemnification ... 51
Section 10.4. Fiduciary Duties ... 52
Section 10.5. Expenses ... 52
ARTICLE XI DISSOLUTION, LIQUIDATION AND TERMINATION ... 53
Section 11.1. No Dissolution ... 53

**TABLE OF CONTENTS**
(continued)

**Page**

Section 11.2. Events Causing Dissolution .... 53
Section 11.3. Liquidation .... 53
Section 11.4. Termination .... 53
Section 11.5. Claims of the Members .... 53
ARTICLE XII CHOICE OF LAW; SUBMISSION TO JURISDICTION; AND WAIVER OF JURY TRIAL .... 53
Section 12.1. Law .... 53
Section 12.2. Waiver Of Jury Trial .... 54
Section 12.3. Consent To The Exclusive Jurisdiction Of The Courts Of Delaware .... 54
ARTICLE XIII NO EXPANSION OF DUTIES; INVESTMENT OPPORTUNITIES; AGREEMENT NOT TO COMPETE .... 54
Section 13.1. Future Opportunities .... 54
ARTICLE XIV MISCELLANEOUS; INVESTOR REPRESENTATIONS .... 55
Section 14.1. Equitable Remedies; Failure to Pursue Remedies; Time of Essence .... 55
Section 14.2. Cumulative Remedies .... 56
Section 14.3. Amendments .... 56
Section 14.4. Binding Effect .... 57
Section 14.5. Notices .... 57
Section 14.6. Interpretation .... 58
Section 14.7. No Strict Construction .... 58
Section 14.8. Severability .... 58
Section 14.9. Counterparts .... 58
Section 14.10. Integration .... 58
Section 14.11. Representations by New Members .... 58

**Schedules**

Schedule A - List of Members

**Exhibits**

Exhibit A - Form of Subscription Agreement

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF OMEGA WIRELESS, LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of OMEGA WIRELESS, LLC, a Delaware limited liability company (the "Company"), made as of April 6, 2016, by and among the Company and the Persons named on the signature pages hereto.

## RECITALS

The Company was organized in accordance with the Delaware Limited Liability Company Act upon the filing of a certificate of formation therefor with the Secretary of State of the State of Delaware on April 17, 2015, and the initial Limited Liability Company Agreement of the Company was executed on February 10, 2016 (the "Original Agreement").

The Federal Communications Commission ("FCC") has adopted rules and procedures in GN Docket NO. 12-168 for the licensing of broadband wireless licenses in the 470 to 698 MHz band (each such authorization, individually, an "Authorization").

The FCC has issued a Public Notice, DA 15-1183, released October 15, 2015 establishing the procedures and deadlines for conducting an incentive auction (Auction 1002) scheduled to commence on March 29, 2016 (the "Auction") for issuance of the Authorizations.

Each of the Members is eligible to hold an Authorization in its own name, and the Members have formed the Company for the purpose of bidding in the Auction.

The Company intends to participate in the FCC's forward portion of the Auction to bid on the Authorizations.

The Persons named on **Schedule A** hereto are entering into this Agreement to provide for their making capital contributions to the Company, to set forth their respective rights and obligations as members of the Company and provide for the management of the Company and its affairs and the conduct of its business, all in accordance with the rules and regulations of the FCC.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINED TERMS

**Section 1.1. Definitions.**

Unless the context otherwise requires, the terms defined in this Section 1.1 shall, for the purposes of this Agreement, have the meanings hereinafter specified.

"**18th Street Group**" means collectively, 18th Street Group, LLC and its Permitted Transferees.

"**Act**" means the Delaware Limited Liability Company Act, as amended.

"**Adjusted Capital Account Deficit**" means, with respect to the Capital Account of any Member as of the end of any Fiscal Year, the amount by which the balance in such Capital Account is less than $0.00, after giving effect to the following adjustments:

(a) Each Member's Capital Account shall be increased by the amount, if any, such Member is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i); and

(b) Each Member's Capital Account shall be decreased by the amount of any of the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"**Affiliate**" means with respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person and, (i) if such Person is an individual, any Family Member of such individual and any trust whose principal beneficiary is such individual or one or more Family Members of such individual and any Person who is controlled by any such member or trust and (ii) if such Person is a trust, any beneficiary of such trust and any Family Member of any beneficiary of such trust. As used in this definition, "control," including, its correlative meanings, "controlled by" and "under common control with," shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise). The parties acknowledge that the term "Affiliate" is a defined term by the FCC with reference to a Designated Entity and that any report to the FCC regarding the Affiliates of the Company or its Controlling Interest Holders (as defined by the FCC) shall be based upon the FCC definition and not the definition of this Agreement.

"**Aggregate Capital Refund Amount**" has the meaning specified in Section 4.6(c).

"**Agreed Tax Rate**" means the highest applicable federal and state marginal tax rate pertaining to the type of income being taxed (such rate to be subject to one or more equitable adjustments by the Board in the event of any changes in the federal capital gains or dividend tax rates) applicable to individuals, with the state rate determined by the highest rate applicable to any individual Member holding a Common Unit (the same rate shall be applied to each Member).

"**Agreement**" means this Limited Liability Company Agreement, as amended, modified, supplemented or restated from time to time in accordance with the terms hereof.

"**Alien**" means (A) a citizen of a country other than the United States (a "Foreign Citizen"), (B) an entity organized under laws of a jurisdiction other than those of the United States or any state, territory or possession of the United States (a "Foreign Entity"), (C) a government other than the government of the United States or of any state, territory or possession of the United States (a "Foreign Government"), (D) a corporation of which, in the aggregate, more than one-fourth of the capital stock is owned of record, owned beneficially or voted by Foreign Citizens, Foreign Entities or Foreign Corporations (as defined herein) or Foreign Partnerships (as defined herein) (a "Foreign Corporation"), (E) a general or limited partnership of which any general partner is a Foreign Citizen, Foreign Entity, Foreign Government, Foreign Corporation or Foreign Partnership (as defined herein) or of which more than one-fourth of the limited partnership equity interests, in the aggregate, are owned by Foreign Citizens, Foreign Entities, Foreign Governments, Foreign Corporations or Foreign Partnerships (as defined herein) (a "Foreign Partnership") or (F) a representative of, or entity controlled by, any of the foregoing.

"**Anti-Collusion Rule**" means the FCC Rule adopted at 47 C.F.R. § 1.2205, as amended, the Guidance Regarding the Prohibition of Certain Communications During the Incentive Auction, DA 15-1129, released October 6, 2015, and any other FCC orders or public notices regarding restrictions under the anti-trust laws or FCC Rules regarding communications and bids, bidding strategies and other possible anti-competitive activities for the Auction.

"**Applicable Refund Amount**" has the meaning specified in Section 4.6(d).

"**Auction**" has the meaning specified in the Recitals.

"**Auction Contributions**" has the meaning specified in Section 6.2(b)(ii)(B).

"**Authorization**" has the meaning specified in the Recitals.

"**Board**" has the meaning specified in Section 6.1(a).

"**Book Gain**" or "**Book Loss**" means the gain or loss recognized by the Company for book purposes in any Fiscal Year or other relevant period by reason of any sale or disposition with respect to any of the assets of the Company. Such Book Gain or Book Loss shall be computed by reference to the Gross Asset Value of such property or assets as of the date of such sale or disposition, rather than by reference to the tax basis of such property or assets as of such date, and each and every reference herein to "gain" or "loss" shall be deemed to refer to Book Gain or Book Loss, rather than to tax gain or tax loss, unless the context manifestly otherwise requires.

"**Business Day**" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in New York City are closed.

"**Call Notice**" has the meaning specified in Section 4.2(c).

"**Capital Account**" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 4.4.

"**Capital Call Contribution**" has the meaning specified in Section 6.2(b)(ii)(A).

"**Capital Securities**" means as to any Person that is a corporation, the authorized shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, and, as to any Person that is not a corporation or an individual, the ownership or membership interests in such Person, including the right to share in Net Incomes and Net Losses, the right to receive distributions of cash and property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise control over such Person.

"**Certificate of Formation**" means the Certificate of Formation of the Company as originally filed with the Secretary of State of the State of Delaware on April 17, 2015, and as amended from time to time as determined by the Board.

"**C**[redacted]" means [redacted] and its Permitted Transferees.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"**Commitment**" has the meaning specified in Section 4.2(a).

"**Common Units**" means, collectively, Series B-1 Common Units, Series B-2 Common Units, Series B-3 Common Units, Series B-4 Common Units and Series B-5 Common Units.

"**Communications Act**" means the Communications Act of 1934, as amended, and any successor to such statute, and the rules, regulations and written policies of the FCC thereunder, and court decisions in respect thereof, all as the same shall be in effect from time to time

"**Company**" means Omega Wireless, LLC, the Delaware limited liability company that is the subject of this Agreement.

"**Company Call Notice**" has the meaning specified in Section 4.2(d).

"**Competing Business**" has the meaning set forth in Section 13.1.

"**Confidential Information**" has the meaning set forth in Section 9.5(a).

"**Contribution**" means, with respect to any Member, the aggregate amount of cash and the initial Gross Asset Value of any property (other than cash) contributed to the Company pursuant to Section 4.2, net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code.

"**Contribution Account**" means an account maintained with respect to each Series A Preferred Unit that as of any date shall equal the difference between (i) $1.00 less (ii) the cumulative distributions theretofore made in respect of such Series A Preferred Unit pursuant to Section 5.3(a)(i).

"**Contribution Notice**" has the meaning specified in Section 4.2(a).

"**Controlling Managers**" has the meaning specified in Section 6.1(g).

"**Controlling Members**" means collectively, Edward Moise, W. Scott Soden, Kenneth D. Anderson and Christopher J. Jensen.

"**Conversion**" has the meaning specified in Section 8.1(a).

"**Covered Person**" means (i) each Member (including without limitation Controlling Members), and each officer, director, stockholder, member, partner, representative or agent of each Member, (ii) each Manager, (iii) the Tax Matters Partner and (iv) any employee or agent of the Company or any of the Subsidiaries designated as such by the Board.

"**Default Notice**" has the meaning specified in Section 4.2(c).

"**Defaulted Contribution**" has the meaning specified in Section 4.2(c).

"**Defaulting Investor Member**" has the meaning specified in Section 4.2(c).

"**Deployed Capital**" means the total actual cash costs of Authorizations acquired by the Company in the Auction, the Auction Contributions and the Success Contribution (if applicable).

"**Depreciation**" means, for each Fiscal Year or other relevant period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other relevant period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year or other relevant period, Depreciation shall, except as otherwise required by Treasury Regulation Section 1.704-3(d), be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other relevant period bears to such beginning adjusted tax basis; and provided further, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year or other relevant period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"**Designated Entity**" means a company that qualifies for a bidding discount or other licensing preference as a Designated Entity in the Auction in accordance with the FCC Rules.

"**Disproportionately Treated Member**" has the meaning specified in Section 14.3.

"**Electing Investor Members**" has the meaning specified in Section 4.2(c).

"**Excluded Securities**" means (i) Common Units hereafter issued to employees of, or service providers to, the Company or its Subsidiaries as approved by the Board, (ii) Capital Securities offered in a Public Offering, (iii) Units issued upon any Unit split, dividend, combination or other similar event with respect to Units, (iv) Capital Securities issued to sellers in consideration of the acquisition of another Person or business by the Company or any

Subsidiary, however such acquisition may be effected, (v) Units issued upon the conversion, exercise or exchange of Units, options, warrants or other rights that have been issued in compliance with, or an issuance exempt from, the provisions of Section 7.7 and (vi) Series A Preferred Units issued pursuant to Section 4.2(a) of this Agreement.

"**Expense Account**" has the meaning specified in Section 6.2(b)(i).

"**Expense Contribution**" means with respect to:

(i) each of M/C, Peppertree, Shamrock and the Triad Members, an amount equal to the sum of (a) the pro rata portion (as among M/C, Peppertree, Shamrock and the Triad Members) of the Signing Contribution, plus (b) the pro rata portion (as among M/C, Peppertree, Shamrock and the Triad Members) of the Capital Call Contribution and plus (c) the pro rata portion (as between M/C, Peppertree, Shamrock and the Triad Members) of the Success Contribution (if any); and

(ii) each Investor Member (other than M/C, Peppertree, Shamrock and the Triad Members), such Investor Member's pro rata portion (as among such Investor Member and all other Investor Members, other than M/C, Peppertree, Shamrock and the Triad Members) of the General Investor Contribution.

"**Family Member**" means as to any individual, such individual's descendants (whether natural or adopted), such individual's spouse, such individual's spouse's descendants (whether natural or adopted), or any trust, limited partnership, limited liability company or other entity established for the primary benefit of any of the foregoing persons (whether natural or adopted) solely for estate planning purposes.

"**FCC**" has the meaning specified in the Recitals.

"**FCC Rules**" means the rules and regulations of the FCC set forth in Title 47 of the Code of Federal regulations, as the same may be amended from time to time.

"**Final Payment Date**" means the date on which winning bidders at the Auction are required to tender to the FCC their payments for the Authorizations.

"**Fiscal Year**" means the fiscal year of the Company, which shall be the calendar year unless another period is required by the Code or selected by the Board, or if this Agreement so requires, any portion thereof.

"**GAAP**" means generally accepted accounting principles, applied on a consistent basis, (a) as set forth in opinions of the accounting principles board of the American Institute of Certified Public Accountants ("AICPA") and in the Financial Accounting Standards Board statements that are applicable in the circumstances as of the date in question, and (b) where not inconsistent with such opinions and statements, as set forth in other AICPA publications and guidelines or which otherwise arise by custom for the particular industry; and the requirement that such principles be applied on a consistent basis means that the accounting principles in a current period are comparable in all material respects to those applied in the immediately preceding period.

"**General Investor Contribution**" has the meaning specified in Section 6.2(b)(ii)(B).

"**G**[redacted]" means collectively, [redacted] and their Permitted Transferees.

"**Gross Asset Value**" of an asset means, as of any particular date, the value at which the asset is properly reflected on the books and records of the Company as of such date. The initial Gross Asset Value of each asset shall be its cost, unless such asset was contributed to the Company by a Member, in which case the initial Gross Asset Value shall be its fair market value on the date of contribution, as agreed to by the contributing Member and the Board. Such Gross Asset Value shall thereafter be adjusted for Depreciation with respect to such asset, rather than for the cost recovery deductions to which the Company is entitled for federal income tax purposes with respect thereto. The Gross Asset Values of all Company assets shall be adjusted to equal their respective fair market values, as determined by the Board, immediately prior to the following times: (i) the contribution to the Company by a new or existing Member of more than a de minimis Capital Contribution if, as a result of such Capital Contribution, such Member's interest in the Company is increased; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company assets, including money, if, as a result of such distribution, such Member's interest in the Company is reduced; (iii) the grant of more than a de minimis interest in the Company as consideration for the provision of services to, or for the benefit of, the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member; and (iv) except as provided in Section 1.704-1(b)(2)(iv)(1) of the Treasury Regulations, the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations; provided, however, that the events described in clauses (i) and (ii) above shall result in an adjustment to the Gross Asset Value of the Company's assets only if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members.

"**Indemnified Costs**" has the meaning specified in Section 10.3(a).

**"Initial Public Offering"** has the meaning specified in Section 8.1(b).

"**Institutional Investors**" means M/C, Peppertree and Shamrock.

"**Investor Members**" means, collectively, the persons holding Series A Preferred Units (and in the case of Members that hold Series A Preferred Units and Common Units, solely in their capacity as holders of Series A Preferred Units, and not in their capacity as the holder of Common Units) as set forth on Schedule A, as amended from time to time in accordance with this Agreement.

"**K**[redacted] **Manager**" means [redacted]

"**K**[redacted] **Member**" means [redacted], a Delaware limited liability company, and its Permitted Transferees.

"**K**[redacted] **Agreement**" means the Limited Liability Company Agreement of [redacted]

"**Legal Remedies**" has the meaning specified in Section 4.2(d).

"**Lien**" means all security interests, title defects or objections, mortgages, liens, claims, charges, rights of others, pledges or other encumbrances of any nature whatsoever, including licenses, leases, chattel or other mortgages, collateral security arrangements, pledges, title imperfections, defect or objection liens, security interests, conditional and installment sales agreements, easements, infringements, encroachments or restrictions, of any kind and other title or interest retention arrangements, reservations or limitations of any nature.

"**Liquidating Trustee(s)**" has the meaning specified in Section 11.3.

"**M/C**" means collectively, M/C Partners VII, L.P., M/C Investors 2014, LLC, and G[redacted] and their Permitted Transferees.

"**Majority Institutional Investors**" means the Institutional Investors whose Commitments as of the date of this Agreement amount to a majority of the Commitments made by all of the Institutional Investors as of the date of this Agreement; provided, however, that if any of the Institutional Investors is a Defaulting Investor Member or withdraws as a Member of the Company pursuant to the terms of this Agreement and other Institutional Investors remain as Members of the Company, "Majority Institutional Investors" shall mean the Institutional Investors holding a majority of the Series A Preferred Units held by the remaining Institutional Investors.

"**Manager**" has the meaning specified in Section 6.1(a).

"**Marin**" means collectively, Marin Capital Ltd., Schoepflin Investment Company and their Permitted Transferees.

"**Member**" means the persons listed on **Schedule A** hereto (as the same may hereafter be amended or supplemented from time to time by the Managers to reflect the admission of new Members and the redemption of Units in accordance herewith), and includes any Person admitted as an additional Member or a substitute Member pursuant to the provisions of this Agreement, in such Person's capacity as a member of the Company, and "Members" means two (2) or more of such Persons when acting in their capacities as members of the Company.

"**Membership Rights**" means all legal and beneficial ownership interests in, and rights and duties as a Member of, the Company, including, without limitation, the right to share in Net Incomes and Net Losses, the right to receive distributions of cash and other property from the Company, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from the Company.

"**Net Capital Refund Amount**" has the meaning specified in Section 4.6(c).

"**Net Income**" and "**Net Loss**" for each Fiscal Year or part thereof means the income or loss of the Company for that period, as determined for federal income tax purposes in accordance with Section 703(a) of the Code (provided that for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted to take into account any tax-exempt income of the Company and any expenses of the Company that are described in Section 705 or 709 of the Code as not deductible or amortizable for federal income tax purposes, and further adjusted as follows:

(a) upon adjustment of the book value of Company property pursuant to clause (ii) in the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property;

(b) in lieu of the depreciation, amortization and other cost recovery with respect to Company property taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such period, computed as provided in this Agreement;

(c) Book Gain or Book Loss shall be taken into account in lieu of any tax gain or tax loss recognized by the Company by reason of any sale or disposition of an asset of the Company; and

(d) Any items that are specially allocated pursuant to the provisions of Section 5.1(c) shall not be taken into account in computing Net Income or Net Loss.

If the Company's taxable income or loss for such period, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Net Income for such period; and if a negative amount, such amount shall be the Company's Net Loss for such period.

If any Company asset is distributed in kind (whether in connection with the liquidation of the Company or otherwise), the Company shall be deemed to have realized Net Income or Net Loss thereon in the same manner as if the Company had sold such asset for an amount equal to its fair market value on the date of distribution.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 5.1(c) hereof shall be determined by applying rules analogous to those set forth above.

"**Newco**" has the meaning specified in Section 8.1(a).

"**New Units**" means any Units or Membership Rights other than Excluded Securities.

"**Non-Controlling Manager**" has the meaning specified in Section 6.1(g).

"**Non-Controlling Member**" means each of the Members that is not a Controlling Member.

"**Notice of Proposed Issuance**" has the meaning specified in Section 7.7(a).

**"Notices"** has the meaning specified in Section 14.5.

"**Offered New Units**" has the meaning specified in Section 7.7(a).

"**Offer Period**" has the meaning specified in Section 7.7(b).

"**Original Agreement**" has the meaning specified in the Recitals.

"**Partial Waiver**" has the meaning specified in Section 7.7(i).

"**Peppertree**" means collectively, Peppertree Capital Fund IV, LP, Peppertree Capital Fund IV QP, LP, Peppertree Capital FIV Co-Investors, LLC and their Permitted Transferees.

"**Peppertree Affiliate**" has the meaning specified in Section 4.2(g).

"**Permitted Transfer**" means the following (to the extent permitted by the rules and regulations of the FCC):

(a) in the case of an Investor Member that is not an individual, (i) any Transfer of Units by such Investor Member to any Affiliate of such Investor Member, (ii) any Transfer of Units to a successor corporation or other successor entity as a result of a merger or consolidation, or a sale of all or substantially all of the assets of, such Investor Member or a Transfer to one or more of its equity holders, or a distribution to such equity holders, (iii) any Transfer of Units to the extent required by governmental rule, law or regulation, or any directive or order of any governmental authority, or (iv) any Transfer of Units pursuant to a Public Offering;

(b) in the case of any other Member (i) any Transfer of Units to a Family Member of such Member solely for estate planning purposes so long as the Transferor retains sole and exclusive voting power over all of the Transferred Units, or (ii) a Transfer of Units pursuant to a Public Offering; and

(c) in the case of Shamrock, at any time prior to the date that is ninety (90) days following the date that the highest bidder for each of the Authorizations has been announced, any Transfer of Units by Shamrock to M/C or Peppertree in consideration for a payment equal to the aggregate Contribution Amount for such Transferred Units; provided, however, unless otherwise approved by a Supermajority Vote, no such Transfer shall be deemed permitted hereunder if, as a result of such Transfer, the new holder of the Transferred Units would hold fifty percent (50%) of more of the issued and outstanding Series A Preferred Units.

Notwithstanding anything in the preceding clause that might be construed to the contrary, unless otherwise approved by a Supermajority Vote, no Transfer (whether direct or indirect) or Transferee that requires prior FCC approval, that causes the Company to undergo a major ownership change (as defined by the FCC) while its application in the Auction is pending, or that causes the Company to lose its status as a Designated Entity prior to the fifth anniversary of any grant of an Authorization acquired through the Auction, shall be deemed permitted hereunder.

"**Permitted Transferee**" means a Person to whom a Permitted Transfer of Units is made; provided, however, that no Person that receives less than all of the Units held by a Member in a Permitted Transfer may thereafter Transfer such Units, including without limitation, Transfers of the type that would otherwise constitute Permitted Transfers. For the avoidance of doubt, unless

otherwise approved by Supermajority Vote, no Transfer or Transferee that requires prior FCC approval, that causes the Company to undergo a major ownership change (as defined by the FCC) while its application in the Auction is pending, or that causes the Company to lose its status as a Designated Entity prior to the fifth anniversary of any grant of an Authorization acquired through the Auction, shall be deemed permitted hereunder.

"**Person**" includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"**Preemptive Rights Holder(s)**" has the meaning specified in Section 7.7(a).

"**Preferred Return**" means an amount accruing on the amount of the Contribution Account of each Series A Preferred Unit and Unpaid Preferred Return (to the extent it has compounded pursuant to the following sentence) from and after the date of issuance thereof in accordance with this Agreement at the rate of 8% per annum, cumulative and compounded annually in arrears, accruing daily and calculated on the basis of the actual number of days elapsed over a 360 day year (prorated on a daily basis for partial periods).

"**Proportionate Share**" has the meaning specified in Section 7.7(c).

"**Proposed Buyer**" has the meaning specified in Section 7.7(a).

"**Pro Rata Fraction**" has the meaning specified in Section 4.2(c).

"**Pro Rata Share**" means with respect to each Investor Member, a fraction the numerator of which shall be the Commitment amount of such Investor Member and the denominator of which shall be the aggregate Commitment amount of all Investor Members as a group.

"**Public Offering**" means the sale or distribution of the common stock of Newco or any of its Subsidiaries pursuant to an underwritten public offering registered under the Securities Act of 1933, as amended, following a Conversion of the Company.

"**Reference Date**" has the meaning specified in Section 10.2(a).

"**Regulated Company**" means any Subsidiary or Affiliate controlled by or under common control with the Company which is, or which directly or indirectly through one or more Subsidiaries controls, the holder of an Authorization. As used in this definition, "controlled by" and "under common control with," means the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of Capital Securities by contract or otherwise).

"**Regulatory Allocations**" has the meaning specified in Section 5.1(c)(vii).

"**Related Agreements**" means, collectively this Agreement and the Subscription Agreements between the Company and each of the Investor Members.

"**Removal For Cause**" means termination of a Person's status as a Manager of the Company for an act that constitutes fraud, a felony, gross negligence in the management of the Company, or an intentional breach of fiduciary duty arising under this Agreement as determined by an independent party chosen by a majority of the other Managers.

"**Repurchase Rights**" has the meaning specified in Section 4.2(d).

**"Required Contribution Amount"** has the meaning specified in Section 4.2(a).

"**Return Amount**" has the meaning specified in Section 4.6(b).

"**Sale of the Company**" means (a) the sale, directly or indirectly, and whether in a single transaction or series of related transactions of all or substantially all of the assets of the Company and the Subsidiaries, taken as a whole, (b) the merger or consolidation of the Company or the Subsidiaries with one or more third parties in a transaction in which such third party(ies) thereafter control, directly or indirectly, substantially all of the voting power and value of the Company or the Subsidiaries; or (c) the sale of substantially all of the outstanding Capital Securities of the Company or the Subsidiaries to one or more third parties in a transaction in which such third party(ies) thereafter controls, directly or indirectly, substantially all of the voting power and value of the Company and the Subsidiaries, in each case encompassing a transfer of substantially all of the Company's and the Subsidiaries' business.

"**Sale Notice**" has the meaning specified in Section 7.8(a).

"**Series B-1 Common Units**" means Membership Rights in the Company having the economic and voting rights set forth herein with respect to "Series B-1 Common Units."

"**Series B-2 Common Units**" means Membership Rights in the Company having the economic and voting rights set forth herein with respect to "Series B-2 Common Units."

"**Series B-3 Common Units**" means Membership Rights in the Company having the economic and voting rights set forth herein with respect to "Series B-3 Common Units."

"**Series B-4 Common Units**" means Membership Rights in the Company having the economic and voting rights set forth herein with respect to "Series B-4 Common Units."

"**Series B-5 Common Units**" means Membership Rights in the Company having the economic and voting rights set forth herein with respect to "Series B-5 Common Units."

"**Series A Preferred Units**" means Membership Rights in the Company having the economic and voting rights set forth herein with respect to "Series A Preferred Units."

"**S**[redacted]" means [redacted] and their Permitted Transferees.

"**Shamrock**" means Capital Growth Fund III, L.P. and its Permitted Transferees.

"**Signing Contribution**" has the meaning specified in Section 6.2(b)(i).

"**Subscription Agreement**" has the meaning specified in Section 4.2(a).

"**Subsidiary(ies)**" means any Person the majority of the Capital Securities of which, directly or indirectly through one or more other Persons, is owned or controlled by the Company. As used in this definition, "control," including, its correlative meaning, "controlled by," means the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of Capital Securities by contract or otherwise).

"**Success Contribution**" has the meaning specified in Section 6.2(b)(iii).

"**Supermajority Vote**" means the affirmative vote or written consent of four (4) of the five (5) Board votes; provided, however, that to the extent two (2) or more Managers are excluded from a vote because they are parties to a transaction or agreement that requires a Supermajority Vote, or are Affiliates of a party to such a transaction or agreement, a Supermajority Vote shall mean the unanimous affirmative vote or written consent of other Managers.

"**Tax Matters Partner**" has the meaning specified in Section 9.3(a).

"**Transfer**" means with respect to Units or other property any direct or indirect transfer, sale, gift, exchange, assignment, pledge or the creation of any Lien on or making any other hypothecation or disposition thereof.

"**Transferor**" and "**Transferee**" have the meanings corresponding, *mutatis mutandis*, to the definition of "Transfer."

"**Treasury Regulations**" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"**Triad Members**" means collectively, Lewis Family Trust dtd 3/23/2006, Viehweg Revocable Trust U/A/D 02/09/99 and their Permitted Transferees.

"**Withdrawal Notice**" has the meaning specified in Section 4.6(c).

"**Withdrawal Period**" has the meaning specified in Section 4.6(c).

"**Withdrawing Member**" has the meaning specified in Section 4.6(d).

"**Units**" means, collectively, the Series A Preferred Units and the Common Units.

"**Unpaid Preferred Return**" means as of any date with respect to each Series A Preferred Unit, the cumulative Preferred Return with respect to such Series A Preferred Unit less all distributions theretofore made on account thereof pursuant to Section 5.3(a)(ii).

**Section 1.2. Headings.**

The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

## ARTICLE II
## FORMATION AND ORGANIZATION

**Section 2.1. Name and Formation.**

The name of the Company is Omega Wireless, LLC. All Company business shall be conducted in the name of "Omega Wireless, LLC" or such other names that comply with applicable law as the Board may select from time to time.

**Section 2.2. Registered Office and Registered Agent.**

The Company's initial registered agent and office is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The Company may change its registered agent or registered office to any other place or places in the State of Delaware as may be determined from time to time the Board.

**Section 2.3. Term.**

The term of the Company shall be perpetual, unless the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.4. No State Law Partnership.**

The Members intend that the Company (i) shall be taxed as a partnership for all applicable federal, state and local income tax purposes and (ii) shall not be a partnership or joint venture for any other purpose, and that no Member or any Manager shall, by virtue of this Agreement, be a partner or joint venturer of any other Member or Manager.

## ARTICLE III
## PURPOSE AND POWERS OF THE COMPANY

**Section 3.1. Purpose.**

The Company is formed for the object and purpose of acquiring Authorizations in the Auction, to acquire, own, manage and operate the Authorizations in accordance with the FCC's rules, and to develop the same for income or profit. The Company may engage in any other activities or transactions necessary, advisable or desirable to accomplish the foregoing purpose and to do any other act or thing incidental or ancillary thereto which has been approved by the Board and permitted under the Act.

**Section 3.2. Powers of the Company.**

(a) Subject to the provisions of this Agreement, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes set forth in Section 3.1, including, without limitation, the power to do the following:

(i) to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property, tangible and intangible, that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(ii) to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any Member, any Affiliate thereof, or any agent of the Company necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Company;

(iii) to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of corporations, associations, general or limited partnerships (including, without limitation, the power to be admitted as a partner thereof and to exercise the rights and perform the duties created thereby), trusts, limited liability companies (including, without limitation, the power to be admitted as a member thereof and to exercise the rights and perform the duties thereof), or individuals or direct or indirect obligations of the United States or of any government, state, territory, governmental district or municipality or of any instrumentality of any of them;

(iv) to lend money for its proper purpose, to invest and reinvest its funds, to take and hold real and personal property as collateral security for the payment of funds so loaned or invested;

(v) to sue, complain and defend, and participate in administrative or other proceedings, in its name;

(vi) to appoint employees and agents of the Company, and define their duties and fix their compensation;

(vii) to indemnify any Person in accordance with the Act and to obtain any and all types of insurance;

(viii) to cease its activities and cancel its Certificate of Formation;

(ix) to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any lease, contract or security agreement in respect of any assets of the Company;

(x) to borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge or other lien on the assets of the Company;

(xi) to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities; and

(xii) to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company.

## ARTICLE IV
## UNITS, CONTRIBUTIONS, NATURE OF INTERESTS AND ESTABLISHMENT OF CAPITAL ACCOUNTS

**Section 4.1.** **Units**.

(a) There are hereby established and authorized for issuance Series A Preferred Units, Series B-1 Common Units, Series B-2 Common Units, Series B-3 Common Units, Series B-4 Common Units and Series B-5 Common Units. The Company shall not certificate the Units and shall maintain unit information in ledger form only. No Units or other interests purporting to confer Membership Rights shall be issued unless they have been authorized for issuance by the Company under the terms of this Agreement.

(b) From and after the date of this Agreement, the Board may, subject to Sections 6.4 and 7.7, authorize and cause the Company to issue additional Units or other Membership Rights (including Series A Preferred Units), including any class or series of Units, on terms, including relative rights and preferences, established by the Board, and amend this Agreement (including so as to change the distribution percentages to which the holders of Units are entitled as set forth in Section 5.3(a)) and **Schedule A** as they shall deem necessary or appropriate in connection with the authorization and issuance of such additional Units or other Membership Rights. No Person acquiring any such additional Units or Membership Rights that is not a Member prior to making such acquisition shall be admitted as a Member unless such Person executes and delivers to the Company a counterpart of this Agreement.

(c) On the date of the Original Agreement the Company issued 100 Series B-1 Common Units, 100 Series B-2 Common Units and 100 Series B-3 Common Units to the Members named on **Schedule A** under the headings "Series B-1 Common Units", "Series B-2 Common Units" and "Series B-3 Common Units". On the date hereof, the Company is issuing 100 Series B-4 Common Units and 100 Series B-5 Common Units to the Members named on **Schedule A** under the headings "Series B-4 Common Units" and "Series B-5 Common Units".

**Section 4.2.** **Members' Contributions**.

(a) Upon the request of the Company and on at least seven (7) Business Days' prior written notice (any such notice, a "Contribution Notice") delivered to each of the Investor Members at any time prior to the later of (x) the date on which the Company is obligated to make final payment to the FCC for Authorizations acquired in the Auction, or (y) the date that is

fifteen (15) Business Days following the end of the Withdrawal Period (if any), each Investor Member shall (i) make a Contribution to the Company in immediately available funds in the amount set forth in the Contribution Notice (the "Required Contribution Amount") and (ii) deliver to the Company an executed subscription agreement (a "Subscription Agreement") in the form attached hereto as **Exhibit A**, and, in consideration therefor, the Company, concurrently with such Member's Contribution and in accordance with the Subscription Agreement executed by such Investor Member and delivered to the Company, shall issue to such Investor Member one Series A Preferred Unit for each $1.00 so contributed; provided, however, that the Required Contribution Amount set forth in any Contribution Notice, taken together with the amount of any prior cash Contributions to the Company by such Investor Member, shall not exceed the amount set forth opposite such Investor Member's name on **Schedule A** under the heading "Commitment" (such Investor Member's "Commitment"). Upon each cash Contribution made by the Investor Members pursuant to this Section 4.2(a), **Schedule A** shall be updated by the Company to reflect (A) the additional Contributions made by the Investor Members and (B) the number of Series A Preferred Units issued to such Investor Members for the Contributions made by such Investor Members.

(b) Except as set forth in this Section 4.2, no Member shall have any obligation to make any Contribution to the Company at any time.

(c) In the event that any Investor Member shall default in such Investor Member's obligations under Section 4.2(a) (such Investor Member being referred to as a "Defaulting Investor Member"), the Company shall thereafter provide notice of such default ("Default Notice") to all other Investor Members (including the Defaulting Investor Member). Subject to Section 4.2(f), in the event that the Defaulting Investor Member does not cure such default within seven (7) Business Days after the Company delivers to the Defaulting Investor Member the Default Notice, any or all of the other Investor Members that establish to the Company's satisfaction that they are at all relevant times an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act ("Electing Investor Members") shall have the right, exercisable by giving written notice of such election (a "Call Notice") to the Company and the Defaulting Investor Member within seven (7) Business Days after the Company' delivery of the Default Notice, to make the Contribution otherwise due from the Defaulting Investor Member (the "Defaulted Contribution") in accordance with Section 4.2(a) and to receive on account thereof the Series A Preferred Units issuable on account of such Contribution in accordance with Section 4.2(a). Each Electing Investor Member shall have the right (but not the obligation) to make a portion of the Defaulted Contribution as shall equal a fraction, the numerator of which shall be the number of Series A Preferred Units then owned by such Electing Investor Member and the denominator of which shall be the aggregate number of Series A Preferred Units then owned by the Electing Investor Members as a group (such fraction as to each Electing Purchase being its "Pro Rata Fraction"). The Electing Investor Members shall have a right of oversubscription such that if any Electing Investor Member fails to elect to make its full Pro Rata Fraction of the Defaulted Contribution, the remaining Electing Investor Members shall have the right to make up to the balance of the Defaulted Contribution. The Electing Investor Members may exercise such right of oversubscription by electing to make more than their Pro Rata Fraction of the Defaulted Contribution, but such election must be made in the Call Notice. If, as a result thereof, such oversubscriptions exceed the total amount of the Defaulted Contribution available in respect to such oversubscription right, the oversubscribing

Electing Investor Members shall be cut back with respect to oversubscriptions on a pro rata basis in accordance with their respective Pro Rata Fractions, or as they may otherwise agree among themselves. The Electing Investor Members shall, upon making the Defaulted Contribution, become obligated to make any additional Contributions that the Defaulting Investor Member is obligated to make in accordance with Section 4.2(a), pro rata in accordance with such Electing Investor Member's respective Pro Rata Fractions, and the Defaulting Investor Member shall be relieved of any future obligation to make Contributions in accordance with Section 4.2(a).

(d) If (i) the Defaulting Investor Member fails to cure such Defaulting Investor Member's own default and (ii) such default is neither waived nor consented to by the Board, then, (A) such Defaulting Investor shall not be entitled to receive any distributions pursuant to Section 5.3(a)(iii) of this Agreement and (B) the Company may elect, subject to Section 4.2(f), by written notice to the Defaulting Investor Member (a "Company Call Notice"), and whether or not the other Investor Members make all or any portion of the Defaulted Contribution in accordance with Section 4.2(c), to (1) repurchase all or any portion of the Defaulting Investor Member's Series A Preferred Units for a price of $1.00 per Series A Preferred Unit less such Defaulting Member's Expense Contribution, or (2) enforce the Company' rights against the Defaulting Investor Member at law or in equity; provided, however, that the Company may exercise its remedy set forth in clause (B)(1) (the "Repurchase Rights") or its remedies set forth in clause (B)(2) (the "Legal Remedies"), but may not exercise both the Repurchase Rights and its Legal Remedies, although it may abandon one set of remedies for the other so long as the Company has not perfected either set of remedies (*i.e.* through consummating either of the Repurchase Rights or recovering damages awarded in connection with a court judgment granting Legal Remedies). A Defaulting Investor Member's obligations to make Capital Contributions in accordance with Section 4.2(a) shall continue in full force and effect unless the other Investor Members make the entirety of the Defaulted Contribution**.**

(e) Subject to Section 4.2(f), the consummation of a purchase of a Defaulting Investor Member's Series A Preferred Units by the Company shall occur as specified by the Company not later than ten (10) Business Days after the Company Call Notice delivered with respect thereto. At each such closing the Defaulting Investor Member shall tender the certificate(s), if any, representing all of the subject Series A Preferred Units and other instruments reasonably satisfactory to the Company in exchange for payment, in immediately available funds, of the purchase price therefor contemplated above in this Section 4.2. Notwithstanding the foregoing, all of the Defaulting Investor Member's Series A Preferred Units as to which the Company exercises its Repurchase Rights shall, without further action on the part of the Company, the Defaulting Investor Member or any other Person being necessary, be deemed cancelled and no longer outstanding for any purpose hereof upon the Company's tendering to the Defaulting Investor Member the purchase price therefor.

(f) Notwithstanding any provision in this Section 4.2 that might be construed to the contrary, any change in ownership or control contemplated by the exercise of rights or otherwise pursuant to Section 4.2 (i) shall be subject to the prior receipt of approval of the FCC if such approval is required by applicable law, (ii) shall not cause the Company to lose its Designated Entity Status, and (iii) that would require an amendment to a pending Auction application of the Company shall take effect after the subject application is granted by final order of the FCC.

(g) Peppertree may assign all or part of its obligation to make a Contribution pursuant to Section 4.2(a) to one or more of Peppertree Capital Fund VI, LP, Peppertree Capital Fund VI QP, LP and/or Peppertree Capital FVI Co-Investors LLC (each, a "Peppertree Affiliate") and upon any Contribution by a Peppertree Affiliate (and execution by such Peppertree Affiliate of a counterpart of this Agreement or a joinder agreement satisfactory to the Company), such Peppertree Affiliate shall be deemed to be a "Member," "Investor Member" and included in the definition of "Peppertree" for all purposes herein; ***provided that***, in connection with and as a condition to any such assignment, the relevant Peppertree Affiliate shall be required to represent to the Company that (i) the information provided on or about the date hereof by such Peppertree Affiliate in the Omega Wireless, LLC Investor Questionnaire remains true and accurate in all respects as of the date of the proposed assignment and has not changed; (ii) since the date of the Original Agreement and subsequently, such Peppertree Affiliate has not taken any action that would constitute a breach of any provision set forth in Section 6.3(e) or (f) herein; and (iii) such Peppertree Affiliate has never and does not hold a disclosable interest as defined in the FCC rules in another forward auction applicant or a controlling interest in a full power or Class A broadcast television licensee. Any Contribution by a Peppertree Affiliate as contemplated by this Section 4.2(g) shall be deemed a Contribution by Peppertree for purposes of determining satisfaction of Peppertree's Commitment hereunder.

**Section 4.3. Nature Of Interests.**

The Units shall for all purposes be personal property. No Member has any interest in specific Company property. Each Member hereby waives any and all rights such Person may have to initiate or maintain any suit or action for partition of the Company's assets.

**Section 4.4. Capital Accounts.**

(a) An individual Capital Account shall be established and maintained for each Member in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the Gross Asset Value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of Net Income (or items thereof). Each Member's Capital Account shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the Gross Asset Value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of Net Loss (or items thereof). The Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Section 1.704-1(b)(2)(iv) and Section 1.704-1(b)(4). On the transfer of all or a portion of a Member's Units, the Capital Account of the transferor that is attributable to the transferred Units shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(1) and, for the purposes of this Agreement, such transferee Member shall be deemed to have made the appropriate form of the Contribution, to the extent actually paid in, of the Member which such transferee Member succeeds. The provisions of this Agreement relating to the maintenance of Capital Accounts are

intended to comply with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

**Section 4.5. Negative Capital Accounts.**

No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

**Section 4.6. Refund.**

(a) In the event that the Company is not the winning bidder of any Authorization, then promptly following Company's receipt of deposited funds from the FCC, the Company will be obligated to return to each Investor Member the amount of Contributions made by such Investor Member less such Investor Member's Expense Contribution. Upon the Company's payment of such refund to such Investor Member, and without further action on the part of the Company, such Investor Member or any other Person being necessary, (A) such Investor Member shall cease to be a Member, (B) the Units theretofore issued to such Investor Member shall be cancelled and shall no longer be outstanding and (C) such Investor Member shall have no further rights or obligations under this Agreement or any Related Agreement and shall no longer be party hereto or thereto.

(b) In the event that the Company is the winning bidder of one or more Authorizations, and the amount of Contributions made by the Investor Members exceeds the sum of the Deployed Capital, then promptly upon the Company making final payment to the FCC for Authorizations acquired in the Auction, the Company will be obligated to return to each Investor Member the amount of the Contribution made by such Investor less such Investor Member's Pro Rata Share of Deployed Capital (the "Return Amount"); provided, however, if the Company shall have made an upfront payment to the FCC in accordance with the Auction rules, then the Company will not be obligated to return the Return Amount to each Investor Member until five (5) Business Days following the Company's receipt of deposited funds from the FCC.

(c) If the Company is announced as the highest bidder of one or more Authorizations after the conclusion of the Auction and each Institutional Investor's Pro Rata Share of Deployed Capital will be less than: $[redacted], then (x) each such Institutional Investor will have the right to withdraw as a Member by sending written notice thereof to the Company (and the Triad Members) (a "Withdrawal Notice") within ten (10) Business Days following such date as the highest bidder for each of the Authorizations has been announced (such ten (10) Business Day period, the "Withdrawal Period"), and each withdrawing Institutional Investor shall be entitled to receive such Institutional Investor's Net Capital Refund Amount (as defined below) in accordance with Section 4.6(d) of this Agreement and (y) the Company shall have the right to force all (and not less than all) Institutional Investors to withdraw as Members of the Company by sending written notice thereof to each Institutional Investor and each Institutional Investor shall be entitled to receive such Institutional Investor's Aggregate Capital Refund Amount (as defined below) in accordance with Section 4.6(d) of this Agreement. In the event that M/C withdraws as a Member pursuant to this Section 4.6(c), the Triad Members shall also have the right to withdraw as Members by sending written notice thereof to the Company within five (5)

Business Days following such date as the Company receives a Withdrawal Notice from M/C, and the Triad Members, should they choose to withdraw, shall be entitled to receive their Net Capital Refund Amount in accordance with Section 4.6(d) of this Agreement. For purposes of this Agreement, (1) "Net Capital Refund Amount" shall mean the amount of Contributions theretofore made by a withdrawing Member less such Member's Expense Contribution. Such Net Capital Refund Amount will be calculated as of the date of such withdrawal, and (2) "Aggregate Capital Refund Amount" shall mean the amount of Contributions theretofore made by a withdrawing Member. Such Net Capital Refund Amount or Aggregate Capital Refund Amount will be calculated as of the date of such withdrawal.

(d) In the event that the Triad Members or any Institutional Investor withdraws as a Member of the Company (or if any Institutional Investor is forced to withdraw as a Member of the Company) in accordance with Section 4.6(c) of this Agreement (each such withdrawing Member, a "Withdrawing Member"), the Company shall return to such Withdrawing Member an amount in cash equal to such Withdrawing Member's Net Capital Refund Amount or Aggregate Capital Refund Amount (as applicable in accordance with Section 4.6(c) (with respect to each Withdrawing Member, the applicable Net Capital Refund Amount or Aggregate Capital Refund Amount shall be referred to as the "Applicable Refund Amount"). Upon receipt of any notice delivered pursuant to Section 4.6(c), the Company shall return to the Withdrawing Member as soon as practicable the Applicable Refund Amount, provided however, if the Company shall have made an upfront payment to the FCC in accordance with the Auction rules, then the Company will not be obligated to return the Applicable Refund Amount to the Withdrawing Member until five (5) Business Days following the Company's receipt of deposited funds from the FCC; provided, further, if the deposited funds returned to the Company are insufficient to fund the full payment of the Applicable Refund Amount to each Withdrawing Member, then (i) the deposited funds returned to the Company shall be distributed pro rata (in proportion to each such Withdrawing Member's Applicable Refund Amount) to each Withdrawing Member, (ii) the Company shall promptly, and in any event, prior to the end of the Withdrawal Period, deliver a Contribution Notice to each of the Investor Members (other than the Withdrawing Members) in an amount sufficient to pay the remaining portion of each Applicable Refund Amount and (iii) the Company shall pay such remaining portion within five (5) Business Days following such time as the Company has received the Contributions necessary to fund such Withdrawing Member's Applicable Refund Amount.

(e) Except for the Withdrawing Member's right to receive the Applicable Refund Amount as described above, upon the Company's receipt of the Withdrawing Member's notice of withdrawal pursuant to Section 4.6(c) of this Agreement (or upon an Institutional Investor's receipt of a notice from the Company that it is forcing such Member to withdraw as a Member of the Company pursuant to Section 4.6(c) of this Agreement), the rights and obligations of the Withdrawing Member under this Agreement shall be deemed suspended without further action on the part of the Company, and the Company and the Withdrawing Member shall cooperate in order to cause (A) the Withdrawing Member to cease to be a Member pursuant to this Agreement, (B) the Units and other Membership Rights theretofore issued to such Withdrawing Member (including any Common Units) to be cancelled and no longer be outstanding and (C) the Withdrawing Member to have no further rights or obligations under this Agreement and to no longer be party hereto. Notwithstanding any provision in this Agreement that might be construed to the contrary, any change in ownership or control that would result from such

withdrawal shall not take effect until either the Auction has been concluded and the FCC has acted upon any post-Auction license application of the Company or, the FCC has approved the withdrawal of the Withdrawing Member without adverse impact on any Auction-related application of the Company.

(f) Except as expressly provided herein or any Related Agreement, no Member shall be entitled to resign or withdraw all or any portion of such Member's Contributions or the balance of such Member's Capital Account, or to receive any distribution from the Company.

**Section 4.7. Loans From Members.**

Loans by Members to the Company shall not be considered Contributions. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member unless otherwise agreed by the Company and such Member. The amount of any such advances that are not agreed to be additional Contributions shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such advances are made.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**Section 5.1. Allocations of Net Incomes and Net Losses.**

(a) Subject to Sections 5.1(b) and (c), Net Income and Net Loss for each Fiscal Year or other relevant period shall be allocated to the Members in amounts that would result in Capital Account balances for each Member, increased by (x) such Member's share of partnership minimum gain (as determined according to Treasury Regulation Section 1.704-2(g)), (y) such Member's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(5)), and (z) any amount which such Member is obligated to restore for any deficit balance in its Capital Account or is deemed obligated to restore pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c), equal, as nearly as possible, to all amounts required to be distributed pursuant to Section 5.3(c) in the priority and manner provided therein on a hypothetical liquidation of the Company. In determining the amounts distributable to the Members under Section 5.3(c) upon a hypothetical liquidation, it shall be presumed that (i) all of the Company's remaining assets are sold at their respective Gross Asset Values, (ii) all Company liabilities are satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value securing that liability), (iii) all Units are vested and (iv) the proceeds of such hypothetical sale are applied and distributed in accordance with Section 5.3(c) hereof. In the period in which the Company sells or otherwise disposes of substantially all of its assets, and, if necessary, in prior Fiscal Years, if the Net Income or Net Loss of the Company are insufficient to allow the Capital Accounts of the Members to be adjusted to equal their respective amounts described above, then items of gross income or loss shall be specially allocated to the Members to the extent necessary to cause their Capital Accounts to equal the amounts described above.

(b) The Net Loss allocated in accordance with (a) shall not exceed the maximum amount of Net Loss that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. All Net Loss in excess of such limitation shall be allocated to the Members who would not have an Adjusted Capital Account Deficit as a result of such allocation (pro rata, in proportion to the excess of each such Member's Capital Account balance over the amount of such allocations that would cause such Member to have an Adjusted Capital Account Deficit). Once all of the Members have been allocated enough Net Loss that the allocation of any additional Net Loss would either create or increase an Adjusted Capital Account Deficit for all of the Members, any additional Net Loss shall be allocated among the Members owning Units, pro rata, in accordance with the number of Units owned by such Members. Any Net Loss allocated pursuant to this (b) shall be reversed with an allocation of Net Income prior to any allocations pursuant to (a), in the reverse order as such Net Loss was allocated.

(c) **Special Allocations**.

(i) Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in partnership minimum gain (as defined in the Code) during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This (i) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(ii) Partner Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Section 5.1, if there is a net decrease in partner nonrecourse debt minimum gain (as defined in the Code) attributable to a partner nonrecourse debt during any Fiscal Year, each Member who has a share of the partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(5), shall be specially allocated items of income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2(i)(4) and 1.704-2(j)(2). This (ii) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iii) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this (i) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this ARTICLE V have been tentatively made as if this (i) were not a term of this Agreement. This (i) is intended to constitute a "qualified income offset" provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv) Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this (ii) shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this (c) have been tentatively made as if this (ii) and (iii) hereof were not in the Agreement.

(v) Partner Nonrecourse Deductions. Any partner nonrecourse deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt to which such partner nonrecourse deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i)(1) and (j)(1).

(vi) Nonrecourse Deductions. Nonrecourse deductions (as defined in the Treasury Regulations) shall be specially allocated among the Members pro rata in accordance with their relative holdings of Common Units.

(vii) Curative Allocations. The allocations set forth in Section 5.1(b) and Section 5.1(c)(i) through (vi) hereof (collectively, the "Regulatory Allocations") are intended to comply with requirements of the Treasury Regulations. It is the intent of the parties hereto that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 5.1(c)(vii). Therefore, notwithstanding any other provision of ARTICLE V (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Board determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account such Member would have had if the Regulatory Allocations were not terms of this Agreement and all Company items were allocated pursuant to Section 5.1. In exercising its discretion under this Section 5.1(c)(vii), the Board shall take into account future Regulatory Allocations under Sections 5.1(c)(i) and

5.1(c)(ii) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 5.1(c)(v) and 5.1(c)(vi).

(viii) Allocations of Withholding. To the extent the Company receives (or is deemed to receive) an amount of income that is net of any withholding tax, (A) such income shall be allocated among the Members as if the Company received the gross amount of such income before giving effect to the payment of the withholding tax and (B) any resulting tax credit shall be allocated among the Members in proportion to such Member's allocated share of income (including income allocated pursuant to Section 704(c) of the Code) to which the credit relates.

(ix) Member Loans. Any interest deductions with respect to loans to the Company by any Member shall be specially allocated to the Member making such loan.

(x) Distributions of Nonrecourse Liability Proceeds. If, during a Fiscal Year, the Company makes a distribution to any Member of the proceeds of any nonrecourse liability of the Company that would otherwise be allocable to an increase in partnership minimum gain pursuant to Treasury Regulation Section 1.704-2(h), then the Company may elect, to the extent permitted by Treasury Regulation Section 1.704-2(h)(3), to treat such distribution as a distribution that is not allocable to an increase in partnership minimum gain.

(d) With respect to any Fiscal Year during which any Member's interest in the Company changes, allocations under ARTICLE V shall be adjusted appropriately to take into account the varying interests of the Members during such period.

**Section 5.2. Tax Allocations.**

(a) Generally. Except as otherwise provided in this Section 5.2, taxable income and loss and all items thereof shall be allocated to the Members to the greatest extent practicable in a manner consistent with the manner set forth in Section 5.1 and Sections 704(b) and (c) of the Code. Allocations pursuant to this Section 5.2 are solely for federal income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Loss, other items or distributions pursuant to any provision of this Agreement.

(b) Section 704(c) of the Code. In accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

(c) Adjustments Under Section 704(c) of the Code. In the event the Gross Asset Value of any Company asset is adjusted pursuant to the third sentence of the definition of "Gross Asset Value," subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset and its Gross Asset Value in the same manner as under Section 704(c) of the Code.

(d) Decisions Relating to Section 704(c) of the Code. Any elections or other decisions relating to allocations under this Section 5.2, including the selection of any allocation method permitted under Treasury Regulation Section 1.704-3, shall be made by the Board. The Board is hereby authorized to amend this Agreement as necessary to implement the method selected under Treasury Regulation Section 1.704-3.

(e) Changes in Members' Interests. If during any Fiscal Year or other accounting period of the Company there is a change in any Member's interest in the Company, the Company shall allocate Net Income or Net Loss to the Members in the Company in a manner that complies with the provisions of Section 706 of the Code and the regulations thereunder using any conventions permitted by law and selected by the Board.

**Section 5.3. Distributions.**

(a) Subject to the provisions of this Section 5.3, all distributions made by the Company shall first be apportioned among holders of Series A Preferred Units, pro rata in accordance with the total number of Series A Preferred Units outstanding, and the amount so apportioned in respect of each Series A Preferred Unit shall then be distributed to the Members as follows and in the following order of priority:

(i) First, to the holder of such Series A Preferred Unit, until the Company has distributed on account of such Series A Preferred Unit an amount equal to the balance of the Contribution Account of such Series A Preferred Unit as of the date of such distribution;

(ii) Second, to the holder of such Series A Preferred Unit until such holder has received aggregate distributions under this Section 5.3(a)(ii) in respect of such Series A Preferred Unit such that the Unpaid Preferred Return with respect to such Series A Preferred Unit is equal to zero;

(iii) Third, subject to Section 4.2(d) of this Agreement, (A) any amount apportioned to any Series A Preferred Unit held by M/C, Peppertree, Shamrock, Marin, 18th Street Group or a Triad Member remaining after the distributions pursuant to the foregoing subsections shall be distributed: (1) 83% to the holder of such Series A Preferred Unit, (2) 15% to the holders of Series B-1 Common Units pro rata based on the number of Series B-1 Common Units held by each such holder, and (3) 2% to the holders of Series B-2 Common Units pro rata based on the number of Series B-2 Common Units held by each such holder; (B) any amount apportioned to any Series A Preferred Unit held by K[redacted] Member after the distributions pursuant to the foregoing subsections shall be distributed: (1) 80% to K[redacted] Member, (2) 13.5% to the holders of Series B-1 Common Units pro rata based on the number of Series B-1 Common Units held by each such holder, (3) 1.5% to the holders of Series B-2 Common Units pro rata based on the number of Series B-2 Common Units held by each such holder and (4) 5% to the holders of Series B-3 Common Units pro rata based on the number of Series B-3 Common Units held by each such holder; (C) any amount apportioned to any Series A Preferred Unit held by C[redacted] after the distributions pursuant to the foregoing subsections shall be distributed: (1) 80% to C[redacted] (2) 13.5% to the holders of Series B-1 Common Units pro rata based on the

number of Series B-1 Common Units held by each such holder, (3) 1.5% to the holders of Series B-2 Common Units pro rata based on the number of Series B-2 Common Units held by each such holder and (4) 5% to the holders of Series B-4 Common Units pro rata based on the number of Series B-4 Common Units held by each such holder; (D) any amount apportioned to any Series A Preferred Unit held by S[redacted] after the distributions pursuant to the foregoing subsections shall be distributed: (1) 80% to the holder of such Series A Preferred Units, (2) 13.5% to the holders of Series B-1 Common Units pro rata based on the number of Series B-1 Common Units held by each such holder, (3) 1.5% to the holders of Series B-2 Common Units pro rata based on the number of Series B-2 Common Units held by each such holder and (4) 5% to the holders of Series B-5 Common Units pro rata based on the number of Series B-5 Common Units held by each such holder; and (E) any amount apportioned to any Series A Preferred Unit held by any other Member remaining after the distributions pursuant to the foregoing subsections (A) – (D) shall be distributed: (1) 80% to the holder of such Series A Preferred Unit, (2) 18% to the holders of Series B-1 Common Units pro rata based on the number of Series B-1 Common Units held by each such holder, and (3) 2% to the holders of Series B-2 Common Units pro rata based on the number of Series B-2 Common Units held by each such holder. Notwithstanding the above, in the event that there are no Members holding Series B-2 Common Units any amounts distributable to the holders of Series B-2 Common Units as provided above shall instead be distributed to the holders of Series B-1 Common Units pro rata based on the number of Series B-1 Common Units held by each such holder.

(b) Subject to the limitations set forth below, on or before March 31 of each Fiscal Year, the Company may distribute to each Person who was a Member during the immediately preceding Fiscal Year of the Company an amount of cash equal to the <u>product</u> of (x) the Agreed Tax Rate multiplied by (y) the excess of (a) the cumulative amount of taxable income and gain allocated to such Person for federal income tax purposes in the Company's income tax return filed or to be filed with respect to such immediately preceding Fiscal Year and all prior Fiscal Years, over (b) the cumulative amount of losses, deductions and credits allocated to such Person for federal income tax purposes in the Company's income tax returns filed or to be filed with respect to such immediately preceding Fiscal Year and all prior Fiscal Years; with such product being reduced by any prior distributions to such Person pursuant to this Section 5.3(b). The calculation of the amount of such distributions to a Member pursuant to this Section 5.3(b) also shall take into account distributions previously made with respect to the Fiscal Year in question to such Member pursuant to Section 5.3(a). The amount of any distributions to a Member pursuant to this Section 5.3(b) shall be credited against and reduce any amounts otherwise distributable to such Member pursuant to Section 5.3(a) or Section 5.3(c). Distributions under this Section 5.3(b) may be made by the Company each year. No distribution under this Section 5.3(b) shall be made if the making of such distribution would constitute a violation of the Act or any other applicable law or regulation or order of any court of competent jurisdiction or any contract or agreement by which the Company is bound, including without limitation any credit agreement of the Company. The Company shall provide, on an annual basis, information necessary to determine the estimated amount of federal and state income tax liability based on this Section 5.3(b).

(c) In the event of the dissolution and liquidation of the Company, the assets of the Company shall be disbursed in the following order of priority:

(i) first, to make payment of all debts and liabilities owing to creditors, including without limitation the expenses of dissolution or liquidation;

(ii) second, to establish such reserves as reasonably deemed by the Liquidating Trustee necessary for any contingent or unforeseen liabilities or obligations of the Company;

(iii) third, to each Controlling Member their pro rata portion (based on their relative holdings of Series B-1 Common Units) of any funds remaining in the Expense Account; and

(iv) fourth, in accordance with the priority established by Section 5.3(a).

(d) Notwithstanding the foregoing, upon the dissolution of the Company, the Company may, at the election of the Board and with the consent of the recipient, distribute a portion of the Company's assets to the Members, or to one or more Members, as determined by the Board, in kind in lieu of cash, provided that if any assets of the Company are to be distributed in kind, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(e) and such assets shall be distributed on the basis of the fair market value thereof (without taking Section 7701(g) of the Code into account) in accordance with the priority established by Section 5.3(a). For purposes of this Section 5.3(d), the "fair market value" of such assets shall be determined in good faith by the Board.

(e) Notwithstanding any provision of the Act, no Member or any Person that ceases to be a Member shall be entitled to receive the fair value of such Person's interest in the Company prior to the dissolution and winding up of the Company.

(f) The Company shall at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold from a payment or distribution or to otherwise make payments to any governmental authority with respect to any foreign, United States Federal, state, local or foreign tax liability of such Member arising as a result of such Member's interest in the Company, and shall allocate any such amounts to the Members with respect to which such amount was withheld. The amount of any such payment shall be applied against and reduce any concurrent or the next succeeding distribution to the relevant Member, and shall be treated for all purposes of this Agreement as a distribution made at the time of such concurrent or next succeeding distribution.

(g) No distribution under this Section 5.3 shall be made if the making of such distribution would constitute a violation of the Act or any contract to which the Company is bound relating to or entered in connection with the Company's indebtedness for borrowed money under a senior credit or loan facility with one or more banks or commercial lending institutions.

(h) Notwithstanding anything contrary in this Agreement, any distributions pursuant to Section 5.3 shall be adjusted by the Board to address any adjustments necessary to ensure that the issuance of Common Units intended to be treated as "profits interests" for federal income tax purposes are so treated.

## ARTICLE VI
## MANAGEMENT OF COMPANY

**Section 6.1. Management by Board of Managers.**

(a) Except for situations in which the approval of one or more Members is expressly required by this Agreement or by nonwaivable provisions of applicable law, (i) the powers of the Company, including, without limitation, converting the Company into a corporation in accordance with Section 265 of the Delaware General Corporation Law, shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a Board of Managers (the "Board"; and each member thereof being referred to as a "Manager") and (ii) the Board may make all decisions and take all actions for the Company not otherwise provided for in this Agreement. The Managers shall have all of the rights, powers, and authorities conferred upon a manager of a Delaware limited liability company by law and under the other provisions of this Agreement. The Managers may delegate responsibility for management of the Company, in whole or in part, to any Person, and any Person to whom such reasonability is delegated shall have and exercise on behalf of the Company all powers and rights necessary or convenient to carry out such management responsibilities. Subject to the restrictions in Section 6.2(c) of this Agreement, the Managers are specifically authorized to engage Affiliates of the Managers to perform services for the Company, provided that the amounts paid to any such Affiliate of a Manager and the terms and provisions of any agreement for the same shall not be more favorable to such Affiliate than would be the case with respect to an agreement negotiated on an arms-length basis with a Person that was not a Member or Affiliate of a Member or Manager.

(b) Subject to Section 7.8 and the nomination rights of the Majority Institutional Investor described below, the Managers shall be elected by the Controlling Members. No Person may be elected as a Manager of the Company at a time when the Company is acting as a Designated Entity unless such Person meets all applicable requirements for a controlling person of a Designated Entity that is participating in the Auction or holding Authorizations.

(c) Kenneth D. Anderson, W. Scott Soden, Christopher J. Jensen, Craig Viehweg, and Barry Lewis shall be the initial Managers of the Company and each shall remain a Manager until the earlier of his death, resignation or removal as provided in Section 6.1(c). All or any lesser number of the Managers may be removed (i) by a Supermajority Vote or (ii) to the extent that grounds exist for Removal for Cause, on thirty (30) days prior written notice after the determination of the independent party for such removal. Craig Viehweg and Barry Lewis shall automatically be removed as Managers immediately upon such time as any Triad Member withdraws as a Member of the Company pursuant to Section 4.6. The removal of a Manager who is a Member shall not, of itself, affect his rights as a Member or constitute a withdrawal as a Member.

(d) Subject to this Section 6.1(d) and Sections 6.1(a), 6.3(c) and 6.6(c), each Manager shall have one vote on all matters voted upon by the Board. In the event that one or more of the Controlling Managers is/are unwilling or unable to serve, the remaining Controlling Manager(s) will be accorded the vote(s) of such Controlling Managers on matters coming before the Board, pending the election of the replacement Controlling Manager(s) by the Controlling Members. In

the event that one of the Non-Controlling Managers is unwilling or unable to serve, the remaining Non-Controlling Manager will be accorded the vote of such Non-Controlling Manager on matters coming before the Board pending the nomination and election of the replacement Non-Controlling Manager. All actions taken by the Board in accordance with its authority hereunder as the same may be comprised during such time as there shall be a vacancy on the Board shall be valid and effective as the actions of the Board for all purposes, and no such action shall be invalid or ineffective for any purpose by reason of there being a vacancy on the Board at the time such action is taken. Except where a Supermajority Vote is called for in this Agreement, the vote or consent of the Managers having a majority of the total number of votes had by all the Managers shall be necessary for the Board to approve taking or consenting to any action or matter.

(e) Notwithstanding any provision at this Section 6.1 that might be construed to the contrary, any change in the membership, composition or size of the Board that would constitute or effect a transfer of control, de jure or de facto, of the Company under the rules, regulations or policies of the FCC, including those relating to the Auction (the "FCC Rules") shall not be deemed effective unless and until any requisite approvals of the FCC have been obtained.

(f) It is the intention of the parties that the Company qualify as a Designated Entity pursuant to the FCC Rules. The parties understand and acknowledge that all Managers are considered to be a controlling interest of the Company under the FCC Rules and must report any and all affiliations and certain financial information in connection with determining the Company's Designated Entity status. In the event that any Manager's affiliations would cause the Company not to qualify as a Designated Entity, the designation of such Manager shall be deemed null and void, and the provisions contained in Section 6.1(b) and Section 6.1(e) hereof shall apply to the designation of a new Manager.

(g) If either Craig Viehweg or Barry Lewis, or any Person elected to replace Craig Viehweg or Barry Lewis as a Manager (each a "Non-Controlling Manager"), cease to serve as a member of the Board for any reason, the Majority Institutional Investors shall nominate a Person to fill the resulting vacancy. The Controlling Members shall promptly act to approve or disapprove such nominated Person by majority vote. If the Controlling Members decline to elect such nominated Person, the Majority Institutional Investors shall nominate an alternative Person to fill the vacancy of the Non-Controlling Manager, and so on until the vacancy is filled. For purposes of this Agreement, the "Controlling Managers" shall mean Kenneth D. Anderson, W. Scott Soden and Christopher J. Jensen and any Person elected to replace each of Kenneth D. Anderson, W. Scott Soden and Christopher J. Jensen as a Manager.

(h) Each Manager shall hold office until such Manager's successor is elected as provided above or until such Manager's earlier resignation or removal. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect upon the receipt of any applicable FCC authorizations or approvals of the new Manager or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, no acceptance of the resignation shall be necessary to make it effective. The resignation of a Manager who is a Member shall not, of itself, affect his rights as a Member or constitute a withdrawal as a Member.

(i) The Board may establish one or more committees, which shall be comprised solely of Managers, the majority of which shall include Managers who are Controlling Managers. Prior to the Company filing an application to participate in the Auction, the Board shall establish a bidding committee and delegate to such bidding committee the authority to oversee the Company's participation and strategy in the Auction, which bidding committee shall be comprised of the entire Board. Simultaneously with the execution of this Agreement, the Board has determined and set forth on a separate schedule the Authorizations the Company may bid on in the Auction and the maximum bidding prices for such Authorizations, which schedule has been provided to the Institutional Investors. Prior to and during the Auction, by Supermajority Vote the bidding committee may make changes to the schedule, including changes in the Authorizations that the Company may bid on and increases of the maximum bidding prices for such Authorizations. At all times, the bidding committee shall comply with the FCC Rules with respect to the retention of control of the Designated Entity by eligibles. The role of any Board committee, with the exception of the aforementioned bidding committee, is limited to making recommendations to the Board for further action.

(j) Unless otherwise required by law or as approved by the Board, the composition of the board of directors (or body serving a similar function) of each Subsidiary of the Company, if any (each a "Sub Board"), shall be the same as that of the Board, and the provisions of this Section 6.1 shall apply equally to each Sub Board, mutatis mutandis.

**Section 6.2. Compensation of Managers; Auction Contributions; Success Contribution.**

(a) Managers, as such, shall not receive any salary or other compensation for their services as Managers. The Company shall reimburse each Manager for reasonable travel and other incidental expenses incurred by such Manager in connection with such Manager's serving on the Board.

(b) Expense Contributions.

(i) Signing Contribution. On the date (if any) on which the Company has received from the Institutional Investors an aggregate Contribution (the "Signing Contribution") equal to one half of one percent (0.5%) of the total Commitments of such Institutional Investors (following delivery of a Contribution Notice to such Institutional Investors in accordance with Section 4.2), the Company shall pay the aggregate amount of such Contributions into an account reserved for expenses (the "Expense Account")

(ii) Capital Call Contribution. On the date on which the Company receives approximately sixty-seven percent (67%) of the total Commitments of all Investor Members to fund the up-front payment for the Auction, the Company shall pay into the Expense Account:

(A) an amount (the "Capital Call Contribution") equal to one half of one percent (0.5%) of the aggregate amount of the Commitments of M/C, Peppertree, Shamrock and the Triad Members; and

(B) an amount equal to two percent (2%) of the aggregate amount of the Commitments of all Investor Members (other than M/C, Peppertree, Shamrock and the Triad Members) (the "General Investor Contribution" and together with the Signing Contribution and the Capital Call Contribution, the "Auction Contributions").

(iii) Success Contribution. In addition to the Auction Contributions, if the Company is the winning bidder of one or more Authorizations in the Auction aggregating in an amount in excess of $[redacted], the Company shall pay into the Expense Account an additional contribution in an amount equal to one percent (1%) of the aggregate amount of the Commitments of M/C, Peppertree, Shamrock and the Triad Members (such amount, the "Success Contribution").

For avoidance of doubt, in no event shall any Member be required to make a Contribution in excess of their Commitment for the purpose of making a contribution to the Expense Account (or any other purpose). The contributions to the Expense Account contemplated in this Section 6.2(b) shall be taken from the Contributions from the Members contemplated in Section 4.2.

(c) The funds in the Expense Account shall be used to pay any and all costs and expenses (including legal fees and other professional fees) that (i) the Controlling Members have incurred in connection with the formation, organization and capitalization of the Company, and (ii) the Company may incur in connection with the preparation for and participation in the Auction and the management of the Company following the Auction; provided, however, that, except as set forth in Section 5.3(c)(iii), such funds shall not be used to pay any salary or management fee to the Controlling Members.

(d) From the date hereof until such time as either W. Scott Soden or Edward Moise are no longer affiliated with Alpina Capital, the Company shall engage Alpina Capital to serve as the Company's investment bank in connection with a Sale of the Company for a total fee equal to one percent (1%) of the transaction value of such Sale of the Company and on such other terms as the Company and Alpina Capital shall mutually agree.

**Section 6.3. Restrictions on Non-Controlling Members.**

(a) Unless authorized to do so by this Agreement, no Member who is not a Manager, Controlling Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable monetarily for any purpose. A Member who is not a Manager or a Controlling Member shall have no right to participate in the management of the Company's business except by specifically authorized voting rights set forth in this Agreement and the Act.

(b) A Member who is not a Manager or a Controlling Member shall not direct the conduct of or have any control over the Company, its management, business and affairs, and shall not have any power or authority to act for or bind the Company.

(c) Notwithstanding any other provision of this Agreement and to maintain and preserve the Company's status as a Designated Entity in accordance with the requirements of the Communications Act, each Member who is not a Manager or a Controlling Member (and its

officers, directors, partners, members, trustees, or equivalent non-corporate officials that are acting on behalf of or as representative of such Member in its capacity as a Member of the Company) shall be prohibited under this Agreement, from:

(i) acting as an employee of the Company if his or her functions, directly or indirectly, related to any telecommunications activity or business of the Company;

(ii) serving, in any material capacity, as an independent contractor or agent to the Company, with respect to any telecommunications activity or business of the Company;

(iii) performing any services for the Company materially relating to the telecommunications activities or business of the Company, except that the Member may make loans to, or act as a surety for, the Company, to the extent such activities do not result in the creation of an attributable interest under the "debt or equity-plus" component of the FCC's ownership attribution rules;

(iv) becoming actively involved in the management or operation of the Company to the extent that such involvement pertains to the activities or business of the Company;

(v) voting on the election of any new Manager; or

(vi) voting to remove any Manager, unless the Manager is subject to (1) bankruptcy, insolvency, reorganization or other proceedings relating to the relief of the debtors, (2) adjudicated insane or incompetent by a court of competent jurisdiction (provided that this clause (2) shall apply only to a Manager that is a natural person); or (3) convicted of a felony.

(d) In the event that the Managers determine, or the FCC advises the Managers, that a particular right or activity by a Member who is not a Manager is inconsistent with the FCC's restrictions on the participation of members in a designated entity enterprise, the parties shall modify the Agreement as necessary to ensure compliance with such restrictions; provided, however, that any such modification shall, to the maximum extent feasible, preserve the respective rights of the parties set forth in this Agreement.

(e) During the course of the Auction, the Members who are not Controlling Members or Managers or are not included as a disclosable interest holder in the application filed by the Company to participate in the Auction shall not receive communications pertaining to bids, bid strategies, post-auction market structure or any other prohibited information under the Anti-Collusion Rule from the Managers, the Controlling Members, or any Member included as a disclosable interest holder in the application filed by the Company to participate in the Auction until the Anti-Collusion's Rule's restrictions are no longer in effect.

(f) The Anti-Collusion Rule restricts certain discussions between applicants that may affect bids, bid strategies and post-auction market structure. Any Member, who is not a Manager or Controlling Member, who has or receives information of the Company pertaining to bids, bid

strategies, post-auction market structure or any other prohibited information under the Anti-Collusion Rule shall not communicate that information to any Person. Any Member who has or receives information of the Company pertaining to bids, bid strategies, post-auction market structure or any other prohibited information under the Anti-Collusion Rule shall not communicate that information, directly or indirectly, to any Person who is prohibited from receiving such information under the Anti-Collusion Rule. If any Member holds an interest in another auction applicant, that Member shall not communicate to the Managers, Controlling Members, or any Member included as a disclosable interest holder in the application filed by the Company to participate in the Auction any information about the bids, bid strategies and post-auction market structure of the other auction applicant in which the Member holds an interest. In addition, a Member shall not receive any information or communications about or discussing the bids, bid strategies and post-auction market structure of any other auction applicant, either directly or indirectly, in which the Member holds an interest or has any other relationship.

**Section 6.4. Member Approval Required; Supermajority Vote Required.**

(a) Notwithstanding any other provisions of this Agreement to the contrary, and except as otherwise specifically allowed below, for so long as any of the Institutional Investors is a Member, neither the Company nor the Board, any Manager, Member, officer, employee or agent of the Company, shall agree to, enter into or engage in any of the following transactions or activities for or on behalf of the Company unless specifically authorized by the affirmative vote or written consent by the Majority Institutional Investors, which consent may be granted, withheld or conditioned in each Investor Member's sole and absolute discretion:

(i) acquire in any manner, whether by purchase, merger, consolidation, combination or otherwise, the Capital Securities or, other than in the ordinary course of business, assets of a Person, or authorize, cause or allow any Subsidiary to acquire in any manner, whether by purchase, merger, consolidation, combination or otherwise, the Capital Securities or, other than in the ordinary course of business, assets of another Person;

(ii) admit new Members or make any change in the members of the Company, provided that Permitted Transferees shall become Members upon the consummation of the Transfer by which they obtain Units as provided in Section 7.4;

(iii) amend or modify this Agreement (including but not limited making any change in the composition or size of the Board) or the Certificate of Formation, or authorize or cause the amendment of any of the Charter Documents of any Subsidiary, except as may be reasonably required by the FCC in order for the Company to maintain its status as a Designated Entity or pursuant to Section 4.2(a) or modify the terms of this Agreement or take any other action that would alter the status of the Company as a Designated Entity under the FCC Rules;

(iv) (A) dissolve, liquidate or wind up the Company or authorize, cause or allow the dissolution, liquidation or winding up of any Subsidiary; or (B) effect a Conversion in accordance with ARTICLE VIII; or (C) authorize or cause the Company, or authorize, cause or allow any Subsidiary, to (u) discontinue its business, (v) apply for consent to the appointment of a receiver, trustee, custodian or liquidator of it or any of its

property, (w) admit in writing its inability to pay its debts as they mature, (x) make a general assignment for the benefit of creditors, (y) file a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment, of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law or (z) take any action for the purpose of effecting any of the foregoing;

(v) except pursuant to Sections 4.2(a) and 4.6(c), authorize or issue any Capital Securities of the Company or any Subsidiary or redeem or permit any Subsidiary to redeem any Capital Securities, other than the repurchase of Capital Securities or options or rights to acquire the same from departing employees or other service providers to the Company or any Subsidiary;

(vi) make any distributions except in accordance with Section 5.3(c); or

(vii) a Sale of the Company or authorize the Company to sell, transfer, assign or otherwise dispose of (whether by sale, merger, consolidation or otherwise) all or any portion of the Company's or any Subsidiary's assets or properties.

(b) Notwithstanding any other provisions of this Agreement to the contrary, for so long as any of the Institutional Investors is a Member, and except as otherwise specifically allowed below, neither the Company nor the Board, any Manager, Member, officer, employee or agent of the Company, shall agree to, enter into or engage in any of the following transactions or activities for or on behalf of the Company unless specifically authorized by the affirmative vote or written consent by Supermajority Vote:

(i) engage or permit any Subsidiary to engage in any business activity other than owning and operating the Authorizations in accordance with the FCC rules and developing the same for income or profit;

(ii) approve the annual budget for expenditures;

(iii) any material deviation from the approved budget, the effect of which would have a substantial impact on the financial condition of the Company;

(iv) incur any indebtedness or authorize, cause or allow any Subsidiary to incur any indebtedness in an amount that, when combined with all other indebtedness of the Company and the Subsidiaries, exceeds twenty five percent (25%) of the annual budgeted capital expenditures; or

(v) authorize or cause the Company, or authorize, cause or allow any Subsidiary, to enter into, or amend, modify, or grant any waiver or approval with respect to, any transaction or agreement of any kind whatsoever with any Member or any Affiliate of any Member (except for the payment of the Auction Contributions and the Success Contribution), provided, however, that the requisite Supermajority Vote shall be determined exclusive of any Manager that is a party to such transaction or agreement or who is an Affiliate of a party to such transaction or agreement.

**Section 6.5. Manager's Duties.**

The Managers shall discharge and perform their respective duties and responsibilities under this Agreement in accordance with the general standards of conduct prescribed by the Act. No Manager shall be required to devote full-time efforts to the affairs of the Company, but shall devote so much of such Manager's time and attention to the Company as is reasonably necessary and advisable to manage the affairs of the Company to the best advantage of the Company. Each Manager shall have the right to engage directly or indirectly in other businesses or activity, including without limitation, any business or activity in competition with the business of the Company.

**Section 6.6. Meetings of Board of Managers; Consent of Members.**

(a) The Board may hold its meetings in such place or places in the State of Delaware or outside the State of Delaware as it shall determine from time to time.

(b) Meetings of the Board or a Board committee shall be held whenever called by at least two (2) Managers, including at least one Controlling Manager. Notice of the day, hour and place of holding of each meeting of the Board or any meeting of a Board committee shall be given to each Manager or committee member by email or any other method under Section 14.5 at least twenty four (24) hours before the meeting. Unless otherwise indicated in the notice thereof, any and all business may be transacted at any such meeting. At any meeting at which every Manager or committee member shall be present, even though without any notice, any business may be transacted.

(c) A quorum for the transaction of business by the Board shall consist of Managers holding a majority of the votes held by the Managers then serving on the Board, provided that at least one Controlling Manager and at least one Non-Controlling Manager is in attendance. If only one or two Controlling Managers is in attendance, the Controlling Manager or Controlling Managers will be deemed to have a total of three (3) votes on all matters voted upon by the Board at such meeting (such that at all times the Controlling Manager(s), or any one or more of them, have at least one vote more than the combined number of votes of all of the other Managers in attendance). A quorum for the transaction of business by a Board committee shall consist of committee members holding a majority of the votes held by the committee members then serving on such committee. If at any meeting of the Board or committee thereof, there is less than a quorum present, holders of a majority of the votes held by those present may adjourn the meeting from time to time until a quorum is present.

(d) Any Manager may participate in any meeting of the Board or a Board committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can communicate with each other, and such participation shall constitute presence in person at such meeting. Any Manager may participate in any meeting either in person or by proxy.

(e) Any action required or permitted to be taken at any meeting of the Board or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action

so taken, is signed by Managers holding a majority of the votes held by the Managers (or a Supermajority Vote, if required herein) then serving on the Board or such committee; provided, however, that to the extent (i) such written consent has not been signed by at least one of the Non-Controlling Managers and (ii) the Institutional Investors are still Members of the Company, such proposed written consent shall not be effective until the third (3rd) business day following the delivery of written notice of the proposed written consent to each of the Institutional Investors. Prompt notice of the taking of an action without a meeting by less than unanimous written consent shall be given to those Managers who have not consented in writing. All such writings shall be filed with the minutes of proceedings of the Board or committee, as the case may be.

(f) Whenever the consent of Members or any group thereof is required, such consent shall be evidenced by a writing setting forth such consent and executed by the Members holding the number of Units necessary for such consent to be effected.

**Section 6.7. Officers.**

The Board may, from time to time, delegate to one or more Managers or Controlling Members such authority and duties as the Board deems advisable. In addition, the Board may assign titles (including, without limitation, chairman of the board, chief executive officer, president, chief operating officer, chief financial officer, vice president, secretary, assistant secretary, treasurer or assistant treasurer) to any Managers or Controlling Members and delegate to such Managers or Controlling Members certain authority and duties. Any number of titles may be held by the same individuals. Any delegation pursuant to this Section 6.7 may be revoked at any time by the Board, in its sole and absolute discretion. Initially, Christopher J. Jensen is designated as the Company's "President", W. Scott Soden is designated as the Company's "Vice President", "Treasurer" and "Secretary" and Barry Lewis is designated as the Company's Technical Officer. The parties understand and acknowledge that it is the intention of the parties that the Company qualify as a Designated Entity pursuant to the FCC Rules. The parties understand and acknowledge that all officers are considered to be a controlling interest of the Company under the FCC Rules and must report any and all affiliations and certain financial information in connection with determining the Company's Designated Entity status. In the event that any officer's affiliations would cause the Company not to qualify as a Designated Entity, the designation of such officer shall be deemed null and void.

**Section 6.8. FCC Rules.**

(a) Notwithstanding any provision in this Agreement that might be construed to the contrary, (i) any change in the Members of the Company that would constitute or effect a transfer of control, de jure or de facto, of the Company under the FCC Rules, (ii) any change in the membership or composition or number of Controlling Members or Managers that would constitute or effect a transfer of control, de jure or de facto, of the Company under the FCC Rules, or (iii) an assignment under FCC Rules of any Authorization shall not be deemed effective unless and until any requisite approvals of the FCC have been obtained.

(b) The Members and Managers acknowledge and agree that any action prior to the completion of the Auction, including the post-Auction licensing phase, that results in a

substantial change in the ownership and/or control of the Company may be deemed by the FCC to constitute a major ownership change adversely affecting the Company's eligibility for licenses in the Auction, and the Members and Managers agree to take all commercially reasonable efforts to avoid such actions.

(c) To ensure that the Company has the ability to invest in, and thereafter continue to hold, the Authorizations consistent with the requirements of the Communications Act and FCC Rules, each Member shall provide the Managers, promptly from time to time and upon its reasonable request, the following information:

(i) Information regarding the percentage of its capital stock, partnership interests, membership interests or other applicable equity interests owned, controlled or voted by Aliens, and the number and percentage of its partners, members, stockholders, or other equity interest holders that are Aliens (as defined below);

(ii) Information to enable the Company to prepare and file an acceptable application to participate in the Auction, to make any other necessary filings with or other submissions to the FCC, and to secure in the post-Auction process any Authorizations on which the Company was the high bidder in the Auction; and

(iii) All other information that the Managers reasonably deem necessary, advisable or convenient in order to enable the Company to ensure its investments in, management and disposal of actual or potential securities are not in violation of the Communications Act or FCC Rules.

The Managers shall use their commercially reasonable efforts to maintain the confidentiality of all proprietary information of the Members delivered to it pursuant to this Section 6.8(c).

(d) In addition, notwithstanding any provision in this Agreement to the contrary, no Member shall take any action that (i) results in a violation of the Communications Act or FCC Rule or (ii) would require the approval of the FCC, without first obtaining such approval of the FCC.

**Section 6.9. <u>Institutional Member Rights</u>.**

Notwithstanding any provision in this Agreement that might be construed to the contrary, all rights granted to G[redacted] as an Institutional Investor shall be exercised on G[redacted]'s behalf by M/C Partners VII, L.P. in its sole and absolute discretion. In connection with the exercise of such rights by M/C Partners VII, L.P., G[redacted] hereby appoints M/C Partners VII, L.P. as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file the following any and all instruments, certificates and other documents that may be deemed necessary or desirable to effect the exercise of such rights. The power of attorney hereby granted by G[redacted] is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent bankruptcy, insolvency or dissolution of such Member.

## ARTICLE VII
## MEMBER RIGHTS

**Section 7.1. Limited Liability.**

Except as otherwise provided by the Act, the Members will not be personally liable for any obligations of the Company and will have no obligation to make contributions to the Company except as specifically provided for herein.

**Section 7.2. No Agency or Authority.**

No Member, by virtue of its status as a Member, is an agent of or has authority to act for or bind the Company. Any Member who takes any action or purports or attempts to bind the Company in violation of this Section 7.2 shall be solely responsible for any loss and/or expense incurred by the Company, any Manager or any Member as a result of such unauthorized action, and such Member shall indemnify and hold harmless the Company, each Manager and each other Member with respect to such loss and/or expense.

**Section 7.3. Power of Attorney.**

(a) Each Member hereby appoints each Manager and any designee of the Board as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file the following:

(i) all amendments to the Certificate of Formation as may be required under the Act that are duly approved pursuant to Section 14.3;

(ii) any amendment to this Agreement duly approved as provided in Section 14.3 or required by the FCC in order for the Company to maintain its status as a Designated Entity;

(iii) any and all instruments, certificates and other documents that may be deemed necessary or desirable to effect the winding-up and termination of the Company in accordance with the terms of this Agreement (including, but not limited to, a Certificate of Dissolution of the Company); and

(iv) any business certificate, fictitious name certificate or amendment thereto, necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable Federal, state or local law.

The power of attorney hereby granted by each of the Members (i) is conditioned upon prior approval of the subject matter thereof by the Board and/or the Members, if so required by the provisions of this Agreement; (ii) is subject to any FCC Rules pertaining to the delegation of powers by a Designated Entity and (iii) is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of such Member.

**Section 7.4. Transfers of Units.**

(a) Except pursuant to a Permitted Transfer, no Member may Transfer all or any part of such Member's Units unless such Transfer has been approved in advance by the Board, which

approval may be withheld by Board in its sole discretion, and a Transferee other than a Permitted Transferee will not become a Member without the approval of the Board. In addition, any Transferee (whether or not pursuant to a Permitted Transfer) will not become a Member unless and until the Transferee executes and delivers to the Company a counterpart of this Agreement. Any Member admitted to the Company in accordance with the terms of this Section 7.4 will succeed to all rights and be subject to all the obligations of the Transferor Member with respect to the Units to which the Transferee Member was substituted.

(b) Except as expressly provided in this Agreement, the Transferor and Transferee will be jointly and severally obligated to reimburse the Company for all reasonable expenses (including legal fees) in connection with any Transfer or proposed Transfer of a Member's Units. As a condition to any Transfer of Units in the Company, the Transferor and the Transferee shall provide such legal opinions and documentation as the Board shall reasonably request.

(c) If a Member Transfers Units in accordance herewith, then unless the Transferor and Transferee shall agree otherwise and so provide in the instrument of assignment pursuant to which such Transfer is effected and provide the Company with a copy thereof at the time of such Transfer, distributions shall be made to the record owner of the Units at the date of distribution and Net Income and Net Loss shall be allocated between the Transferor and Transferee by taking into account their varying interests in the Transferred Units during the Fiscal Year in which such Transfer is effected in accordance with Section 706(d) of the Code, using any conventions permitted by law and selected by the Board.

(d) The provisions of this Section 7.4 supersede, and shall be controlling with respect to, any conflicting provisions contained in any other agreement between or among the Company and any Member. Any Transfer of a Member's Units in contravention of, or not in accordance with, any provisions hereof shall be void and ineffectual and shall not bind or be recognized by the Company or any of its Members.

(e) Notwithstanding anything that might be construed to the contrary in this Section 7.4, no Member shall be permitted at any time to Transfer to any Person any Units if such transfer (i) would cause the Company to undergo a major ownership change (as defined by the FCC) or otherwise disqualify it from participation in the Auction (as a Designated Entity or otherwise) while its application in the Auction is pending, (ii) would cause the Company to lose its status as a Designated Entity, (iii) would cause the Company or such Member or transferee to violate or not be in compliance with FCC Rules or the Communications Act, (iv) would result in foreign ownership attribution that, individually or when aggregated with the total foreign ownership attributable to the Company, would cause the Company to exceed the applicable limitations set forth in Section 310(b) of the Communications Act or alternatively, if applicable, any higher limit authorized by the FCC or (v) would not be in compliance with such Member's obligations under Section 7.6.

(f) Without the written consent of the Company (as authorized by the Board), the K[redacted] Member and the K[redacted] Manager each covenants and agrees that it will not:

(i) terminate, waive any right under, or amend the K[redacted] LLC Agreement or any other of K[redacted] Member's governing documents, that could reasonably be

expected to result in a breach or default of any representation or covenant of the K[redacted] Member contained in this Agreement, provided that such written consent of the Company shall not be unreasonably withheld;

(ii) enter into any governing documents of the K[redacted] Member or any agreement with any Person that could reasonably be expected to result in a breach or default of any representation or covenant of the K[redacted] Member contained in this Agreement, provided that such written consent of the Company shall not be unreasonably withheld;

(iii) permit the members of the K[redacted] Member to take any action that would be prohibited if such member of the K[redacted] Member were a Member of the Company, including, without limitation, any action that would cause the Company or the K[redacted] Member or the members of the K[redacted] Member to violate or not be in compliance with FCC Rules or the Communications Act or that would result in foreign ownership attribution that, individually or when aggregated with the total foreign ownership attributable to the Company, would cause the Company to exceed the applicable limitations set forth in Section 310(b) of the Communications Act or alternatively, if applicable, any higher limit authorized by the FCC;

(iv) authorize the Transfer of Capital Securities of the K[redacted] Member by the holders thereof to any Person that is not a member of the K[redacted] Member on the date hereof, except as permitted by Section 7.4 hereof; or

(v) permit the issuance of any new Capital Securities by the K[redacted] Member to any person that is not a member of the K[redacted] Member as of the date hereof.

(g) In furtherance of the foregoing Section 7.4(f), the K[redacted] Member shall provide the Company with copies of its governing documents (i) whenever requested by the Board (which shall be no more than once per calendar quarter) or (ii) if the Board has reason to believe that such restrictions may have been violated and the K[redacted] Member and the K[redacted] Manager shall provide the Board with confirmation that the restrictions in this Agreement have not been violated.

**Section 7.5. <u>Designated Entity</u>.**

It is the intention of the parties for the Company to qualify as a Designated Entity under the FCC Rules. The parties will take such actions as are reasonable and necessary to establish and maintain the Company's status as such. Specifically, and without limitation, (a) each Member will supply, on a timely basis, all information reasonably requested by the Company in order to enable the Company to prepare and file an acceptable application to participate in the Auction and to secure in the post-Auction process any Authorizations on which the Company was the high bidder in the Auction; and (b) the parties acknowledge and agree that any action prior to the completion of the Auction, including the post-Auction licensing phase, that results in a substantial change in the ownership and/or control of the Company may be deemed by the FCC to constitute a major ownership change adversely affecting the Company's eligibility for licenses in the Auction, and the parties agree to make commercially reasonable efforts to avoid or correct

such actions. The parties understand and acknowledge that each Controlling Member is considered to hold a controlling interest of the Company under the FCC Rules and must report any and all affiliations and certain financial information in connection with determining the Company's Designated Entity status.

**Section 7.6. Control by Eligibles.**

It is the intention of the parties for this Agreement to accord the Controlling Members "controlling interests" in the Company within the meaning of the FCC Rules governing Designated Entities. If any provision of this Agreement is deemed by the FCC to be inconsistent with this intention, the parties shall cooperate in good faith to reform this Agreement in a manner consistent with the parties' intention while maintaining to the extent possible the rights, obligations and economic interest of the parties hereto. The parties acknowledge and agree that the Investor Members are participating in this enterprise because of the knowledge and experience of the Controlling Members. In the event of an involuntary assignment or transfer of the interests of a majority of the Controlling Members, the remaining Investor Members and the successors in interest to the original Controlling Members agree to cooperate in a good faith effort to agree upon the appointment of replacement Controlling Managers that are capable of successfully managing the enterprise and while enabling the Company to retain its status as a Designated Entity.

**Section 7.7. Preemptive Rights.**

The Company shall only issue New Units in accordance with the following terms:

(a) In the event the Company desires to issue any New Units, it shall first deliver to each Member holding Series A Preferred Units that at all relevant times in respect to such issue is an "accredited investor", as such term is defined under the Securities Act of 1933, as amended, (collectively, the "Preemptive Rights Holders" and each a "Preemptive Rights Holder") a written notice (each such notice, a "Notice of Proposed Issuance") specifying the name and address of the proposed purchaser of the New Units (each such purchaser, a "Proposed Buyer"), the type and total number of such New Units that the Company then desires to issue to such Proposed Buyer (such New Units, the "Offered New Units"), all of the material terms, including the price, upon which the Company proposes to issue such Offered New Units to such Proposed Buyer, and stating that the Preemptive Rights Holders shall have the right to purchase such Offered New Units in the manner specified in this Section 7.7 at the price and in accordance with the terms and conditions specified in such Notice of Proposed Issuance.

(b) During the fifteen (15) business day period commencing on the date on which the Preemptive Rights Holders receive the Notice of Proposed Issuance (the "Offer Period"), each Preemptive Rights Holder shall have the option to purchase the Offered New Units subject to such Notice of Proposed Issuance at the price and terms specified in such Notice of Proposed Issuance and in the amount specified in Section 7.7(c). A Preemptive Rights Holder shall give written notice of its election to purchase Offered New Units to the Company on or before the last day of the Offer Period and, if a Preemptive Rights Holder has not given such written notice within such period, such Preemptive Rights Holder shall be deemed to have rejected its right to purchase the Offered New Units. If the Offered New Units are being offered as a part of an

equity investment together with debt or other instruments, any election by a Purchaser to purchase Offered New Units shall also constitute an election to purchase a like portion of such debt or other instruments. Each Preemptive Rights Holder shall have the right to condition such Preemptive Rights Holders' purchase of the Offered New Units upon the closing of the sale of the balance of such Offered New Units.

(c) Each Preemptive Rights Holder shall have the right to purchase that number of the Offered New Units as shall be equal to the number of the Offered New Units multiplied by a fraction, the numerator of which is the number of Series A Preferred Units then owned by such Preemptive Rights Holder and the denominator of which shall be the aggregate number of Series A Preferred Units then owned by all of the Preemptive Rights Holders. The amount of such Offered New Units that each Person is entitled to purchase under this Section 7.7(c) is referred to as such Preemptive Rights Holders' "Proportionate Share."

(d) Each Preemptive Rights Holder shall have a right of oversubscription such that if any Preemptive Rights Holder fails to elect to purchase its full Proportionate Share of the Offered New Units, the remaining Preemptive Rights Holders shall, among them, have the right to purchase up to the balance of the Proportionate Shares of such Offered New Units not so purchased. Each Preemptive Rights Holder may exercise such right of oversubscription by electing to purchase more than its Proportionate Share of the Offered New Units by so indicating in its written notice given during the Offer Period. If, as a result thereof, such oversubscriptions exceed the total number of the Offered New Units available in respect to such oversubscription privilege, the oversubscribing Preemptive Rights Holders shall be cut back with respect to oversubscriptions on a pro rata basis in accordance with their respective Proportionate Shares or as they may otherwise agree among themselves.

(e) If some or all of the Offered New Units have not been purchased by the Preemptive Rights Holders pursuant to Section 7.7(a) through Section 7.7(d) hereof, then the Company shall have the right, until the expiration of one-hundred eighty (180) days commencing on the first day immediately following the expiration of the Offer Period, to issue such remaining Offered New Units to the Proposed Buyer or one or more third parties at not less than, and on terms no more favorable to the purchasers thereof than, the price and terms specified in the Notice of Proposed Issuance. If for any reason the Offered New Units are not issued within such period and at such price and on such terms, the right to issue in accordance with the Notice of Proposed Issuance shall expire and the provisions of this Agreement shall continue to be applicable to the Offered New Units.

(f) The Preemptive Rights Holder purchasing the greatest percentage of any Offered New Units shall set the place, time and date for the closing of the purchase of the Offered New Units, which closing shall be no later than the date of the closing of the sale of any Offered New Units to the Proposed Buyer. The purchase price for the Offered New Units shall, unless otherwise agreed in writing by the parties to such transaction, be paid in immediately available funds on the date of the closing.

(g) The Company may proceed with the issuance of New Units without first following procedures in Section 7.7(a) through Section 7.7(f) above, provided that (i) the purchaser of such New Units agrees in writing to take such New Units subject to the provisions

of this Section 7.7, and (ii) within ten (10) days following the issuance of such New Units, the Company or the purchaser of the New Units undertakes steps substantially similar to those in Section 7.7(a) through Section 7.7(f) above to offer to all Preemptive Rights Holders the right to purchase from the Company a pro rata portion of such New Units or equivalent at the same price and terms applicable to the purchaser's purchase thereof so as to achieve substantially the same effect from a dilution protection standpoint as if the procedures set forth in Section 7.7(a) through Section 7.7(f) had been followed prior to the issuance of such New Units.

(h) Notwithstanding the foregoing, no Preemptive Rights Holder shall have any rights under this Section 7.7 if at any time such Preemptive Rights Holder has failed to purchase its Proportionate Share of New Units that (A) had not been the subject of a waiver or Partial Waiver pursuant to Section 7.7(i) and (B) such Preemptive Rights Holder had the right to purchase under this Section 7.7.

(i) Notwithstanding Section 7.7(a) through Section 7.7(h), the Majority Institutional Investors may waive, either prospectively or retrospectively, any and all rights arising under this Section 7.7 with respect to the issuance of any New Units to any Person, or may elect to waive the rights under this Section 7.7 with respect to the issuance of a portion of such New Units (a "Partial Waiver"), provided none of the Investor Members or their Affiliates are purchasing those New Units subject to a waiver or Partial Waiver, and any such waiver or Partial Waiver shall be effective as to all holders with such rights under this Section 7.7.

**Section 7.8. Sale of the Company; Drag-Along Rights.**

(a) Commencing on the eighth anniversary of the date hereof and any time and from time to time thereafter, the Company shall, upon written notice from an Institutional Investor (the "Sale Notice"), engage one or more investment banking or brokerage firms of national standing and that are acceptable to the Majority Institutional Investors after consultation with all Institutional Investors (unless Alpina Capital is required to be engaged pursuant to Section 6.2(c) of this Agreement, in which case Alpina Capital shall be engaged) to effect a Sale of the Company. The Company will cooperate with such advisers and use its best efforts to effect a Sale of the Company. In connection with the delivery of a Sale Notice by an Institutional Investor as contemplated above, each of the other Institutional Investors (and any Permitted Transferees of such other Institutional Investors to the extent such Permitted Transferees are considered Institutional Investors hereunder) agree to cooperate in good faith to cause the Company to complete a Sale of the Company pursuant and subject to this Section 7.8.

(b) In the event that a Sale of the Company is not consummated within six (6) months of an Institutional Investor's delivery of a Sale Notice to the Company pursuant to Section 7.8(a), the Majority Institutional Investors (after consultation with all Institutional Investors) shall have the right to designate four (4) Managers and the Controlling Members shall have the right to elect one (1) Manager.

(c) In the event that a Sale of the Company is: (i) approved by the Majority Institutional Investors pursuant to Section 6.4 or (ii) requested by an Institutional Investor in connection with the delivery of a Sale Notice pursuant this Section 7.8, the Company shall give written notice to all of the Members that it is invoking the provisions of this Section 7.8. Each of

the Members hereby waives, to the extent permitted by applicable law, all applicable appraisal rights and rights to object to or dissent from such Sale of the Company and agrees that it will raise no objections against such Sale of the Company. Each Member agrees to vote its respective Units to approve such Sale of the Company and the terms of any such Sale of the Company and any matters ancillary thereto (including any conversion or exchange of Units for shares of capital stock of a corporation), all to the extent necessary in the judgment of the Majority Institutional Investors (after consultation with all Institutional Investors) to effect such Sale of the Company, provided each Member receives in such Sale of the Company an amount of consideration in respect of such Member's Units that such Member would receive if the aggregate consideration payable in such Sale of the Company were distributed pursuant to Section 5.3(a).

(d) Each of the Members hereby agree to cooperate fully with the Board and the Majority Institutional Investors, in any Sale of the Company and not to take any action prejudicial to or inconsistent with such Sale of the Company, including without limitation providing access to and answering questions of the buyer and its representatives in connection with such Sale of the Company, and to execute any and all agreements and instruments executed by the Company effectuating such Sale of the Company. The Members will, upon request, deliver an executed instrument of transfer with respect to their Units in escrow (pending receipt of the purchase price therefor) to counsel designated by the Company.

(e) The Board, subject to the approval of the Majority Institutional Investors, shall have complete discretion over the terms and conditions of any Sale of the Company effected hereby, including, without limitation, price, type of economic consideration, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, holdbacks and escrows, provided that the following conditions are met:

(i) the type of economic consideration and payment terms applicable to each respective class or series of Units are identical in all material respects with respect to all of the Units in such class or series; and

(ii) each Member receives in such sale of the Company an amount of economic consideration in respect of such Member's Units that such Member would receive if the aggregate economic consideration payable in such Sale of the Company were distributed pursuant to Section 5.3(a).

(f) Except as set forth in Section 5.3(a), each Member shall pay for all transaction costs and expenses incurred by such Member on an individual basis, and its pro rata share (based upon its share of the aggregate proceeds, including for this purpose the value of any Member's exchanged or retained equity) of those transaction costs and expenses incurred for the benefit of all of the Members as a group in connection with any Sale of the Company, in each case, to the extent not otherwise paid by the Company or the acquiring party. In addition, each Member shall bear its pro rata share (as determined in the immediately preceding sentence) of any indemnities required of all of the Members in connection with a Sale of the Company (other than indemnities arising out of representations concerning a Member's own Units, the authority of that Member to effect the transaction, the enforceability of that Member's obligations thereunder, and other representations and covenants particular to the individual Member, for which such

Member shall be solely responsible), provided that, other than in instances of an individual Member's intentional fraud, the maximum potential liability for such indemnities shall be limited to the lesser of (i) such Member's pro rata share (as determined in the immediately preceding sentence) of the indemnity obligations, or (ii) the amount of the aggregate proceeds received or receivable by such Member in the Sale of the Company.

(g) EACH MEMBER HEREBY EXPRESSLY AND IRREVOCABLY APPOINTS THE BOARD OR ANY PERSON DESIGNATED BY THE BOARD FOR SUCH PURPOSE AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AS SUCH MEMBER'S PROXY AND ATTORNEY-IN-FACT TO VOTE SUCH MEMBER'S UNITS AND TAKE ANY AND ALL SUCH OTHER ACTION WITH RESPECT TO SUCH MEMBER'S UNITS AND OTHER SECURITIES OF THE COMPANY AS A MANAGER MAY DIRECT IN CONNECTION WITH A SALE OF THE COMPANY EFFECTED BY THE COMPANY IN ACCORDANCE WITH THIS SECTION. SUCH APPOINTMENT THE BOARD OR ANY PERSON DESIGNATED BY THE BOARD AS PROXY AND ATTORNEY-IN-FACT IS COUPLED WITH AN INTEREST AND SHALL BE VALID THROUGH THE DATE THERE SHALL BE CONSUMMATED A SALE OF THE COMPANY.

## ARTICLE VIII
## CONVERSION TO CORPORATE SOLUTION

**Section 8.1. Conversion to Corporation**.

(a) Subject to the receipt of any required approvals of the FCC, the Board shall have the power and authority to effect the conversion of the Company's business form from a limited liability company to a Delaware corporation or the merger of the Company with or into a new or previously-established but dormant Delaware corporation having no assets or liabilities, debts or other obligations of any kind whatsoever other than those that are de minimis in amount and that are associated with its formation and initial capitalization (such a conversion or merger is referred to as a "Conversion" and such Delaware corporation is referred to as "Newco"); provided, however, that no such Conversion will be allowed within five years of the grant of any Authorization acquired through the Auction if it would cause the Company to lose its Designated Entity status. Upon any such Conversion, the terms of this Agreement and all of the parties' rights and obligations hereunder with respect to their Units and other Membership Rights shall continue in effect, *mutatis mutandis*, with respect to the Newco Capital Securities issued on account of the Units and other Membership Rights as provided in this Section 8.1. A legend referencing the rights and obligations hereunder shall be placed on all certificates evidencing Newco Capital Securities upon the issuance thereof (except to the extent they are issued in connection with a Public Offering).

(b) Upon the consummation of a Conversion, the Units held by each holder thereof shall thereupon be converted into, or exchanged for, a number of shares of one or more classes of Newco's Capital Securities containing the economic and other terms and rights relative to each other holder of Units as the Board shall determine to be as nearly as practicable in all material respects the same as such holder's Units as provided herein; provided, however, that the terms and conditions applicable to each holder of Units with respect to each class or series of Units are identical in all material respects as those applicable to each other holder of Units of such class or

series. Such determination by the Board of the class(es) (and the terms thereof and rights associated therewith) and number of shares of Newco Capital Securities that each Member receives upon a Conversion shall be final and binding on the holders of Units absent manifest arithmetic error. Without limitation of the foregoing, if a Conversion is effected in connection with any underwritten initial Public Offering (an "Initial Public Offering"), each holder of Units shall be entitled to receive that value of common stock (or options to purchase common stock) of the corporation whose shares of common stock are being sold in connection with such Initial Public Offering as equals the amount such holder would be entitled to receive, relative to the Units that such holder held in the Company immediately prior to such Conversion, if a liquidation of the Company had occurred immediately prior to the consummation of such Initial Public Offering; provided that the shares of common stock (or options to purchase common stock) received by each such holder shall as nearly as practicable provide such holder and such corporation with the same economic and other rights, including, without limitation, the terms of any vesting regimen, to which such holder and such corporation, respectively, were entitled or subject with respect to such holder's Units prior to such Conversion.

(c) In connection with a Conversion, each Member hereby covenants and agrees to take any and all such action and execute and deliver any and all such instruments and other documents as the Board may reasonably request in order to effect or evidence such Conversion. Without limiting the generality of the foregoing, no Member shall have or be entitled to exercise any dissenter's rights, appraisal rights or other similar rights in connection with such Conversion and to the extent such rights are provided by applicable law such rights are hereby deemed waived to the fullest extent permitted under applicable law.

## ARTICLE IX
## BOOKS AND RECORDS; CONFIDENTIALITY

**Section 9.1. Books, Records and Financial Statements.**

The Company and each of its Subsidiaries shall keep books of record and account in which full, true and correct entries are made of all of its and their respective dealings, business and affairs, in accordance with GAAP. Such books of record and account, together with a certified copy of this Agreement and of the Certificate of Formation, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each holder of Series A Preferred Units, Series B-1 Common Units, Series B-2 Common Units and Series B-3 Common Units and their respective duly authorized representatives for any purpose reasonably related to such holder's interest in the Company.

**Section 9.2. Accounting System.**

At all times during the continuance of the Company, the Company shall maintain a system of accounting in accordance with GAAP and maintain a Fiscal Year ending December 31 for the Company and each of the Subsidiaries.

**Section 9.3. Tax Matters Partners.**

(a) For tax years commencing before January 1, 2018, W. Scott Soden is hereby designated as the "Tax Matters Partner" of the Company for purposes of Section 6231(a)(7) of the Code and shall have the power and authority, subject to the direction and control of the Board, to represent the Company in any administrative proceeding involving the Company with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes. If any state or local tax law provides for a tax matters partner or person having similar rights, powers, authority or obligations, the Tax Matters Partner shall be authorized to serve in such capacity, subject to the direction and control of the Board. The Board may remove any Person serving as the Tax Matters Partner and appoint another Person to serve as Tax Matters Partner at any time. The Tax Matters Partner shall act as directed by the Board as to any election to be made with respect to tax matters and shall provide all necessary information for the preparation of tax returns within ninety (90) days after the close of each Fiscal Year of the Company. Decisions made by the Tax Matters Partner pursuant to its role as a "tax matters partner" within the meaning of Section 6231(a)(7) of the Code, including, without limitation, whether or not to settle or contest any tax matter, whether or not to extend the period of limitations for the assessment or collection of any tax and the choice of forum for such contest shall be subject to the direction and control of the Board. The Tax Matters Partner may not take any action pursuant to its authority granted by this Section 9.3(a) which may adversely affect the Investor Members disproportionately to the other Members without prior notice of any such proposed action being given to the Investor Members and the written approval of the Majority Institutional Investors. The Tax Matters Partner shall notify the IRS to treat Investor Members as notice partners in accordance with Section 6223 of the Code.

(b) For tax years commencing after December 31, 2017:

(i) The Board shall designate a Member to serve as the "partnership representative" under Section 6223 of the Code as then in effect (the "Partnership Representative"), subject to the direction and control of the Board. The Partnership Representative is authorized, with the prior approval of the Board, to take such actions and to execute and file all statements and forms on behalf of the Company, which may be permitted or required by the applicable provisions of Sections 6221 through 6241 of the Code or the Treasury Regulations issued thereunder, including to the extent available an election under Code Section 6221(b). The Partnership Representative shall, subject to the direction and control of the Board, represent the Company (at the Company's expense) in connection with all audits and examinations of the Company's affairs by the Internal Revenue Service, which may be permitted or required by the applicable provisions of the Code or the Treasury Regulations issued thereunder. Such representation shall include, without limitation, the power and authority to extend the statute of limitations, file a request for administrative adjustment, file suit concerning any Company tax matter, enter into a settlement agreement relating to any Company tax matter, and cause the Company to pay, and the manner of payment of, any imputed underpayment arising out of a final partnership adjustment under Code Section 6225 or to cause the Company to elect under Code Section 6226 to allocate the adjustment to the Members. The Partnership Representative may not take any action pursuant to its authority granted by this Section 9.3(b) which may adversely affect the Investor Members disproportionately to the other Members without prior notice of any such proposed action being given to the Investor Members and the written approval of the Majority Institutional Investors. The Board may

remove any Person serving as the Partnership Representative and appoint another Person to serve as the Partnership Representative at any time.

(ii) No Member shall file a notice with the United States Internal Revenue Service under Section 6222(c) in connection with such Member's intention to treat an item on such Member's United States federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's United States federal income tax return unless such Member has, not less than 30 days prior to the filing of such notice, provided the Board with a copy of the notice and thereafter in a timely manner provides such other information related thereto as the Board shall reasonably request.

(iii) Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the Board of such settlement agreement and its terms within 60 days after the date thereof.

**Section 9.4. Information Rights.**

The Company hereby agrees that so long as any Units are held by any of the Investor Members, the Company shall comply with, and will cause its Subsidiaries to comply with, the following provisions:

(a) Annual Statements. Within one-hundred twenty (120) days after the close of each Fiscal Year of the Company, commencing with the Fiscal Year ending on December 31, 2016, the Company will deliver to each Investor Member, and each Manager unaudited consolidated balance sheets and statements of income and retained earnings and of cash flows of the Company and its Subsidiaries, which annual financial statements shall show the financial condition of the Company and its Subsidiaries as of the close of such Fiscal Year and the results of the Company's operations during such Fiscal Year. The Company shall deliver to each Investor Member and each Member a certificate of the Company's chief financial officer stating that, except as may otherwise be indicated therein or provided for in this Agreement, such statements have been prepared in accordance with GAAP and present fairly the consolidated financial position of the Company as of the close of such Fiscal Year and the results of their respective operations and changes in financial position with respect to such Fiscal Year.

(b) Tax Information. The Company shall use its reasonable efforts to cause Schedule K-1s (or reasonable estimates if final Schedule K-1s are not available) to be delivered to each Member no later than the ninety (90) days after the close of each Fiscal Year of the Company. The Company shall also use its reasonable efforts to provide, or cause to be provided, any other information reasonably requested by such Member in order for such Member to comply with its or any of its beneficial owners' U.S. federal income tax reporting obligations. Such information shall be provided to the Member within (ninety) 90 days of the receipt of a written request by such Member. The Company shall deliver to each Member a copy of the Company's federal partnership return on the date such return is filed with the U.S. Internal Revenue Service.

**Section 9.5. Confidentiality.**

(a) Each Member acknowledges that, as a result of his, her or its business relationship and activities with one another and the Company hereunder, certain trade secrets and other information of a proprietary, competitively sensitive or confidential nature relating to the business of the Company have been and may be disclosed to such Member, including, without limitation, the terms of this Agreements, trade secrets, inventions, products, services, patents, licenses, research projects, costs, processes, techniques, plans for future development, market analyses, projects and business plans, financial information and projections, customer and customer prospects, supplier and supplier prospects, contracts, information regarding potential sale transactions and other information of commercial value that is not known generally or publicly outside of the business of the Company (collectively, "Confidential Information"). Confidential Information does not include information which (i) becomes generally available to the public other than as a result of a disclosure by a Member, (ii) was available to a Member on a non-confidential basis prior to its disclosure to such Member by the Company or (iii) becomes available to a Member on a non-confidential basis from a source other than the Company that is not bound by confidentiality obligations to the Company or otherwise prohibited from transmitting the information to such Member.

(b) Each Member acknowledges and agrees that such Confidential Information is of considerable importance to the Company and may be the result of the incurrence of costs and expenses and development time, and agrees to hold such Confidential Information in strict confidence and not to disclose (except to such Member's Affiliates, general partners, limited partners, officers, directors, accountants, attorneys or other professional advisors and representatives who have a need to know such Confidential Information) the Confidential Information; provided that the foregoing will not preclude disclosure by a Member that is required to comply with applicable law, subpoena or other form of legal process, in which case, the disclosing Member shall promptly notify the Company of such requirement to enable the Company may seek a protective order or other equitable relief and provide all assistance reasonably requested by the Company in furtherance thereof. If the Company is unable to prevent the disclosure thereof, such Member shall furnish only that portion of the Confidential Information that is legally required to be disclosed and exercise reasonable efforts to obtain a protective order or other reliable assurance that confidential treatment will be afforded to the Confidential Information so disclosed.

## ARTICLE X
## LIABILITY, EXCULPATION AND INDEMNIFICATION

**Section 10.1. Liability.**

Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

**Section 10.2. Exculpation.**

(a) To the fullest extent permitted by applicable law, no Covered Person shall be liable to the Company or any other Covered Person, Member or other Person that is a party to or

otherwise bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person from and after the date that such Person first acted in the capacity as a Covered Person (the "Reference Date") in connection with matters relating to the Company and its Subsidiaries and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall not be released from liability to the Company or any other Covered Person, Member or other Person that is a party to or otherwise bound by this Agreement for any such loss, damage or claim incurred by reason of such Covered Person's fraud, intentional misconduct or bad faith violation of the implied contractual covenant of good faith and fair dealing, or such Covered Person's breach of any Related Agreement or other agreement with the Company or a Subsidiary to which such Covered Person is a party.

(b) A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Net Income, Net Loss or income or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

**Section 10.3. Indemnification.**

(a) The Company shall reimburse, indemnify and hold harmless each Covered Person to the fullest extent permitted by applicable law from and against any and all losses, claims, demands, costs, damages, liabilities (joint or several), expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements, and other amounts ("Indemnified Costs") arising from any and all claims, demands, actions, suits, or proceedings, whether civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved as a party or otherwise, arising out of or incidental to the business or activities of or relating to the Company and its Subsidiaries, regardless of whether the Covered Person is a Covered Person at the time any such Indemnified Cost is paid or incurred, except that no Covered Person shall be entitled to be indemnified in respect of any Indemnified Cost incurred by such Covered Person by reason of such Covered Person's fraud, gross negligence or intentional misconduct, and this provision shall not reduce or limit the contractual liability of a Covered Person for breach of any Related Agreement or other agreement with the Company or a Subsidiary to which such Covered Person is a party (the "Related Agreements"); provided, however, that any indemnity under this Section 10.3 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

(b) The indemnification provided by this Section 10.3 shall be in addition to any other rights to which a Covered Person may be entitled under any agreement, decision of a Manager, as a matter of law or equity, or otherwise, both as to an action in the Covered Person's capacity as a Covered Person, and as to an action in another capacity, and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns, and administrators of each Covered Person.

(c) Notwithstanding any other provision of this Section 10.3, the Company shall reimburse Indemnified Costs incurred by a Covered Person in connection with such Person's appearance as a witness on behalf of the Company or its Subsidiaries or other participation at the request of the Company or a Subsidiary in a proceeding involving or affecting the Company or its Subsidiaries at a time when the Covered Person is not a named defendant or respondent in the proceeding.

(d) A Covered Person shall not be denied indemnification in whole or in part under this Section 10.3 solely because the Covered Person had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of the Related Agreements.

**Section 10.4. Fiduciary Duties.**

(a) To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Member, a Covered Person acting under or in accordance with this Agreement shall not be liable to the Company or to any Member for such Covered Person's good faith reliance on the provisions of this Agreement.

(b) No Member (as such) shall owe any fiduciary duty to the Company or any other Member in exercising or refraining from exercising such Member's rights or duties under this Agreement; provided, however, that the foregoing provisions of this Section 10.4(b) do not limit or eliminate liability for an act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

(c) To the extent that a Covered Person owes fiduciary duties to the Company or any Member, such Covered Person shall not be liable for any monetary damages or other monetary relief arising in connection with the breach thereof and the sole remedy therefor shall be non-monetary equitable relief, except with respect to liability for (i) the amount of any financial benefit received by such Covered Person to which he is not entitled; (ii) an intentional violation of criminal law; or (iii) an act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

(d) The provisions of this Agreement, to the extent that they restrict or limit the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace and limit such other duties and liabilities of such Covered Person.

**Section 10.5. Expenses.**

To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.3 hereof.

## ARTICLE XI
## DISSOLUTION, LIQUIDATION AND TERMINATION

**Section 11.1. <u>No Dissolution</u>.**

Only the events set forth in Section 11.2 hereof shall cause the dissolution of the Company. The Company shall not be dissolved by the admission of additional or substitute Members in accordance with the terms of this Agreement.

**Section 11.2. <u>Events Causing Dissolution</u>.**

The Company shall be dissolved and its affairs shall be wound up as follows:

(a) at any time at the election of the Board, subject to Section 6.4; or

(b) upon the entry of a decree of judicial dissolution under the Delaware Act.

**Section 11.3. <u>Liquidation</u>.**

Upon dissolution of the Company, the Board may appoint one or more Persons to carry out the winding up of the Company (such Person(s) if appointed, or the Board if no such Person(s) are so appointed, being referred to as the "<u>Liquidating Trustee(s)</u>"), which Liquidating Trustee(s) shall immediately commence to wind up the Company's affairs in an orderly fashion. The proceeds of liquidation shall be disbursed as provided in Section 5.3(c).

**Section 11.4. <u>Termination</u>.**

The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed as provided in Section 5.3.

**Section 11.5. <u>Claims of the Members</u>.**

The Members and former Members shall look solely to the Company's assets for the return of their Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Contributions, the Members and former Members shall have no recourse against the Company or any other Member.

## ARTICLE XII
## CHOICE OF LAW; SUBMISSION TO JURISDICTION; AND WAIVER OF JURY TRIAL

**Section 12.1. <u>Law</u>.**

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (WITHOUT GIVING EFFECT TO THE CONFLICTS OR CHOICE OF LAWS PROVISIONS THEREOF THAT

WOULD GIVE RISE TO THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER JURISDICTION). NONE OF THE PARTIES HERETO HAS AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

**Section 12.2. Waiver Of Jury Trial.**

EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY. NO PARTY HAS AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

**Section 12.3. Consent To The Exclusive Jurisdiction Of The Courts Of Delaware.**

(a) EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF DELAWARE AND THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, AS WELL AS TO THE JURISDICTION OF ALL COURTS TO WHICH AN APPEAL MAY BE TAKEN FROM SUCH COURTS, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING RELATING TO ANCILLARY MEASURES IN AID OF ARBITRATION, PROVISIONAL REMEDIES AND INTERIM RELIEF, OR ANY PROCEEDING TO ENFORCE ANY ARBITRAL DECISION OR AWARD.

(b) EACH PARTY HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS TO BRING ANY SUIT, ACTION OR OTHER PROCEEDING IN OR BEFORE ANY COURT OR TRIBUNAL OTHER THAN THE COURTS OF THE STATE OF DELAWARE AND COVENANTS THAT SUCH PARTY SHALL NOT SEEK IN ANY MANNER TO RESOLVE ANY DISPUTE OTHER THAN AS SET FORTH HEREIN OR TO CHALLENGE OR SET ASIDE ANY DECISION, AWARD OR JUDGMENT OBTAINED IN ACCORDANCE WITH THE PROVISIONS HEREOF.

(c) EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS SUCH PARTY MAY HAVE TO VENUE, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS. IN ADDITION, EACH OF THE PARTIES CONSENTS TO THE SERVICE OF PROCESS BY PERSONAL SERVICE OR ANY MANNER IN WHICH NOTICES MAY BE DELIVERED HEREUNDER IN ACCORDANCE WITH SECTION 14.5.

## ARTICLE XIII
## NO EXPANSION OF DUTIES; INVESTMENT OPPORTUNITIES; AGREEMENT NOT TO COMPETE

**Section 13.1. Future Opportunities.**

(a) Subject to 13.1(b), no Investor Member or Controlling Member, by virtue of holding Units or other Membership Rights in the Company, shall have any obligation or duty to the Company, any Subsidiary or any other Member to refrain from competing with the Company or any Subsidiary, making investments in businesses that compete with the Company or any Subsidiary, or otherwise engaging in any commercial activity; and none of the Company, any Subsidiary or any other Member shall have any right with respect to any such other investments or activities undertaken by such Member, or such Member's Affiliates. Without limitation of the foregoing, each Investor Member, each Controlling Member, each Manager and each of their respective Affiliates may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company or any Subsidiary (a "Competing Business"), and none of the Company, any Subsidiary or any other Member shall have any rights or expectancy by virtue of such Person's relationships with the Company, this Agreement or otherwise in and to such independent ventures or the income or profits derived therefrom; and the pursuit of any such venture, even if such investment is in a Competing Business shall not be deemed wrongful or improper. No Investor Member, Controlling Member, Manager or any of their respective Affiliates shall be obligated to present any particular investment opportunity to the Company or any Subsidiary even if such opportunity is of a character that, if presented to the Company or a Subsidiary, could be taken by the Company, and such Persons and their respective Affiliates shall continue to have the right to take for their own respective account or to recommend to others any such particular investment opportunity.

(b) No Manager, Controlling Member, or any Member holding 10% or more of the total Units shall hold a ten percent (10%) or greater voting or non-voting ownership interest or a controlling interest in an entity that plans to or has filed an application to participate in the Auction. To be clear, any Member that holds any ownership interest in an entity that plans to or has filed an application to participate in the Auction remains subject to the communications prohibitions of Section 6.3(e) and (f).

## ARTICLE XIV
## MISCELLANEOUS; INVESTOR REPRESENTATIONS

### Section 14.1. Equitable Remedies; Failure to Pursue Remedies; Time of Essence.

(a) The parties agree that irreparable harm would occur in the event that any of the agreements and provisions in this Agreement, were not performed fully by the parties hereto in accordance with their specific terms or were otherwise breached, and that money damages are an inadequate remedy for breach hereof because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its terms or is otherwise breached. It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions to restrain, enjoin and prevent breaches of this Agreement by the Company and the other parties hereto and to enforce specifically such terms and provisions of this Agreement against the Company and other parties hereto, as applicable, in any court of the United States or any state having jurisdiction, such remedy being in addition to and not in lieu of, any other rights and remedies to which the parties are entitled to hereunder and at law or in equity.

(b) Except where a time period is otherwise specified, no delay on the part of any party in the exercise of any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any exercise or partial exercise of any such right, power, privilege or remedy preclude any further exercise thereof or the exercise of any other right, power, privilege or remedy.

(c) Time is of the essence for all purposes of this Agreement.

**Section 14.2. Cumulative Remedies.**

The rights and remedies provided by this Agreement are cumulative and the use of any one such right or remedy by any party shall not preclude or waive its right to use any or all other such rights or remedies. Except as otherwise provided herein, said rights and remedies are in addition to any other rights or remedies the parties may have by law, statute, ordinance or otherwise.

**Section 14.3. Amendments.**

Subject to the provisions of this Section 14.3, any provision of this Agreement may be amended or waived only with the written consent of the Majority Institutional Investors, which amendment or waiver shall be binding upon all Members and holders of Units as to any such amendment or waiver; provided, however, that if any waiver or amendment would materially and adversely change the specifically enumerated rights hereunder of one or more Members in a way that is materially disproportionate to the change such waiver or amendment would effect on such specifically enumerated rights of other Members (each such Member whose specifically enumerated rights are being so disproportionately changed is referred to as a "Disproportionately Treated Member"), such amendment or waiver shall not be effective as to any Disproportionately Treated Member unless consented to by a majority in interest of the Disproportionately Treated Members (determined by reference to their relative holdings of Units entitled to receive distributions in accordance with Section 5.3(a)(iii)). For purposes of the foregoing, the term "disproportionate" refers to a change in specifically enumerated rights hereunder of one Member while not similarly changing such specifically enumerated rights held by another Member holding the same class or series of Units with respect thereto (or any other class or series of Units that is *pari passu* with the first Member's Units with respect to the specifically enumerated rights that are being changed), and determined without regard to any disproportionate results or consequences of such change that are due to a difference in their relative equity ownership interests in the Company or due to differences in the rights, preferences, priorities, privileges or limitations applicable to different classes or series of Units as set forth herein. For purposes of this Section 14.3, the Series B-1 Common Units, Series B-2 Common Units, Series B-3 Common Units, Series B-4 Common Units and Series B-5 Common Units are *pari passu* with one another in all economic respects. An amendment or waiver effected in connection with the issuance of any Units or Membership Rights in accordance with Section 4.1(b), the effect of which is to change or dilute the economic rights of the holders of Units pro rata in accordance with the relative economic sharing percentages of the Units as set forth in Section 5.3(a)(iii), shall in no event be deemed to be a "disproportionate" change of a specifically enumerated right of any holder of Units of any series thereof relative to any other holder of Units of the same or any other series thereof. Each Member shall be bound by any amendment or waiver effected in accordance

with this Section, whether or not such Member has consented to such amendment or waiver. Upon effectuation of each such waiver or amendment, the Company shall give written notice thereof to the Members who have not previously consented thereto in writing.

**Section 14.4. Binding Effect.**

This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

**Section 14.5. Notices.**

Except as otherwise provided herein, all demands, notices, requests, consents and other communications required or permitted under this Agreement (collectively, "Notices") shall be in writing and shall be personally delivered or sent by facsimile machine (with a confirmation copy sent by one of the other methods authorized in this Section), or delivered via nationally recognized commercial overnight delivery service (including FedEx) that maintains and can provide a record of delivery as set forth below:

If to the Company, addressed to:

Omega Wireless, LLC
455 N. Cityfront Plaza Drive
Suite 2755
Chicago, IL 60611
Attention: Christopher J. Jensen

with a copy to:

Locke Lord LLP
2800 Financial Plaza
Providence, RI 02903
Attention: Peter J. Barrett, Esq. & Robert E. Baute, Jr., Esq.

If to any Member, to such Member's address as set forth on **Schedule A**.

Notices directed to the Company shall be deemed received on the first Business Day after the actual delivery thereof to the Company as provided above; and Notices directed to Members shall be deemed received upon the earlier to occur of the first Business Day after the (i) actual delivery thereof to the party to whom such notice is directed as provided above or (ii) on the first Business Day following the day the same is deposited with the commercial carrier if sent by commercial overnight delivery service. Each party, by notice duly delivered in accordance herewith may specify a different address for the giving of any notice hereunder.

Notices of meetings or actions of the Board or Members and other written communications may be delivered via electronic means, such as email or facsimile, for which a record of such transmission by the sender is automatically created. Such notices may be delivered to the latest email address, facsimile number or the like for each Manager or Member

of which the Company has record. Such notices shall be deemed received upon the delivery thereof.

**Section 14.6. Interpretation.**

Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. All references herein to "Articles," "Sections," "subsections" and "subparagraphs" shall refer to corresponding provisions of this Agreement. The term "including" is not exclusive and shall be read as "including without limitation."

**Section 14.7. No Strict Construction.**

The words used in this Agreement are the words mutually chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

**Section 14.8. Severability.**

If any term or provision of the Agreement, or the application thereof to any Person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or application to other Persons or circumstances, shall not be affected thereby, and each term and provision of this Agreement shall be enforced to the fullest extent permitted by law.

**Section 14.9. Counterparts.**

This Agreement may be executed in any number of counterparts hereof, and by the parties hereto on separate counterparts hereof, and all such counterparts shall together constitute one and the same agreement. Counterparts of the signature pages hereto signed and delivered to other parties hereto via facsimile shall for all purposes be deemed to constitute the delivery of an originally executed counterpart hereof.

**Section 14.10. Integration.**

This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto, including without limitation any term sheets or private placement memoranda.

**Section 14.11. Representations by New Members.**

Each of the Members that was not a party to the Original Agreement hereby represents to the Company that (a) since the date of the Original Agreement and subsequently, such Member has not taken any action that would constitute a breach of any provision set forth in Section 6.3(e) or (f) herein; and (b) such Member has never and does not hold a disclosable interest as defined in the FCC rules in another forward auction applicant or a controlling interest in a full power or Class A broadcast television licensee.

[End of Text; the Next Page is the First Signature Page]

REDACTED FOR PUBLIC INSPECTION

**COMPANY:**

**OMEGA WIRELESS, LLC**

By:______________________________
Christopher J. Jensen, Manager

**CONTROLLING MEMBERS:**

Kenneth D. Anderson

Christopher J. Jensen

Edward Moise

W. Scott Soden

**CONTROLLING MEMBERS:**

____________________________
Kenneth D. Anderson

____________________________
Christopher J. Jensen

____________________________
Edward Moise


____________________________
W. Scott Soden

OMEGA WIRELESS, LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

SCHEDULE A

As of April 6, 2016

| Name and Address of Member | Commitment Amount | Series A Preferred Contribution Amount | Series A Preferred Units | Series B-1 Common Units | Series B-2 Common Units | Series B-3 Common Units | Series B-4 Common Units | Series B-5 Common Units |
|---|---|---|---|---|---|---|---|---|
| 18th Street Group, LLC<br>125 Whitestick Road<br>Beckley, WV 25801 | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| M/C Investors 2014, LLC<br>75 State Street<br>Boston, MA 02109 | [redacted] | | | | | | | |
| M/C Partners VII, L.P.<br>75 State Street<br>Boston, MA 02109 | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | | | | | | | | |
| [redacted] | [redacted] | | | | | | | | |
| [redacted] | [redacted] | | | | | | | | |
| Peppertree Capital Fund IV, LP<br>86 West Street<br>Chagrin Falls, OH 44022 | [redacted] | | | | | | | | |
| Peppertree Capital Fund IV QP, LP<br>86 West Street<br>Chagrin Falls, OH 44022 | [redacted] | | | | | | | | |
| Peppertree Capital FIV Co-Investors, LLC<br>86 West Street<br>Chagrin Falls, OH 44022 | [redacted] | | | | | | | | |
| Shamrock Capital Growth Fund III, L.P.<br>1100 Glendon Ave #1600<br>Los Angeles, CA 90024 | [redacted] | | | | | | | | |
| Lewis Family Trust DTD 3/23/2006<br>132 Burns Ave.<br>Atherton CA 94027 | [redacted] | | | | [redacted] | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| The Viehweg Revocable Trust U/A/D 02-09-99<br>150 Cortes Ave.<br>San Francisco, CA 94116 | [redacted] | | | | [redacted] | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| Kenneth D. Anderson<br>c/o Anderson Pacific Corporation<br>455 N. Cityfront Plaza Drive, Suite 2755<br>Chicago, IL 60611 | [redacted] | | | [redacted] | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | | | | | | [redacted] | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | | | | | | [redacted] | | |
| [redacted] | | | | | | | | [redacted] |
| Christopher J. Jensen<br>c/o Anderson Pacific Corporation<br>455 N. Cityfront Plaza Drive, Suite 2755<br>Chicago, IL 60611 | [redacted] | | | [redacted] | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | | | | | | [redacted] | | |
| Edward D. Moise<br>3219 Coliseum St.<br>New Orleans, LA 70115 | [redacted] | | | [redacted] | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |

REDACTED FOR PUBLIC INSPECTION

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | | | | | | | |
| W. Scott Soden<br>643 Franklin St.<br>Denver, CO 80218 | [redacted] | | | [redacted] | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | [redacted] | | | | | | | |
| [redacted] | | | | | | [redacted] | | |
| [redacted] | [redacted] | | | | | | | |
| **Total:** | [redacted] | | | [redacted] | [redacted] | [redacted] | | [redacted] |

EXHIBIT A

FORM OF SUBSCRIPTION AGREEMENT

[See Attached]

**OMEGA WIRELESS, LLC**

**SUBSCRIPTION AGREEMENT**

**Section 1**

**Investor:** ________________________________________(the "Investor")

**Required Contribution Amount:** $________________________

SUBSCRIPTION AGREEMENT dated as of ______ ____, ____, is made by and between OMEGA WIRELESS, LLC, a Delaware limited liability company (the "Company"), and the Investor.

RECITALS

The Investor desires to acquire membership interests in the Company represented by Series A Preferred Units (collectively, the "Units") and the Company desires to issue the Units to the Investor on the terms and conditions set forth below. The Investor has executed the Company's Amended and Restated Limited Liability Company Agreement dated April 6, 2016 (as may be amended from time to time, the "LLC Agreement") and committed to contribute up to $____ to the Company in accordance with the terms of the LLC Agreement and the Company has admitted the Investor as a Member of the Company in accordance with the terms of the LLC Agreement. The Company has delivered to the Investor a Contribution Notice dated ______ ____, ____ in accordance with Section 4.2(a) of the LLC Agreement (the "Pending Contribution Notice"), requiring the Investor to make a cash Contribution to the Company on or before ______ ____, ____ in the amount of the Required Contribution Amount set forth above. Capitalized terms used herein and not defined are used herein with the meanings ascribed thereto in the LLC Agreement.

The parties agree as follows:

1. Issuance and Sale. Subject to and in reliance upon the representations, warranties, terms and conditions set forth in this Agreement and the LLC Agreement, the Company shall issue to the Investor, and the Investor shall purchase from the Company, one (1) Series A Preferred Unit for each $1.00 contributed by such Investor as a cash Contribution pursuant to Section 4.2(a) of the LLC Agreement and as required by the Pending Contribution Notice. Pursuant to Section 4.2(a) with the terms of the LLC Agreement, the Investor has agreed to make a cash Contribution in the amount of the Required Contribution Amount set forth above.

2. Investor Representations. The Investor represents and warrants to the Company as follows, which representations and warranties are true as of the date hereof and will be true as of the date the Units are issued in accordance with Section 1 and as of the date the Investor acquires any additional securities in accordance with the LLC Agreement:

(a) The Investor has full power and authority to enter into this Agreement. The execution, delivery and performance by the Investor of this Agreement do not and will not conflict with or result in any breach of any provision of any law, regulation, order, judgment, writ, injunction, license, permit, agreement or instrument to which the Investor is subject.

(b) The Units to be acquired by the Investor will be acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the Transfer, resale or distribution of any part thereof and the Investor has no present intention of transferring, selling, granting any participation in, or otherwise distributing the same. The Investor does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, Transfer or grant participations to such Person or to any third Person, with respect to any of the Units. The Investor understands that the Units have not been, and will not be, registered under federal or state securities laws (the "Securities Laws") by reason of a specific exemption from the registration provisions of the Securities Laws that depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Investor's representations as expressed herein.

(c) The Investor has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company, and so is capable of evaluating the merits and risks of the Investor's investment in the Company and has the capacity to protect the Investor's own interests. The Investor acknowledges that all documents and other materials pertaining to the Investor's investment in the Company that the Investor has requested to examine have been made available for inspection by the Investor. The Investor, or a Person or Persons acting on the Investor's behalf, has had a reasonable opportunity to ask questions of and receive answers from the Company concerning the offering of the Units and the Company, and all such questions have been answered to the full satisfaction of the Investor. The Investor understands that the purchase of the Units hereunder is a speculative investment that involves a high degree of risk of loss of such Investor's investment therein. The Investor is able to bear the economic risks of its investment in the Units for an indefinite period of time, including the risk of a complete loss of the Investor's investment in the Units.

(d) Reference is made to the Confidential Private Placement Memorandum provided to the Investor by the Company on or about February 5, 2016 (the "PPM"). The Investor has been furnished with a copy of the PPM, has read it and understands the risks of, and other considerations relating to, an investment in the Company. The Investor is purchasing the Units in the Company relying solely on the information contained in the PPM and the LLC Agreement (and the other agreements referred to in the LLC Agreement), and not on any other statement (whether oral or written) with respect to the offering of Units made by the Company, any placement agent for the Company or any officer, director, employee, stockholder, member or affiliate of either of them.

(e) The Investor understands that the Units are characterized as "restricted securities" under the Securities Laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations the Units may be resold without registration under the Securities

Laws only in certain limited circumstances. The Investor acknowledges that the Units must be held indefinitely unless subsequently registered under the Securities Laws and under applicable state securities laws or an exemption from such registration is available. The Investor is aware of the provisions of Rule 144 ("Rule 144") promulgated under the Securities Act of 1933, as amended (the "Securities Act") that permit limited resale of securities purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, a holding period. The Investor understands that no public market now exists for any of the securities issued by the Company, and that the Company has made no assurances that a public market will ever exist for the Units.

(f) Without in any way limiting the representations set forth above and in addition to the limitations on dispositions with respect to the Units set forth in the LLC Agreement, the Investor further agrees not to make any disposition of all or any portion of the Units unless and until:

(i) There is then in effect a registration statement under the Securities Laws covering the Units intended to be disposed of, and such disposition is made in accordance with such registration statement; or

(ii) The Investor shall have notified the Company of the proposed disposition and shall have furnished the Company with a reasonably detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Investor shall have furnished the Company with a legal opinion, reasonably satisfactory to the Company, stating that such disposition is exempt from the registration requirements of the Securities Act.

(g) The Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by such Investor any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement.

(h) The Investor is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Laws (see **Section 2** for definition of "accredited investor").

(i) The Investor is not an investor in, nor an officer or director of, any entity other than the Company that is or plans to be an applicant in Federal Communications Commission's ("FCC") forward auction of FCC authorizations located in the 470 to 698 MHz band pursuant to FCC Docket No. 12-268 (the "Auction"), nor is the Investor a party, directly or indirectly, to such an application of any entity other than the Company, nor is the Investor a controlling interest holder, officer, director or governing board member of a full power or Class A broadcast television licensee.

3. Miscellaneous.

(a) Equitable Remedies. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would

give rise to irreparable harm to the other party for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(b) Further Actions. The parties agree to execute such further instruments and to take such further action as may reasonably be necessary to carry out the intent of this Agreement.

(c) Successors and Assigns. This Agreement shall inure to the benefit of the successors and assigns of the Company and be binding upon the Investors and the Investors' heirs, executors and administrators.

(d) Governing Law; Severability. This Agreement shall be construed under and governed by the internal laws of the State of Delaware, without regard to principles of conflicts of law. If any provision of this Agreement is determined by a court of law to be illegal or unenforceable, then such provision will be enforced to the maximum extent possible and the other provisions will remain fully effective and enforceable.

(e) Headings. Headings are for convenience only and are not deemed to be part of this Agreement.

(f) Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one instrument.

(g) Anti-Collusion Rule. The Investor shall refrain from engaging in any communications or discussions with any third party concerning the Company's actual or planned Auction bids or bidding strategy to the extent that such communication would violate the FCC's Anti-Collusion Rule (47 C.F.R. Section 2105(c)). Specifically, and without limitation, the Investor will not (a) discuss or disclose to any Person outside the Company who is or plans to be in the Auction any information pertaining to bids or bidding strategies in the Auction; (b) discuss or negotiate any agreement pertaining to the bids or bidding strategies of any applicant in the Auction with any representative of the other party; (c) discuss or disclose any information, or negotiate any settlement agreement with any representative of the other party pertaining to post-Auction market structure involving the licenses being auctioned in the Auction; or (d) discuss any matters with each other that would affect, or in the reasonable assessment of the parties have the potential to affect, either party's Auction bidding or bidding strategy. If after February 10, 2016 but prior to making an investment in the Company, the Investor received any bids or bidding strategy from any other forward auction applicant or broadcast television licensee, the Investor shall, without disclosing any actual bids or bidding strategy, notify the Company that it has received information regarding the bids and bidding strategy of

another applicant and will make any certifications necessary under 47 C.F.R. § 1.2105(c)(5)(ii)(*1*)-(2).

(h) Entire Agreement. This Agreement and the LLC Agreement constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between the parties hereto with respect to the specific subject matter hereof.

(i) No Strict Construction. The words used in this Agreement are the words mutually chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(j) Time of the Essence. Time shall be of the essence in this Agreement.

[The remainder of this page is intentionally left blank.]

## Section 2

Definition of "accredited investor" under Rule 501

(a) Accredited investor. Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(2(i)) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000.

(i) Except as provided in paragraph (a)(5)(ii) of this section, for purposes of calculating net worth under this paragraph (a)(5):

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result

of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

(ii) Paragraph (a)(5)(i) of this section will not apply to any calculation of a person's net worth made in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

(A) Such right was held by the person on July 20, 2010;

(B) The person qualified as an accredited investor on the basis of net worth at the time the person acquired such right; and

(C) The person held securities of the same issuer, other than such right, on July 20, 2010.

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated Person as described in §230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

IN WITNESS WHEREOF, the undersigned have executed this Subscription Agreement as of the day and year first above written.

**INVESTOR (if a natural person)**

___________________________________
(Signature of Investor)

___________________________________
(Date)

**INVESTOR (if an entity)**

___________________________________
(Printed Name of Investor)

___________________________________
(Signature of Officer)

___________________________________
(Title of Officer)

___________________________________
(Date)

***Subscription Accepted:***

**OMEGA WIRELESS, LLC**

By:_____________________________________
_______________________, Manager