**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA *ex rel.* THOMAS WOLF

*Plaintiff–Relator,*

v.

OMEGA WIRELESS, LLC; M/C PARTNERS; SHAMROCK CAPITAL ADVISORS, LLC; PEPPERTREE CAPITAL MANAGEMENT, INC.; PEPPERTREE CAPITAL FUND IV, LP; PEPPERTREE CAPITAL FUND IV QP, LP; PEPPERTREE CAPITAL FIV CO-INVESTORS, LLC; PEPPERTREE CAPITAL FUND VI, LP; PEPPERTREE CAPITAL FUND VI QP, LP; PEPPERTREE CAPITAL FVI CO-INVESTORS, LLC; 18TH STREET GROUP, LLC; GLENMEDE TRUST COMPANY; CHERRY WIRELESS, LLC; MONARCH WIRELESS, LLC; CANOPY SPECTRUM, LLC; TRIAD 700, LLC; TRIAD 8, LLC; CYPRESS CELLULAR, LP; and JOHN DOES #1–50, FICTICIOUS NAMES,

*Defendants*.

Civil Action No. 1:21-cv-02346-JMC

**PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§3729–3732, FEDERAL FALSE CLAIMS ACT**

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS


INTRODUCTION .......... 1

PARTIES .......... 4

I. Plaintiff/Relator Thomas Wolf .......... 4

II. Defendants .......... 4

A. Omega Wireless, LLC .......... 4
B. M/C Partners .......... 5
C. Shamrock Capital Advisors, LLC .......... 5
D. Peppertree Capital Management, Inc. .......... 6
E. The Peppertree Funds .......... 6
F. 18th Street Group, LLC .......... 7
G. Glenmede Trust Company .......... 8
H. Cherry Wireless, LLC .......... 8
I. Monarch Wireless, LLC .......... 9
J. Canopy Spectrum, LLC .......... 9
K. Triad 700, LLC .......... 10
L. Triad 8, LLC .......... 10
M. Cypress Cellular, LP .......... 10
N. John Does Nos. 1 –50, Fictitious Names .......... 11

JURISDICTION AND VENUE .......... 11

BACKGROUND AND APPLICABLE LAW .......... 12

I. FCC Spectrum Auctions .......... 12

II. Designated Entities .......... 16

III. The Auction Process .......... 21

A. Short-Form Applications and Certifications .......... 21
B. Long-Form Application and Certifications .......... 23
C. Post-Auction Restrictions .......... 24

DEFENDANTS' SCHEME TO FRAUDULENTLY OBTAIN A "SMALL BUSINESS DISCOUNT" .......... 25

I. Auction 1002 .......... 26

II. Omega Is a Private Fund Organization .......... 26

III. Omega's Auction History .......... 29

IV. Omega Was Unable to Raise the Large Amounts of Capital Necessary to Implement its Business Plan for Auction 1002 .......... 30

V. Omega Gives Up *De Facto* Control to Large Business Defendants .......... 32

VI. Defendants Violated the FCC Quiet Period Rule and Anti-Collusion Rules .......... 37

VII. Omega's Bidding Behavior Demonstrates Large Entity Control of Omega .......... 37

VIII. Results of Auction 1002 ........ 39
IX. The Same Investors and Principals Used the Same Template in Other Auctions ........ 40
X. Omega's Sham Private Fund Structure ........ 41
XI. Defendants' Continuing Fraud Post-Auction ........ 43
A. Other Auctions ........ 46

DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED FALSE CLAIMS OR STATEMENTS REGARDING THE "SMALL BUSINESS" STATUS OF BIDDING ENTITIES ........ 51

DEFENDANTS MISREPRESENTED THAT THEY WOULD COMPLETE A BUILDOUT ........ 52

DEFENDANTS FRAUDULENTLY INDUCED THE GOVERNMENT TO ISSUE LICENSES TO THEIR CHOSEN BIDDING ENTITIES AND TO ALLOW THE DE DISCOUNT ........ 53

DEFENDANTS' FALSE CLAIMS CAUSED SUBSTANTIAL DAMAGE TO THE FEDERAL GOVERNMENT ........ 54

COUNT I ........ 55
(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ........ 55

COUNT II ........ 56
(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ........ 56

COUNT III ........ 56
(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ........ 56

COUNT IV ........ 57
(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ........ 57

PRAYER FOR RELIEF ........ 57

JURY TRIAL DEMAND ........ 58

On behalf of the United States of America ("United States"), Plaintiff-Relator Thomas Wolf ("Relator") hereby files this Complaint against Defendants Omega Wireless, LLC; M/C Partners; Shamrock Capital Advisors, LLC; Peppertree Capital Management, Inc.; Peppertree Capital Fund IV, LP; Peppertree Capital Fund IV QP, LP; Peppertree Capital Fund FIV Co-Investors, LLC; Peppertree Capital Fund VI, LP; Peppertree Capital Fund VI QP, LP; Peppertree Capital FVI Co-Investors, LLC; 18th Street Group, LLC; Glenmede Trust Company; Cherry Wireless, LLC; Monarch Wireless, LLC; Canopy Spectrum, LLC; Triad 700, LLC; Triad 8, LLC; Cyress Cellular, LP; and John Does #1-50, Fictitious Names (collectively, the "Defendants"), pursuant to the qui tam provisions of the federal False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA").

## INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, claims, and "reverse false claims" made and caused to be made by Defendants and/or their agents, employees and co-conspirators in violation of the FCA.

2. Defendants are a syndicate of sophisticated companies that knowingly defrauded the United States in connection with a Federal Communications Commission ("FCC") public auction of spectrum licenses by falsely claiming at least $32 million in "very small business" credits to which Defendants were not entitled.

3. Defendants targeted exclusive licensing access to wireless services spectrum that were auctioned by the FCC in Auction 1002, which was conducted in August 2016. Specifically, Defendants Peppertree Capital Fund IV, LP, Peppertree Capital Fund IV QP, LP, Peppertree Capital Fund FIV Co-Investors, LLC, Peppertree Capital Fund VI, LP, Peppertree Capital Fund VI QP, LP,

Peppertree Capital FVI Co-Investors, LLC (collectively, "The Peppertree Funds"), M/C Partners, Shamrock Capital Advisors, LLC, 18th Street Group, and Glenmede Trust Company (collectively, the "Large Business Defendants"), identified particular blocks of spectrum that supplemented spectrum licenses the Large Business Defendants already owned.

4. But these complementary licenses were not the only target. The Large Business Defendants also wanted the valuable auction credits that the FCC reserves for eligible "very small businesses"—as that term is defined by FCC regulations—which entitle a successful bidder to a 25% discount (or bidding credit) on its obligations to the United States incurred as a result of its successful bids. However, none of the Large Business Defendants qualified for these small business auction credits.

5. Undeterred, the Large Business Defendants devised a scheme whereby they used Defendant Omega Wireless, LLC ("Omega") as a front both to obtain these specific spectrum licenses and secure from the FCC the lucrative 25% discount.

6. With little substantive experience in the spectrum auction space, Omega had difficulty finding investors who were comfortable with ceding control to an inexperienced bidder. The one thing Omega did offer though, was a claim to "designated entity" status. Faced with the prospect of not being able to participate in Auction 1002 at all, Omega willingly relinquished control over its bidding to secure the capital it needed for participation. To that end, Defendants knowingly agreed to trade capital for control, with Omega getting a seat at the auction table and the Large Business Defendants obtaining *de facto* control of Omega and, importantly, its purported entitlement to auction credits.

7. The scheme orchestrated by the Large Business Defendants was successful. First, Defendant Omega, as the purported "very small business," was the winning bidder on one-hundred

and nineteen 600 MHz Band licenses that complemented the Large Business Defendants' existing and unique operating markets.

8. Second, because Omega falsely claimed and certified up to and through the payment deadline that it was a "designated entity" by virtue of its purported status as an independent "small business," Defendants caused the FCC to issue an auction credit of $32,234,183—a credit for which none of the Defendants were eligible.

9. This is because Omega was, in fact, under the *de facto* control of the Large Business Defendants during the relevant time period, thus rendering Omega ineligible for the discount.

10. Defendants also intentionally created a complex chain of *de jure* controls to hide *de facto* control by the Large Business Defendants and to create the illusion that Omega was under the control of minority equity interests.

11. Had Defendants truthfully disclosed the Large Business Defendants' *de facto* control of Omega, Omega would not have been considered a designated entity under FCC rules, and it would have been required to pay the full amount of its bids. Based on their false certifications, however, Defendants paid approximately $32 million less than they should have to the United States for these wireless services spectrum rights.

12. Defendants conspired amongst themselves to deceive the United States as to the small business status of Omega. Defendants agreed to enter into this scheme to present these false claims and statements to the United States, and these false claims and statements were made in furtherance of conspiracies to defraud the United States. The purpose of the scheme has, at all relevant times, been to receive credits under false pretenses for claims submitted to the United States.

13. As a result of these false certifications, reports, and claims, the Government was

falsely and/or fraudulently induced to award Defendant Omega bidding credits for which it was not eligible. Because the United States was falsely and/or fraudulently induced to complete this transaction with Defendants, every claim for payment or credits as part of Auction 1002 was a false claim. Moreover, because Defendants subverted the goal of the program by diverting funds that were intended to go to legitimate "very small businesses," the proper (unmultiplied) measure of damages is the entire value of the bidding credits that were awarded to Defendants.

14. Accordingly, Relator, on behalf of the United States and pursuant to the FCA, seeks all applicable damages and penalties from Defendants for knowingly submitting false claims.

## PARTIES

### I. Plaintiff/Relator Thomas Wolf

15. Relator Thomas Wolf is a resident of Denver, Colorado. Wolf is a licensed securities professional, holding Series 7 and Series 66 licenses. Wolf is also a Chartered Alternative Investment Analyst.

16. Relator is an original source of the allegations in this Complaint against Defendants, and the allegations are not based upon publicly-disclosed information. Relator voluntarily provided the Government with the information upon which the allegations in this Complaint are based prior to the filing of the Complaint in accordance with 31 U.S.C. § 3730(b)(2).

### II. Defendants

#### A. Omega Wireless, LLC

17. Omega Wireless LLC is a limited liability company, established in 2016 in Delaware. Omega was created for the express purpose of bidding on authorizations (or licenses) for broadband wireless spectrum in the 470 to 698 MHz band offered through an FCC incentive auction.

18. Ed Moise was the managing director of Omega. The other mangers of Omega included Kenneth Anderson, Christopher Jensen, and William Scott Soden.

19. Other investors in Omega included M/C VII Funds (16.34% interest), Peppertree IV Funds (21.79% interest), Shamrock Capital Advisors, LLC (21.79%), and 18th Street Group, LLC (8.72% interest).

**B. M/C Partners**

20. M/C Partners, formerly known as Media Communications Partners, is a multi-billion-dollar private equity firm, established in 1986 in Massachusetts and has approximately $3.0 billion in assets under management.

21. M/C Partners, led by Managing Partners Jim Wade, Gillis Cashman, and Brian Clark, focuses exclusively on the communications and information technology sectors.

22. According to their website, M/C Partners takes "an active role in our investments, working closely and effectively with management teams to deliver success and strong investment returns."

23. M/C Partners directly and indirectly holds 16.34% interest in Omega Wireless, LLC and 32.90% interest in Triad 8, LLC.

**C. Shamrock Capital Advisors, LLC**

24. Shamrock Capital Advisors, LLC ("Shamrock") is a California limited liability company, founded in 1978 and headquartered in Los Angeles, California. As of 2021, Shamrock had approximately $7.4 billion of assets under management.

25. Shamrock current partners include Stephen D. Royer, William J. Wynperle, Michael A. LaSalle, Andrew J. Howard, Patrick A. Russo, and Alan H. Resenikoff.

26. On April 6, 2016, Shamrock acquired 21.79% beneficial equity interest in Omega.

**D. Peppertree Capital Management, Inc.**

27. Peppertree Capital Management, Inc. was incorporated in Ohio in 2003. Peppertree Capital Management, Inc., by and through its employees and agents, engaged in acts and omissions on behalf of and for the benefit of the Peppertree Funds.

**E. The Peppertree Funds**

28. The Peppertree Funds are a family of six private equity funds owned and managed by F. Howard Mandel and Ryan Lepene. The Peppertree Funds are a subset of a broader group of business formations bearing the name "Peppertree Capital," including Peppertree Capital Management, Inc.

29. Mr. Mandel and Mr. Lepene formed six Peppertree Funds to collectively invest in Omega's Auction 1002 participation as follows:

| | **Peppertree Entity** | **Total Contribution (aggregate as of April 2017)** | **Percent of Direct Equity Interest** |
|---|---|---|---|
| 1 | Peppertree Capital Fund IV, LP | $ 1,415,396.23 | 1.391% (1.31%) |
| 2 | Peppertree Capital Fund IV QP, LP | $ 9,954,965.33 | 9.781% (9.22%) |
| 3 | Peppertree Capital FIV Co-Investors, LLC | $ 280,033.63 | 0.275% (.37%) |
| 4 | Peppertree Capital Fund VI, LP | $148,344.39 | 0.146% (.13%) |
| 5 | Peppertree Capital Fund VI QP, LP | $11,413,552.31 | 11.215% (10.5%) |
| 6 | Peppertree Capital FVI Co-Investors, LLC | $88,498.50 | 0.087% (.26%) |
| | **TOTAL** | **$23,300,790.38** | **22.895%** |

30. The Peppertree Funds' collective 22.895% interest in Omega is a beneficial equity interest.

31. Peppertree Capital Fund IV, LP was formed in Delaware in 2013. F. Howard Mandel and Ryan Lapene each hold a 50% equity and voting ownership interest in Peppertree Capital IV,

Inc., which is the general partner of Peppertree Capital Fund FIV, LP, which is in turn the general partner of the defendant entity, Peppertree Capital Fund IV, LP.

32. Peppertree Capital Fund IV QP, LP was formed in Delaware in 2013. F. Howard Mandel and Ryan Lapene each hold a 50% equity and voting ownership interest in Peppertree Capital IV, Inc., which is the general partner of Peppertree Capital Fund FIV, LP, which is in turn the general partner of the defendant entity, Peppertree Capital Fund IV QP, LP.

33. Peppertree Capital Fund FIV Co-Investors, LLC, was formed in Ohio in 2013. F. Howard Mandel is a managing member of the entity.

34. Peppertree Capital Fund VI, LP was formed in Delaware in February 2016 and has been registered in Ohio since March 2016. F. Howard Mandel and Ryan Lapene each hold a 50% equity and voting ownership interest in Peppertree Capital VI, Inc., which is the general partner of Peppertree Capital FVI, LP, which is in turn the general partner of the defendant entity, Peppertree Capital Fund VI, LP.

35. Peppertree Capital Fund VI QP, LP was formed in Delaware in February 2016 and has been registered in Ohio since March 2016. F. Howard Mandel and Ryan Lapene each hold a 50% equity and voting ownership interest in Peppertree Capital VI, Inc., which is the general partner of Peppertree Capital FVI, LP, which is in turn the general partner of the defendant entity, Peppertree Capital Fund VI QP, LP. Peppertree Capital FVI Co-Investors, LLC, was formed in Ohio in February 2016. F. Howard Mandel is a managing member of the entity.

**F. 18th Street Group, LLC**

36. 18th Street Group LLC ("18th St. Group") is a limited liability company fund founded in 2003 and headquartered in Beckley, West Virginia.

37. The managing members of 18th St. Group are Marz Attar and Tom Attar.

38. 18th St. Group holds an 8.72% beneficial equity interest in Omega.

**G. Glenmede Trust Company**

39. Glenmede Trust Company ("Glenmede"), a $53 billion private investment management firm, was founded in 1956 and is headquartered in Philadelphia, Pennsylvania.

40. Glenmede participated with Omega in the FCC Auction through three entities: Glenmede Private Investment Fund, VIII, LLC, Glenmede Private Investment Fund VIII-B, LLC, and PCT Partners, LLC.

41. Glenmede's three funds collectively invested the following capital in Omega's Auction 1002 participation:

| | Glenmede Entity | Total Contribution (aggregate as of April 2017) | Percent of Direct Equity Interest |
|---|---|---|---|
| 1 | Glenmede Private Investment Fund VIII, LLC | $ 514,600 | 0.506% |
| 2 | Glenmede Private Investment Fund VIII-B, LLC | $ 485,400 | 0.477% |
| 3 | PCT Partners, LLC | $4,660,158 | 4.579% |
| | **TOTAL** | **$5,660,158** | **5.562%** |

**H. Cherry Wireless, LLC**

42. Cherry Wireless, LLC was formed in Delaware in 2021. Edward D. Moise, Jr. is a managing member of the entity and its CEO. Mr. Moise and Ms. Jennifer M. Fritzsche are both managing members of the LLC and have voting interests.

43. The Peppertree Funds directly and indirectly hold 47.17% of the Class B Interests in Cherry Wireless, LLC, which equals 38.91% of the total equity in the entity. Frank H. Mandel and Ryan Lepene each hold a 50% equity and voting ownership interest in the entities serving as

the general partners of these Peppertree Funds.

44. In 2021–2022, Cherry Wireless, LLC participated in Auction 110: 3.45 GHz Service claiming a 25% bidding credit as a very small business designated entity.

**I. Monarch Wireless, LLC**

45. Monarch Wireless, LLC was formed in Delaware in 2019. Edward D. Moise, Jr. is a managing member of the entity and its CFO. Mr. Moise and Mr. Kenneth D. Anderson are both Class A Members and managing members of Monarch Wireless, LLC. Each holds a 50% voting interest in Monarch Wireless, LLC.

46. The Peppertree Funds directly and indirectly hold 38.43% of the Class B Company Interests in Monarch Wireless, LLC, which equals 30.74% of the total equity in the entity. Frank H. Mandel and Ryan Lepene each hold a 50% equity and voting ownership interest in the entities serving as the general partners of these Peppertree Funds.

47. In 2019–2020, Monarch Wireless, LLC, participated in FCC Auction 103: Spectrum Frontiers — Upper 37 Ghz, 39 GHz, and 47 GHz claiming a 25% bidding credit as a very small business designated entity.

**J. Canopy Spectrum, LLC**

48. Canopy Spectrum, LLC was formed in Delaware in 2020. Edward D. Moise, Jr. is the entity's CEO. Mr. Moise and Ms. Jennifer M. Fritzsche are both managing members of Canopy Spectrum, LLC, and each have 50% voting interests.

49. The Peppertree Funds directly and indirectly hold 25.49% of the Class B Interests in Canopy Spectrum, LLC, which equals 21.03% of the total equity in the entity. Frank H. Mandel and Ryan Lepene each hold a 50% equity and voting ownership interest in the entities serving as the general partners of these Peppertree Funds.

50. In 2020–2021, Canopy Spectrum, LLC, participated in FCC Auction 107: 3.7 GHz Service — Lower C-Band claiming a 25% bidding credit as a very small business designated entity.

**K. Triad 700, LLC**

51. Triad 700, LLC was formed in Delaware in 2007. Craig W. Viehweg and Barry B. Lewis hold direct, controlling interests in the entity.

52. M/C Venture Partners, LLC is the general partner of an entity that is the general partner of an entity that holds a direct interest of 27.96% in Triad 700, LLC.

53. In 2008, Triad 700 participated in FCC Auction 73: 700 MHz Band claiming a 25% bidding credit as a very small business designated entity.

**L. Triad 8, LLC**

54. Triad 8, LLC was formed in Delaware in 2013. Control of the entity is vested in exactly two individuals: Barry B. Lewis and Craig W. Viehweg, who are both controlling members and controlling directors of the entity.

55. In 2014, individuals from Defendant M/C Partners signed a letter of intent to invest in Triad 8, LLC for an estimated 32.90% interest in Triad 8.

56. Defendants Peppertree Capital Fund IV, LP and Peppertree Capital Fund IV QP, LP, and other associated Peppertree Funds, signed a letter of intent to invest in Triad 8, LLC, for a total estimated interest of 32.90% in Triad 8.

57. In 2014–2015, Triad 8, LLC, participated in FCC Auction 97: Advanced Wireless Services (AWS-3), claiming a 25% bidding credit as a very small business designated entity.

**M. Cypress Cellular, LP**

58. Cypress Cellular, LP was formed in Illinois in 2014. It was involuntarily dissolved

in 2022. Kenneth D. Anderson and Christopher C. Jensen each held a 50% equity and voting interest in Anderson Pacific Partners, LLC, and were managers of Anderson Pacific Partners, LLC. Anderson Pacific Partners, LLC was the general partner of Cypress Cellular, LP.

59. In 2014–2015, Cypress Cellular, LP, participated in FCC Auction 97: Advanced Wireless Services (AWS-3), claiming a 25% bidding credit as a very small business designated entity.

**N. John Does Nos. 1 –50, Fictitious Names**

60. John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme described herein.

61. To the extent that any of the conduct or activities described in this Complaint was not performed by Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme described herein.

62. As a result of actions of John Does Nos. 1-50, Fictitious Names, the United States has suffered financial harm.

## JURISDICTION AND VENUE

63. This Court has subject matter jurisdiction over claims brought on behalf of the United States under the False Claims Act pursuant to 31 U.S.C. §§ 3730 and 3732.

64. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

§ 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

65. Venue is proper in this judicial district under 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because certain acts that form the basis of this Complaint occurred in this judicial district.

66. Defendants have used the FCC and its application and auction processes as an instrumentality of the fraud committed against the federal Government. Both the FCC's headquarters and the FCC's Wireless Telecommunications Bureau, Auctions Division, which managed and supervised Auction 1002, are located at 445 12th Street SW, in the District of Columbia. Having committed the fraudulent acts and made the fraudulent statements as alleged in this Complaint within the District of Columbia fraudulently to claim and obtain "very small business" bidding credits in the FCC's Auction 1002, Defendants are subject to the jurisdiction of this Court.

67. The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to conceal their wrongdoing.

## BACKGROUND AND APPLICABLE LAW

### I. FCC Spectrum Auctions

68. The Federal Communications Act of 1934, as amended by Congress several times and as codified in Title 47 of the U.S. Code, 47 U.S.C. § 101, *et seq.*, sets out the requirements and the authority by which the FCC regulates interstate communications by radio, television, wire, satellite, and cable in the United States. The Communications Act establishes that the radio spectrum (a subset of which is used for wireless communications—including use by wireless carriers to provide mobile services—which is often called "spectrum" or "the airwaves") is owned

by and governed for the people of the United States.

69. The Communications Act prohibits all private ownership of spectrum, but permits private and public organizations to obtain licenses for the exclusive use of portions of the spectrum for several years so long as that use is consistent with the "public interest, convenience and necessity."[1] Consistent with the Communications Act, the FCC allocates a subset of the radio frequencies for commercial purposes. Subject to FCC regulation, several well-known companies offer commercial wireless services to the public today, such as AT&T, Verizon Wireless, and T-Mobile.

70. Over the last thirty years, there has been a revolution in mobile wireless communications as cellphones, smartphones, tablets, and other wireless devices have grown in popularity and have become an integral part of American life for both voice and data communications. As the FCC observed in its 2014 CMRS Competition Report to Congress:

71. Competition in mobile wireless services is a cornerstone of the Commission's mission and essential for driving innovation, investment, and consumer benefits. In recent years, mobile wireless services have gone from a luxury to a convenience to a central part of Americans' daily lives. Increasing numbers of users now have multiple devices connected to mobile networks. Handsets are no longer used just for voice communication, email, social networking, and web browsing, but increasingly as hubs for entertainment, mobile commerce, and to connect other personal devices such as smart watches and fitness monitors. These developments have helped make mobile wireless one of the most important sectors in the national economy.[2]

72. Anticipating this increasing need for spectrum for wireless communications,

---

[1] 47 U.S.C. § 307.

[2] Seventeenth CMRS Competition Report, WT Docket No. 13-135, DA 14-1862, 11 (Dec. 18, 2014).

Congress amended the Communications Act in 1993 to give the FCC the authority to award commercial spectrum licenses "through a system of competitive bidding," i.e., by auction.[3] In doing so, Congress directed the FCC to design the rules and procedures of the auctions to balance three national objectives.

73. First, the auctions are to be a means to best serve consumers by allocating spectrum efficiently and rapidly to wireless providers—the premise being that the businesses placing the highest value on the spectrum will win licenses at auction among other competing businesses because the winners anticipate a superior commercial strategy.

74. Second, because the spectrum belongs to the American people, Congress required the auctions to "recover[] for the public a portion of the value of the public spectrum resource made available for commercial use and avoid[] unjust enrichment through the methods employed to award uses of that resource."[4]

75. Finally, Congress required the FCC to design auction rules that would enable legitimate small businesses to obtain licenses when bidding against much larger incumbent providers, both to encourage the growth of small businesses and because small businesses are likely to offer innovative and different wireless services to consumers that are not offered by the large incumbent providers.[5] These companies are commonly referred to as "designated entities" or "DEs."

76. Fundamental to this framework to encourage competition is the rejection of systems

---

[3] 47 U.S.C. § 309(j)(l).
[4] *Id.* § 309(j)(3)(C).
[5] *Id.* § 309(j)(3)(B) (directing FCC to adopt auction rules to "ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses").

that would allow monopolistic behavior. To this end, FCC regulations, including 47 C.F.R. § 1.2105 provide what are known in the industry as "anti-collusion rules" and "quiet periods" to prevent coordination between entities that would effectively generate monopolistic environments with anti-consumer outcomes.

77. The FCC issues licenses to commercial companies, for the exclusive privilege of offering wireless services, such as mobile voice and broadband Internet access, to the American public. The American public owns the spectrum, but Congress delegated to the FCC the authority to regulate its use and to issue licenses to commercial entities.

78. The FCC begins the licensed spectrum allocation process by identifying new frequency bands of RF spectrum that are considered suitable for future commercial use. For example, in the early 1990s, the FCC determined that certain frequency blocks at and around 1.9 gigahertz (GHz) of the electromagnetic spectrum should be allocated specifically for broadband personal communications service (or broadband PCS) commercial mobile operations. The FCC then establishes sub-blocks within the larger spectrum blocks that are designed for specific licenses.

79. Once the FCC's service and technical rules are established, the FCC then prepares for and conducts multi-round auctions for the spectrum licenses in which many CMRS providers, including "very small businesses," participate to win licenses.

80. Prices for licenses in an FCC auction reflect the value companies participating in the auction place on the exclusive rights to use that spectrum in particular markets, including the propagation characteristics of the frequencies and the carrier's need for additional spectrum capacity to meet customer demand in each market. For instance, since market demand is quantified by the number of consumers living in that region, the price for spectrum in an urban geographic

region such as New York City will likely be higher than the price for the same spectrum in less densely populated markets such as rural North Dakota.

## II. Designated Entities

81. To implement its small business objectives, Congress directed the FCC to design auction rules to encourage and enable small businesses to obtain licenses through the auction process.[6] Congress, however, required the FCC to balance this objective with the need to "prevent unjust enrichment as a result of the methods employed to issue licenses."[7] The FCC, likewise, has emphasized repeatedly that "the integrity of the small business benefit program depends on ensuring that only entities eligible for benefits receive them."[8]

82. To facilitate the successful participation of DEs in its auctions, the FCC provides auction bidding credits, which discount the payments DEs are required to make the Federal Treasury for licenses they win in an amount measured as a percentage of their gross winning bids.[9]

83. For the license opportunities open for bids in Auction 1002, FCC rules provided that qualifying "small businesses" would receive a 25% discount off their gross winning bids. A "small business" was entitled to its discount only if it represented and certified accurately to the FCC, in both its Short-Form and Long-Form and associated documentation, that the applicant, together with its affiliates, its controlling interest holders, the affiliates of the controlling interest holders,

[6] *Id.* § 309(j)(4)(D) (FCC rules shall favor small businesses in spectrum auctions through "the use of tax certificates, bidding preferences, and other procedures").
[7] *Id.* § 309(j)(4)(E).
[8] *Updating Part 1 Competitive Bidding Rules,* Notice of Proposed Rulemaking, 29 FCC Rcd 12426, 142 (2014); *Updating Part 1 Competitive Bidding Rules,* Report and Order, 30 FCC Rcd 7493, 119 (2015) *("Part 1 Update Order")* (Section 309(j) of the Communications Act gives the FCC "the responsibility and the discretion to provide opportunities for small businesses while preventing the unjust enrichment of ineligible entities.").
[9] 47 C.F.R. §1.2110(f)(2)(i)-(iii).

and the entities with which it has an attributable material relationship, had average annual gross revenues of not more than $20 million for the preceding three years.[10]

84. Thus, if the "small business" DE made a winning auction bid of $1,000,000 for a license in Auction 1002, it would have been required to pay only $750,000 to obtain that license.

85. To qualify for bidding credits, the FCC requires every DE to certify in writing that its annual gross revenues together with the annual gross revenues of all of the DE's affiliates, its controlling interests, and the affiliates of its controlling interests fall below certain annual revenue caps defined by FCC rules for each auction.[11] Once the FCC issues the license, the DE licensee is then required in its DE Annual Report to disclose to the FCC all agreements, arrangements, proposed agreements, and proposed arrangements that may affect the DE's current status as a "very small business."[12]

86. To further prevent unjust enrichment, FCC rules require the DE to seek prior Commission approval for all "reportable eligibility events," including "[a]ny spectrum lease . . . or any other type of spectrum use agreement with one entity or on a cumulative basis that might cause a licensee to lose eligibility for . . . a bidding credit" or "[a]ny other event that would lead to a change in the eligibility of a licensee for designated entity benefits."[13]

87. The FCC relies upon all licensees, especially DEs, to be truthful when dealing with

---

[10] DA 15-1183 ¶ 120.
[11] 47 C.F.R. § 1.2110(b).
[12] *Id.* § 1.2110(n) ("Each designated entity licensee must file with the Commission an annual report within five business days before the anniversary date of the designated entity's license grant. The annual report shall include, at a minimum, a list and summaries of all agreements and arrangements (including proposed agreements and arrangements) that relate to eligibility for designated entity benefits. In addition to a summary of each agreement or arrangement, this list must include the parties (including affiliates, controlling interests, and affiliates of controlling interests) to each agreement or arrangement, as well as the dates on which the parties entered into each agreement or arrangement.").
[13] *Id.* § 1.2114(a).

the agency.[14] The FCC is required to review tens of thousands of applications and license-related filings every year from thousands of licensees and the staff cannot independently investigate and corroborate the truthfulness, completeness, candor, and accuracy of the statements made by each of its licensees. The FCC's regulations, therefore, prohibit any person or entity from providing "material factual information that is incorrect or intentionally omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading."[15]

88. After conducting several auctions in the late 1990s and early 2000s, it became apparent that some putative DEs were "put[ting] themselves forward as small companies in order to qualify for auction discounts," even though they had entered into agreements to lease their prospective spectrum rights to larger firms that were not entitled to such benefits.[16] Similarly, other

---

[14] *RKO General, Inc. v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981) (the FCC "must rely heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate").

[15] 47 C.F.R. § 1.17(a)(1); see also id. § 1.65(a) ("[e]ach applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application or in Commission proceedings involving a pending application"); Vermont Telephone Company, 29 FCC Rcd 16052, ¶ 12 (2014) (holding that "[f]ull and accurate information concerning applicable gross revenues [of a DE] is necessary to meet our statutory obligation 'to prevent unjust enrichment as a result of the method employed to issue licenses' ... The Commission has a strong interest in ensuring that our auctions are fair to all participants and that only bidders that qualify for a bidding credit are able to bid with such a preference, and we rely on auction applicants to make complete, truthful and accurate disclosures in order to properly assess the merits of an applicant's claim of entitlement to a bidding credit" (citing 47 U.S.C. § 309(j)(4)(E)); Application of Fox Television Stations, Inc., Memorandum Opinion and Order, 10 FCC Rcd 8452, ¶ 59 (1995) ("A licensee's duty of candor is critical given the FCC's many duties. There is thus no question that an applicant's candor is an issue of the utmost importance to us. Lack of candor takes two basic forms: (1) misrepresentation, which involves false statements of fact; and (2) failure to disclose, which involves concealment, evasion, or other failures to be fully informative.").

[16] *See Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures,* 21 FCC Rcd 1753, 1771 (2006) (Statement of FCC Commissioner Copps).

DEs had acquired licenses "not for the legitimate objective of developing or offering spectrum services," but rather "as investments to be later sold for profit in the after-market."[17]

89. The U.S. Department of Justice ("DOJ") confirmed the rampant fraudulent use of DEs to obtain discounts in FCC spectrum auctions. DOJ filed a statement asserting that in its "extensive experience reviewing DE's relationships with large wireless carriers in its numerous wireless merger investigations, it has often encountered DEs that are not independent of large enterprises."[18]

90. An applicant seeking to qualify as a designated entity either as a "small business" also was required to make certain disclosures to demonstrate that it was a legitimate small business and not merely a proxy for a larger enterprise. In addition to the applicant's own gross revenues, the FCC requires a designated entity applicant to disclose the gross revenues from the three preceding years for its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship. The revenues of the applicant and its affiliated entities are then aggregated for purposes of determining whether the entity is, in fact, a "small business" eligible for a bidding credit.

91. The FCC provides guidance as to what qualifies as an applicant's affiliate, controlling interest, or an entity with which the applicant has an attributable material relationship.

92. "Controlling interests" of an applicant include individuals and entities with either *de facto* or *de jure* control of the applicant.[19]

---

[17] *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 321-22 (S.D.N.Y. 2004) (internal quotation marks and brackets omitted).

[18] Ex Parte Submission of the Department of Justice, *Implementation of the Commercial Spectrum Enhancement Act and the Modernization of the Commission's Competitive Bidding Rules and Procedures,* March 17, 2006, *available at* http://www.justice.gov/atr/public/comments/215145.htm.

[19] 47 C.F.R. § 1.2110(c)(2).

93. *De jure* control typically is evidenced by ownership of more than 50% of an applicant's voting interests.[20]

94. *De facto* control is determined on the basis of all the circumstances of the particular case. The analysis of *de facto* control includes whether—despite the existence of legal documents or other arrangements that place *de jure* control of an entity in the hands of one party—there exist relationships (*e.g.*, familial or business), practical realities (*e.g.*, indebtedness), or other factors (*e.g.*, experience) that place actual control of the applicant in the hands of another.[21]

95. Among the factors that determine *de facto* control are: (a) who makes management and policy decisions for the applicant, including who determines the applicant's activities and actions; (b) who is in charge of financing of the applicant's business activities; (c) who controls the day-to-day operations; (d) who is in charge of employment decisions; (e) whether the applicant shares facilities and equipment; (f) the existence and nature of business and social relationships; and (g) the nature of stock ownership, contractual, employment and other business relationships between the applicant and another entity or entities, including lenders, investors, and limited partners.[22]

96. FCC regulations define an "affiliate" as any individual or entity that (a) directly or indirectly controls or has the power to control the applicant, (b) is directly or indirectly controlled by the applicant, (c) is directly or indirectly controlled by a third party that also controls or has the

[20] *Id.*
[21] *Id.*
[22] *Id*; *see also SNR Wireless LicenseCo, LLC v. Fed. Commc'ns Comm'n*, 868 F.3d 1021, 1031 (D.C. Cir. 2017), *cert. denied sub nom. SNR Wireless LicenseCo v. F.C.C.*, 138 S. Ct. 2674 (2018); *see also id.* at 1030 ("Established FCC precedent highlights that the likelihood of a *de facto* control finding is 'greatly increased' in cases ... where a large company ... is the 'single entity provid[ing] most of the capital and management services' for smaller companies.").

power to control the applicant, or (d) has an identity of interest with the applicant.[23] Affiliate revenues are added to entity revenues to determine qualification for designated entity status.

97. An applicant also must disclose in its Short-Form application all real parties in interest with which the applicant has entered into any agreements, arrangements, or understandings of any kind relating to the licenses that may arise from the auction, including any agreements relating to post-auction market structure.[24]

## III. The Auction Process

### A. Short-Form Applications and Certifications

98. An entity seeking to participate in an FCC auction must first submit a Short-Form application or FCC Form 175, in which it makes certain disclosures and certifications regarding its qualifications under penalty of perjury. The application provides the FCC with the information it needs to determine whether the applicant is legally, technically, and financially qualified to participate in Commission auctions for licenses or permits, including whether its attributable revenues qualify it for "designated entity" status. A Short-Form application including all requisite disclosures and certifications is a prerequisite to participation in a spectrum auction.

99. Among other things, the applicant must disclose in its Short-Form application certain ownership information. Specifically, the applicant is required to disclose fully information regarding the real party- or parties-in-interest and the ownership structure of the applicant, including both direct and indirect ownership interests of 10% or more. A "real party in interest" is a person or entity directly or indirectly owning or controlling (or both) the applicant.

100. In conjunction with these disclosures, an applicant seeking designated entity status

[23] 47 C.F.R. § 1.2110(c)(5).
[24] *Id.* § 1.2105(a)(2)(viii)-(ix).

must make several certifications under penalty of perjury as part of its Short-Form application, including the following:

a. A statement and a declaration that the applicant is a qualified designated entity eligible for bidding credits as either a "small business" or "very small business" if the applicant applies as such,[25]

b. The identity of and a brief description of each party to, any partnerships, joint ventures, consortia or other agreements, arrangements or understandings of any kind relating to the licenses being auctioned, including any agreements that address or communicate directly or indirectly bids (including specific prices), bidding strategies (including the specific licenses on which to bid or not to bid), or the post-auction market structure;[26] and

c. A certification that the applicant has not entered and will not enter into any partnerships, joint ventures, consortia or other agreements, arrangements, or understandings of any kind relating to the licenses being auctioned that address or communicate, directly or indirectly, bidding at auction (including specific prices to be bid) or bidding strategies (including the specific licenses on which to bid or not to bid), or post-auction market structure.[27]

101. These certifications are made by the requisite attachments, declarations or statements as well as through the "Certify and Submit" screens of the Short-Form application. The "Certify and Submit" screen lists the certifications required of all applicants in the Commission's competitive bidding processes, requests the identification of the applicant's certifying official, and

---

[25] *Id.* § 1.2105(a)(2)(iv).
[26] *Id.* § 1.2105(a)(2)(viii).
[27] *Id.* § 1.2105(a)(2)(ix).

then requires the certifying official to certify the entire application.

102. There may be more than one party making certifications for an applicant. For example, one individual may certify, under penalty of perjury, the separately required statement and declaration that the applicant is a qualified designated entity, while another individual certifies and signs the "Certify and Submit" screens.

103. If an applicant fails to make these certifications, its Short-Form application will be rejected, and the applicant will not be permitted to participate in the auction or to obtain a spectrum license through the auction process. If an applicant fails to submit certifications to qualify as "small business," then it is not eligible for the 25% bid credit and would be required to pay the federal Government the full amount of its winning bids.

104. Entities whose Short-Form applications are accepted by the FCC are authorized to participate in the auction.

**B. Long-Form Application and Certifications**

105. After bidding ends, the FCC issues a public notice declaring the auction closed, identifies the winning bidders, and sets forth the deadlines for down payments, final payments, Long-Form applications, and ownership disclosure information reports.

106. For a period in advance of bidding through the long-form deadline or payment deadline, the FCC's prohibited-communications rule, 47 C.F.R. § 1.2105(c)(1), bars any applicant to participate in competitive bidding from cooperating, collaborating, or communicating with any other applicant about bids, bidding strategies, or settlements. The "quiet period," as it is known, ensures that each designated-entity applicant bids independently and that its claimed eligibility for bidding credits is not the product of coordination with the investors who control it. Compliance with the quiet period is material to the FCC's award of licenses and bidding credits.

107. Winning bidders obtain the exclusive right to apply formally for licenses to use the blocks of spectrum they had won at auction. Winning bidders electronically submit a Long-Form (or "Form 601") application for those license(s).

108. Winning bidders that claimed eligibility for a bidding credit as a designated entity were again required to demonstrate their eligibility for the bidding credit in the Long-Form, affirming all designated entity certifications in the Short-Form application.

109. The Long-Form application also requires the bidders to verify the information in their ownership disclosure report that previously was submitted with their Short-Forms, which is then incorporated into the Long-Form. This includes verification of disclosures with respect to bidding agreements.

110. As with the Short-Form, the Long-Form is submitted electronically, and the applicant ultimately reaches a "certification" screen that provides General Certification Statements and requests the applicant's electronic signature. By electronically signing this form, an applicant certifies that the statements listed on the screen are true, complete, correct, and made in good faith. Winning bidders were required to pay in full for their exclusive rights before license applications were processed and approved.

**C. Post-Auction Restrictions**

111. Once a license is awarded, federal "anti-trafficking" and "unjust enrichment" restrictions prevent licensees from earning speculative profits through post-auction resale of discounted licenses. Such restrictions are intended to prevent "shams" from circumventing Congressional policy favoring small business opportunity, by stopping "sham" licensees from acquiring licenses at a discount and then ceding control over the licenses to entities that are not qualified to obtain bid discounts. A license-holder must typically wait at least five years until it

can transfer the licenses, and, at all times, the FCC must grant permission in order for a transfer to be executed.[28]

**DEFENDANTS' SCHEME TO FRAUDULENTLY OBTAIN A "SMALL BUSINESS DISCOUNT"**

112. Omega was faced with a choice as Auction 1002 approached. Omega needed investors to bankroll its participation in Auction 1002 because Omega itself was not sufficiently capitalized. In fact, Omega was a new entity, created exclusively to participate in this auction.

113. Attempting to generate the capital it needed, Omega engaged in a lengthy roadshow, conducting meetings across the country with numerous investors. But with little substantive experience in the spectrum auction space and a non-unique strategy, Omega had trouble finding investors who were comfortable with ceding control to such an inexperienced bidder. The one thing Omega did have though, was a potential claim to DE status. Faced with the prospect of not being able to participate in Auction 1002 at all, Omega decided to solicit capital from investors on terms that allowed those investors to still control over how the capital was deployed in exchange for Omega supplying its DE status and the corresponding discount.

114. By giving up *de facto* and *de jure* control of the bidding, Omega should have also given up its DE status. Yet, Omega still claimed DE status in Auction 1002. By doing so, Omega delivered a discount to its investors that secured their investment but, in the process, also intentionally defrauded the government.

---

[28] 47 U.S.C. § 310(d).

## I. Auction 1002

115. Auction 1002 involved multiple blocks of 600 MHz spectrum. Qualified bidders were able to bid on separate geographic blocks across the nation.

116. Auction 1002 was part of a broadcast incentive auction, which was comprised of two separate but interdependent auctions: (1) a reverse auction, which determined the price at which broadcasters voluntarily relinquished their spectrum usage rights; and (2) a forward auction, which determined the price companies were willing to pay for flexible use wireless licenses.[29] The reverse auction was known as Auction 1001 and the forward auction was Auction 1002.[30]

117. The bidding phase for Auction 1002 began on August 16, 2016.

118. The auction was conducted as a simultaneous multiple-round auction. Every available block was offered for bid at the same time, and participants placed bids on individual licenses in successive bidding rounds until no further bid was made on any available block.

## II. Omega Is a Private Fund Organization

119. Omega operated as a private equity fund. A private equity fund is a pooled investment vehicle where the adviser pools together the money invested in the fund by all the investors and uses that money to make investments on behalf of the fund. In this case, the fund was Omega and the investment was the FCC spectrum to be purchased in Auction 1002.

120. Private equity funds typically are structured as a limited liability company (LLC) as shown below:

---

[29] *How It Works: The Incentive Auction Explained*, FEDERAL COMMUNICATIONS COMMISSION, February 3, 2017, https://www.fcc.gov/about-fcc/fcc-initiatives/incentive-auctions/how-it-works.

[30] *Auction 1000 Bidding Procedures PN*, FCC-15-78A1 at 3.




121. Omega is categorized as a "blind pool" in the private-fund world. The inherent conflict in blind pools is that the investors (especially the large investors) want to control the operator of the pool by directing how their investment is put to work, thereby minimizing the amount of choice the operator has in running the blind pool. Investors exerting such control is problematic in the FCC auction space because too much investor control can mean a loss of DE status.

122. Omega was constructed as a manager-managed LLC. In a manager-managed LLC there are two distinct categories of participants: managers and members. Managers are active parties who originate the strategy and its structure, execute it by deploying capital, manage it over the holding period, and then dispose of it. Members are passive parties who only provide capital and, in doing so, cede all of the active duties to the Managers. Often the managers are called

general partners and the investors are called limited partners.[31]

123. Typically, in private equity funds, the general partners do not make substantial capital investments into the fund, usually around 1%-5%. Thus, the upside for general partners is not the return on their own capital contributions. Instead, the general partners receive their share of the ongoing management fee and certainly have a vested interest in the fund doing well from that standpoint alone. However, the "real money" stands to be made from the carried interest component of their compensation.

124. Carried interest is only created when the fund generates profits. Within the private equity industry, the standard metric is commonly referred to as "2 and 20," which means investors pay the general partners an ongoing fee of 2% annually. Meanwhile, the carried interest portion represents the "20" and is where their big payoff lies: it allows the general partners to earn 20% of the fund's profits over the life of the investment.

125. Less established private funds that are weakly regarded—like Omega—are often forced to discount their service and yield to the overwhelming power of large institutional investors, *i.e.*, the limited partners. Management fees and carried interest could be reduced or preferred returns could be included to attract investors. The preferred return accrues and compounds to the investor at a rate and is paid to the limited partners of a private equity fund prior to the general partners receiving their carried interest or "carry." Put another way, an investor with a preferred return gets their initial investment back along with a set percentage return on their investment before any of the other investors get a penny. These terms are highly unusual and, when used, highlight the power of the limited partners and their ability to dictate control over the novice

---

[31] Managers are also referred to as called "Portfolio Managers" while Members are called "Investors."

general partners.

126. Originally, Omega's structure was typical for the private fund world. Omega was the LLC managed by its general partners, who were supposed to run the daily operations of the LLC and make the strategic investment decisions, including how to invest in the spectrum auction. Meanwhile, the limited partners were to act as passive investors in the fund.

127. The financial terms originally offered during Omega's roadshow were set at the industry standard for a private-fund structure. Omega and its general partners were to be paid a small management fee (1%) and would receive the bulk of their compensation through the carried interest, which was set at 20%. There was no preferred return for any investor.

## III. Omega's Auction History

128. Two of Omega's principals, Scott Soden and Ed Moise, had long desired to be involved in FCC spectrum auctions. To that end, in June of 2014, Soden—who also was the managing director of Alpina Capital—contacted Relator and requested that Relator educate Soden and Moise on private funds, an area of expertise for Relator. Soden and Moise wanted to participate in the upcoming AWS-3 FCC spectrum auction (Auction 97) as a principal. This was a departure from their usual role of selling spectrum in the secondary market as agents.

129. The first spectrum auction, however, opened and closed inside of three months, and thus Soden, Moise, and Relator were unable to put together a private fund with which to bid in such a short time frame.

130. Despite the failure to put the private fund together, Moise and Soden were retained as bidding agents in Auction 97. Moise and Soden were not principals in Auction 97, but instead worked as subcontractors for Cypress Cellular and formulated bid and pricing strategies, designed bidding systems, executed bidding, and formulated market selection decisions for each auction

round. In total, they worked with about $13,000,000 worth of capital in Auction 97.

131. After Auction 97, Moise and Soden's interest in spectrum auctions was piqued, and they started looking for other opportunities.

## IV. Omega Was Unable to Raise the Large Amounts of Capital Necessary to Implement its Business Plan for Auction 1002

132. Approximately one year later, in early 2015, the FCC began releasing information involving Auction 1002.

133. Leading up to Auction 1002, Omega publicly expressed to investors the great value of nationwide spectrum for its own business, and regularly updated investors of its larger goal to aggressively acquire additional valuable spectrum through the FCC auction process and to use the acquired spectrum to advance its own business interests.

134. Omega hoped to raise approximately $350 million to participate in Auction 1002, "targeting a potential 25% annualized return on investment with an anticipated exit in 6 to 8 years."

135. Yet, the principals of Omega—Moise and Soden—had limited experience in spectrum license acquisition, development, or services and, under arms-length circumstances, could not have raised the many hundreds of millions of dollars required to fund the acquisition of spectrum licenses. For example, their previous experience in Auction 97 involved $330 million less capital than Omega was hoping to raise in Auction 1002.

136. Given the gap in their experience raising such large amounts of capital, Soden and Moise contacted Relator again with interest in participating in Auction 1002. On May 15, 2015, Relator entered into agreement with Omega to assist Omega in raising capital for use in Auction 1002. On June 1, 2015, Relator officially started working for Omega.

137. When Relator started with Omega, his role was to raise capital for deployment by

Omega in Auction 1002. Moise was the Managing Partner of Omega as well as the acting bidder in the FCC auction. In that capacity, Moise was in control of the strategy for the upcoming spectrum auction. Moise believed that he had a unique and innovative bidding strategy that would put Omega at an advantage.

138. Throughout the second-half of 2015 and into the first quarter of 2016, Relator put together a roadshow to raise capital for Omega's use in Auction 1002. Relator spent the next nine months calling on his roughly 200 clients, often traveling with Moise to meet in person with potential investors.

139. At these pitch meetings, Moise attempted to present himself as an industry veteran with a special insight for assessing value of wireless spectrum. At first, he was very guarded in sharing his approach, wanting to equate it to trade secrets or his own intellectual property. Some investors, however, entered into confidentiality agreements and thus were given a thorough demonstration of how Moise and Omega planned to operate in the live auction.

140. Yet, after full presentations with many potential clients, only a handful were inclined to invest in Omega. The investors' reasoning varied; some thought that the auction process was confusing, others were concerned with Moise and Omega's limited track record. For example, on November 18, 2015, Steve Royer at Shamrock emailed Relator, declining Relator's investment solicitation for Omega, reasoning, "that [Omega] is not really an operating company."

141. A major reason why many investors did not like Omega's approach was that it depended heavily on Omega's status as a designated entity. This meant that, in order for Omega to keep its status as a designated entity, the large investors could not exert the level of control over their investment they wanted. Put another way, the large investors wanted *de facto* or *de jure* control

of Omega in exchange for their investments—something Moise did not want to give up as it would mean that Omega would no longer qualify as a designated entity.

142. The difficulty in securing investment in Omega and his bidding strategies greatly disappointed Moise. Moise believed that the private capital markets were not recognizing him or valuing what he believed was his expertise.

## V. Omega Gives Up *De Facto* Control to Large Business Defendants

143. With the spectrum auction date quickly approaching, the general partners at Omega had to reassess and reconfigure their strategy. Moise and Soden ultimately made the decision to sacrifice some control and economic upside in order to better entice investors.

144. When the idea of offering more control of Omega to big investors was further explored with other investor groups, many of the investors still had no interest, but the idea took hold with M/C Partners.

145. In January 2016, the concept of Omega handing over control to its larger investors took root. On January 26, 2016, Craig Viehweg of Triad Communications emailed Moise and Soden. In that email, Viehweg explained that M/C Partners will be calling the shots on the Auction 1002 strategy. Specifically, M/C Partners will have "max prices" for various licenses after doing its own independent analysis. After discussing M/C Partners' demands on pricing, Viehweg and Triad also emailed Omega about M/C Partners' and Triad's requirements for "bidding tactics."

146. In approximately February 2016, Omega explained to Relator the pricing and terms it had reached with M/C Partners—its anchor investor—and encouraged Relator to continue to solicit additional investors. The pricing was a massive departure from the original terms proposed. The new terms included an 8.5% preferred return with no catch up. This meant that Omega would effectively have to return the preferred investors' initial capital *twice* before participating in the

upside. And even then, the upside for Omega was lowered to only a 17% carry, which was down significantly from the initially proposed 20% carry. These practically unheard of terms demonstrated how desperate Omega was for investment and how it was willing to accept nearly any terms, including ceding *de facto* control, to participate in the auction.

147. The net effect of this change in fees due to the addition of the preferred return, the reduced carry, and the non-recurring management fee was that Omega had agreed to work at half the price of prevailing industry economics. Furthermore, the terms of the relationship between Omega and its investors did not change the overall return on investment. In that zero-sum scenario, the amounts of Omega's loss would be the same as the larger investors gain.

148. During this time, M/C Partners began to play a larger and larger role in Omega's strategy for Auction 1002 and was included in a number of high priority emails regarding the auction. For example, on February 10, 2016, Chris Jensen sent an email to Craig Viehweg at Triad, copying Brian Clark at M/C Partners. The first sentence of the email states, "Omega Partners–attached is the investor commitment list." The largest three investors listed were "MC partners" at 29.57%, "Peppertree" at 19.71%, "18th Street Group, LLC (Attar)" at 15.77%.

149. M/C Partners was also included in multiple emails exchanges between Omega and potential investors. On February 4, 2016, Mandel wrote to Omega's principals and to Brian Clark of M/C Partners, "I'm buddies with Andy Howard at Shamrock in LA. They might have some interest in the spectrum play. Can I send them the decks or would you prefer that I don't?" It was Clark who responded, "Sure." A few days later, on February 11, 2016, F. Howard Mandel of **Peppertree Capital** introduced Moise and Jensen in an email to Andy Howard of **Shamrock** by stating, "They are *leading the efforts with Brian Clark [of **M/C Partners**]* on the spectrum auction play." These emails reflected the reality that M/C Partners was managing the spectrum auction for

Omega.

150. Each of the Large Business Defendants was aware that M/C Partners would control the bidding process, not Omega.

151. On March 1, 2016, after its introduction to Omega via Mandel, **Shamrock**, who had in November 2015 declined Relator's offer to invest in Omega, changed its mind and decided to participate with Omega in Auction 1002. Knowing that M/C Partners would be in control rather than Omega, along with greatly reduced fees and terms compared with the initial solicitation, motivated Shamrock's change in investment decision.

152. In the first quarter of 2016, M/C Partners solicited Glenmede. M/C Partners informed Glenmede that M/C Partners would control the bidding process. Glenmede was not interested in investing unless M/C Partners could deploy their expertise and strategies in control of Omega.

153. In other words, not only did Shamrock, the Peppertree Funds, and Glenmede knowingly accept the violation of the FCC bidding rules, the illegal scheme is exactly what attracted them to invest at all. Relator had several conversations with Moise during February and March of 2016, in which Moise relayed to Relator that he had traded control of Omega's strategy for capital. Moise explained to Relator that M/C Partners was now dictating Omega's strategy for Auction 1002. Moise lamented that M/C Partners had effectively nullified his proprietary bidding strategy.

154. Moise told Relator that even though Moise had licenses he wanted to buy, his hands were tied because M/C Partners had the final say. Moise also expressed concern to Relator that M/C Partners would take advantage of him by steering the bidding to spectrums in which he saw less value. Because Moise knew that this approach would put the designated entity discount at risk,

he avoided putting his concerns in writing so as not to create a record.

155. The ultimate deal that Omega and Moise accepted from M/C Partners was fundamentally different than the originally envisioned structure. Instead of Omega controlling its Auction 1002 bidding and strategy, the Large Business Defendants led by M/C Partners dictated the material aspects of Omega's bidding, including, (1) the specific licenses Omega could buy; (2) at what price; and (3) in what locations. Omega's own operating agreement recites that the Board "has determined and set forth on a separate schedule the Authorization that the Company may bid on in the Auction and the maximum bidding prices for such Authorizations, which schedule has been provided to the Institutional Investors"; it places bidding authority in a committee "comprised of the entire Board," including the two Non-Controlling Managers; and it permits changes to the approved licenses or maximum princes only be a "Supermajority Vote" i.e., four members, which is a threshold the Controlling Managers cannot reach without a Non-Controlling Manager.

156. The deal also materially altered how Omega operated and what its economics would be. Specifically, to secure the investment capital of M/C Partners and the Large Business Defendants, Omega had to change its payout structure. The terms of the Limited Partnership Agreements and Investment Agreements were changed to favor the limited partners and ensure that the Large Business Defendants like M/C Partners reaped the vast majority of any profits received by Omega. Instead of Omega receiving the typical 20% carried interest rate, Omega was forced to reduce its rate to just 17%. Similarly, Omega had to offer an 8.5% preferred return to Large Business Defendants like M/C Partners. Essentially, Omega was willing to accept a weaker financial structure and give up *de facto* control in order to secure the necessary capital.

157. The fact that Omega's general partners agreed to reduce their interests in Omega for a fraction of what they were worth demonstrates that Omega and the Large Business Defendants

were never independent parties. As the FCC has warned, a DE that lacks a meaningful economic stake is a telltale mark of a sham: "We will scrutinize . . . any mechanisms that deprive the [DE] control group of the ability to realize a financial benefit proportional to its ownership of the applicant"[32] and the DEs' "equity interest [should] entitle[] them to a substantial stake in the profits and liquidation value of the venture relative to the non-controlling principals."[33]

158. Furthermore, funds like M/C Partners—per the terms of its own fund documents—are prohibited from investing in other private fund structures because it adds another layer of management, and thus fees, to the investment. In fact, M/C Partners, as a fiduciary, has made representations to its investors that it will not invest in other private equity funds, including Omega.

159. M/C Partners' investment strategy was to simply hold the licenses and then resell them at a profit at a later date. A partner with M/C Partners explained in reference to a prior auction that M/C Partners "acquires the spectrum strategically because at a later date it will be of interest to somebody."[34] With such a holding strategy, there is little need for M/C Partners to need to involve as there is little to no active management of the investments after the auction. This is especially true in this instance where M/C Partners essentially rejected Omega's bidding strategy for Auction 1002. The only thing that Omega brought to the table was its DE status. In the end, M/C Partners was able to retain the investment control a private equity fund typically enjoys—while also securing the DE discount—by trading its capital investment for control over Omega.

[32] *Implementation of Section 309(j) of the Communications Act - Competitive Bidding*, Fifth Memorandum Opinion & Order, 10 FCC Rcd 403, ¶ 82 (1994).
[33] *Id.* ¶ 278.
[34] Engebreston, Joan, Private Equity Company Sees Telecom Opportunities, telecompetitor (Nov. 25, 2013), https://www.telecompetitor.com/private-equity-company-sees-telecom-opportunities/.

## VI. Defendants Violated the FCC Quiet Period Rule and Anti-Collusion Rules

160. For Auction 1002, the quiet period ran from February 10, 2016, to April 27, 2017.

161. Defendants knew of the quiet period and were bound by it. The investors were asked to sign a non-disclosure and anti-collusion agreement before discussing "Omega's participation in the auction."

162. Even in ways that Defendants feigned compliance with the quiet period rule, they were still violation the Anti-Collusion Rules. For example, the parties tried to nail down a strategy before the quiet period started, and by February 7, 2016, the individuals from many Defendant entities had a joint call in which they agreed on license-specific bidding price caps. Moise circulated "the results from Thursdays call on price caps" to Viehweg, Lewis, Soden, Clark of M/C Partners and others. Two days later, the day before the quiet period started, Viehweg confirmed the final numbers per market.

163. After the short-form application was submitted, Defendants continued to communicate with each other about strategy, including over phone calls and meetings during the quiet period. They never disclosed either the communication, the substance demonstrating control, or their violation of quiet period compliance.

## VII. Omega's Bidding Behavior Demonstrates Large Entity Control of Omega

164. Once the bidding commenced, the Large Business Defendants implemented a strategy of overlapping bidding to supplement and complement blocks of spectrum they already owned. This pattern of bidding also confirms that Omega was not bidding for the purpose of establishing a competitive and independent provider of wireless services to the public. Rather, Omega's role was twofold: (1) to bid for and obtain licenses that complemented the Large Business

Defendants' existing and unique operating markets; and (2) prevent other companies from obtaining a spectrum foothold in or adjacent to those markets. In this context, Omega's bidding activities must be viewed as those of a proxy or instrumentality of the Large Business Defendants, not of an independent company in control of its own strategies and operations. Each Defendant agreed to allow M/C Partners to control Omega, was aware that M/C Partners in fact controlled Omega, and was aware that Omega represented that Omega was entitled to the DE discount.

165. M/C Partners had control of many licenses. M/C Partners' strategy was for Omega to bid on licenses that complemented licenses already under M/C Partners' control. "Stacking" of geographically and temporally proximate licenses allows for bundled sales that are more valuable (stacked spectrum licenses allow for a higher per spectrum sales price than individual per spectrum sales prices). The licenses that Omega obtained from these auctions were complementary to the licenses M/C acquired in prior auctions.

166. Take, for example, the image below of a region comprising parts of Ohio, Indiana, Michigan, Pennsylvania, West Virginia, and New York. Each auction is represented with a different color. (See graphic key in bottom left corner.) Stripes denote spectrums that were acquired multiple times by a different defendant each time in these auctions—*i.e.*, how Defendants deployed their "stacking" strategy. The prevalence of stripes makes clear that these entities targeted the same geographic areas for licenses while avoiding the same other areas.




## VIII. Results of Auction 1002

167. After starting on August 16, 2016, Auction 1002 finally closed on March 30, 2017.[35]

168. In the closing notice for Auction 1002, winning bidders were notified that their Long-Forms were due on April 27, 2017.[36] Final payment of winning bids in Auction 1002 was due May 11, 2017.[37]

169. Proceeds from Auction 1002, *i.e.*, the value of winning bids net of credits for rural service providers and small businesses, totaled $19,318,157,706. Fifty bidders placed winning bids for a total of 2776 licenses.

170. Defendant Omega won $131,139,106 million worth of licenses for a net bid total (after application of the DE discount of $32,234,183) of $99,024,356.

171. The FCC granted Omega's 119 Auction 1002 licenses on July 26, 2018. The first

[35] DA 17-314, ¶ 1.
[36] DA 17-314, ¶ 45.
[37] DA 17-314, ¶ 26.

buildout deadline for these licenses was set for July 26, 2024.

## IX. The Same Investors and Principals Used the Same Template in Other Auctions

172. The actions of Defendants with regard to Auction 1002 are similar to their actions in past auctions. In Auction 97, Moise and Soden formulated bid and pricing strategies, designed bidding systems, executed bidding, and formulated market selection decisions on behalf of Cypress Cellular, LP. Cypress acquired 40 licenses in that auction for over $13 million with a 25% credit. Nearly half of these licenses (nineteen) were identical to the licenses Omega acquired in Auction 1002.

173. Triad also bid in Auction 97. In its short-form application, dated, September 12, 2014, Triad 8 represented that control rested with Lewis and Viewheb (with a direct interest of 7.8% each). Triad disclosed that M/C VII Funds "will hold an estimated 32.90%" and that Peppertree IV Funds "will hold an estimated 32.90%." It described both stakes as "beneficial equity interests, not voting interests." Further, the submission stated that neither fund "would . . . control or have the power to control Triad 8."[38] Omega's Form 175 later used the same structure and the same disclaimers. Viehweg of Triad served on Omega's Board as a "Non-Controlling Manager."

174. The results of Auction 1002 show a near identical overlap of prior auction acquisitions of parties affiliated with M/C Partners in not just Auction 97, but also Auction 73. There, Triad 700, LLC, won 36 licenses, 12 of which Omega also bought in Auction 1002. M/C Partners is a major investor in Triad 700 LLC. Triad's total gross bid for these licenses was $22,694,000. The 25% discount decreased the obligation to the government by $5,673,500.

---

[38] FCC Form 175, Triad 8, Exhibit 1, File No. 0006457477, at 1–3.

175. The probability of this occurring without control by the Large Business Defendants is miniscule. Omega did not just happen to buy one third of what Triad and M/C Partners had owned before. Rather, this was an intentional strategy undertaken by Omega at the direction of the M/C Partners, with permission from Shamrock, 18th Street, Glenmede, Peppertree, and John Does.

176. The unique license holdings of Omega were complementary *only* to the other holdings of Omega's controlling limited partners'—the Large Business Defendants'—operating markets and were not complementary to the markets of any other wireless service provider in the country.

177. Controlling the Omega licenses had tremendous value for the Large Business Defendants by allowing them to reduce spectrum costs and increase profit margins with easy, but illegal, access to valuable spectrum at below-market prices.

178. Engaging in this scheme also allowed the Large Business Defendants to secure a better entry point and lower initial capital outlay versus acquiring and owning wireless spectrum at full price.

## X. Omega's Sham Private Fund Structure

179. In the end, the truth about Omega's structure was that it was controlled by the Large Business Defendants. As part of a corrupt bargain to ensure that Omega was able to participate in Auction 1002, Omega's general partners gave up one-half of their financial upside and any control over its bidding strategy.

180. What originally started out as a typical private fund structure—which would allow Omega to keep its DE status—changed into a ploy to preserve the crucial DE status, while

allowing the Large Business Defendants to exercise the control they made a condition of their investment.

181. Because the Large Business Defendants exercised *de facto* control over Omega, Omega was no longer eligible for DE status and the corresponding discount. Nevertheless, Omega intentionally misrepresented the nature of its relationship with the Large Business Defendants and claimed its DE status anyway.






**XI. Defendants' Continuing Fraud Post-Auction**

182. The Large Business Defendants' *de facto* control over Omega's bidding activities was never fully disclosed to the FCC, even though such disclosure was mandated.

183. Omega represented in its Form 175 application that its respective average gross annual revenues, aggregated with the gross revenues of its affiliates, controlling interests, the affiliates of those controlling interests, and the entities with which it had an attributable material relationship, did not exceed $20 million for the three years preceding its Form 175 application. In this Form 175 ownership disclosure, on July 20, 2016, Omega affirmatively represented that the M/C VII Funds, the Peppertree Funds, Shamrock, and 18th Street Group each "do[es] not control or have the power to control Omega," are "not affiliate of Omega," and hold only "beneficial equity interests, not voting interests," such that their gross revenue was "not attributable to Omega."[39]

184. On June 4, 2018, the FCC wrote a letter to Omega. The letter sought additional

[39] Form 175 amended July 20, 2016

information to confirm that Omega was entitled to its small business bidding credits. The letter read: "To establish its eligibility for the SB DE bidding credit, Applicant asserts that the Controlling Members of the LLC4 and members of the LLC's Board of Managers have both *de jure* and *de facto* control of the Applicant. With reference to the reviewed Omega Wireless, LLC Amended and Restated Limited Liability Company Agreement, dated April 6, 2016 (Agreement) filed with the Application, please provide by July 9, 2018 a written explanation as to how the specific provisions of that Agreement identified in Appendix A, both individually and in the aggregate, are consistent with this assertion. If your explanation leads the Applicant to revise the Agreement, please include a redline of any changes when you file your explanation."

185. In particular, the FCC identified Omega's Amended and Restated Limited Liability Company Agreement's (the "Agreement's") requirement of a supermajority of all "Managers" for specified proposed actions. This provision meant that, at a minimum, one of the two "non-controlling" managers must vote for an action subject to the supermajority requirement for it to be ratified. The actions subject to the supermajority include such things as the annual budget for expenditures, any "material deviation from the approved budget, the effect of which would have a substantial impact on the financial condition of the Company" and incurring "any indebtedness or authorize, cause or allow any Subsidiary to incur any indebtedness in an amount that, when combined with all other indebtedness of the Company and the Subsidiaries, exceeds twenty five percent (25%) of the annual budgeted capital expenditures."

186. The FCC also inquired about the Agreement's requirement that consent of the Majority Institutional Investors may engage in certain activities or transactions. The Majority Institutional Investors included Large Business Defendants M/C Partners, Peppertree, and Shamrock. The activities included any amendment of Omega's charter documents, including the

Agreement, without limitation (other than as reasonably required by the FCC); and the sale, transfer or assignment of not only "all" but also "any portion" of Omega's assets or property.

187. On July 25, 2018, FCC Chairman Ajit Pai appeared before the U.S. House of Representatives Subcommittee on Communications and Technology at a hearing entitled "Oversight of the Federal Communications Commission." Chairman Pai later responded to questions from the Congressional Subcommittee in a letter dated August 31, 2018.

188. In response to Representative Yvette Clarke's request to "identify all DE bidders participating in the AWS-3 and 600 MHz auctions that were afforded opportunities to cure *de facto* control issues," Chairman Pai wrote the following:

Response: The Broadband Division has identified two DE bidders raising control issues (although not necessarily issues of *de facto* control)—Bluewater Wireless II, L.P. and Omega Wireless, LLC—and asked each to provide written explanations as to how specific provisions in their agreements were consistent with their eligibility for a small business bidding credit. In response, both applicants chose to revise their agreements.

189. On July 26, 2018, Omega revised its Amended and Restated Limited Liability Company Agreement (the "Revised Agreement") to purportedly address these questions, but the revisions did not reflect the true control the Large Business Defendants maintained, and continued to maintain, over Omega at all relevant times.

190. Neither Omega's response to the June 4, 2018 letter, nor the revised agreement that followed, disclosed M/C Partners' participation in the recruitment of Shamrock, M/C Partners, and Triad's supplying of "max prices" and "bidding tactics."

191. Based on Defendants' material omissions and additional misrepresentations to the FCC, Omega's application for licenses was found to be complete and in conformance with the

FCC's rules. And the FCC granted Omega's licenses with the 25% small business bidding credit discount. But Omega's Revised Agreement intentionally concealed the fact that the Large Business Defendants had never actually ceded *de facto* control over Omega. Instead, the Revised Agreement contained language specifically tailored to make it falsely appear that Omega was eligible for the small business bidding credits at issue. To this day, Omega has never disclosed the true nature of its relationships with the Large Business Defendants.

192. Neither Representative Clarke's request nor Chairman Pai's response constituted an administrative civil money penalty proceeding under 31 U.S.C. § 3730(e)(3). Specifically, there was no penalty imposed by the government against Omega or any of the Defendants. Nor was there any denial of Omega's bidding credits.

193. By executing the fraudulent bidding scheme described above, the Large Business Defendants secured the rights to spectrum while depriving the United States of at least $32 million in auction proceeds.

194. Because the FCC does not independently examine the existence of *de facto* control prior to a spectrum auction, but instead relies on participants' certifications that *de facto* control has been disclosed, Omega was able to qualify for designated entity status by falsely certifying that it was not under the *de facto* control of the Large Business Defendants.

**A. Other Auctions**

195. Defendants' scheme did not end with Auction 1002 or these warnings. The same principals and investors have formed other single-purpose bidders that claimed small business status in other FCC auctions, including Auctions 103, 107, and 110. And the spectrum licenses for which they bid maintained a valuable complementarity to licenses already within the control of Defendants.

196. Defendants plan during the period with which Relator worked with them was to deploy the scheme they used in Auctions 73, 97, and 1002 in an array of auctions. It is through this knowledge leveraged with his analysis of ensuing auctions that Relator maintains personal knowledge of subsequent auctions.

**1. Auction 103**

197. Auction 103, for Upper 37 GHz, 39 GHz, and 47 GHz Bands, opened December 10, 2019, and closed March 5, 2020. Monarch LLC qualified to bid with a $24.9 million upfront payment. It disclosed interest holders of Moise (50%), Anderson (50%), Mandel (30.74%), Lepene (30.74%), Peppertree entities (Peppertree Capital Fund VII QP, LP (29.81%), Peppertree Capital FVII, LP (30.74%), Peppertree Capital VII, Inc. (30.74%)), and Cloverlay entities (Cloverlay Fund II (SVP I), LLC and Cloverlay GP II, LLC (11.5% each)), and affiliates including Omega Wireless LLC, Cypress Cellular LP, Cityfront Wireless LLC, Cityfront Partners, LLC, and the Kenneth D. Anderson Equity Trust.[40] It reported its average gross revenue of $2,238,672.81, putting it well within the range for the small business credit.[41]

198. In its Form 175, Monarch represented twice that, "the LLC Agreement expressly vests control of the Applicant in the Managers: Messrs. Anderson and Moise."[42] It also represented that the Peppertree Funds and the Cloverlay Funds "do not control or have the power to control Monarch, do not have an agreement with Monarch to use more than 25% of the spectrum capacity of any license that may be won in the auction, and are not affiliates of Monarch or any of its controlling interests."[43]

---

[40] https://aap.fcc.gov/search/results/578abf8f-208a-4b33-a785-b162e867884d?tab=ownership
[41] https://aap.fcc.gov/search/results/578abf8f-208a-4b33-a785-b162e867884d?tab=ownership
[42] Monarch Wireless, LLC, FCC Form 175, Auction 103, Attachment 1: Indirect Ownership at 3; *id.* at 4.
[43] Monarch Wireless, LLC, FCC Form 175, Auction 103, Attachment 1: Indirect Ownership at 3; *id.* at 4.

199. These representations were false. Monarch bid on the complementary spectrums that served the same interest as in Auction 1002, demonstrating influence beyond what was disclosed.

200. For Auction 103, the quiet period ran from September 9, 2019, to March 26, 2020. On information and belief—based on Relator's personal knowledge of the ways in which Defendants conducted business in past auctions, and based on the disclosure of Cypress and Omega as Monarch's affiliates and of Mandel's substantial ownership interest in Monarch—Monarch and Defendants' affiliated applicants communicated about bids and bidding strategy during the quiet period. Their subsequent disclosures do not report those communications.

201. Based on these representations, the FCC determined that Monarch qualified as a small business entity. Thus, Monarch bid in Auction 103 with the small business 25% discount bidding credits.[44]

202. The auction rendered Monarch successful on many bids, for which Monarch's obligation to the FCC was fraudulently decreased by 25%.

**2. Auction 107**

203. Auction 107, for 3.7 GHZ Service, opened December 8, 2020, and closed February 17, 2021. Canopy Spectrum, LLC qualified with a $46,360,000 upfront payment. Its disclosed interest holders include Shamrock principals Howard and LaSalle (21.24% each), Mandel (25.49%), Moise (50.00%), and Cloverlay entities. Omega, Monarch, and Moise entities are listed as affiliates.[45]

204. In its application, Canopy represented that control rested with those principals.

[44] https://auctiondata.fcc.gov/public/projects/auction103/reports/results_by_license
[45] https://auctiondata.fcc.gov/public/projects/auction107

Although Canopy disclosed interest of other parties, it did not disclose their influence on business decisions.[46] Canopy reported aggregate average gross revenues of only $796,734.67.[47] The FCC relied on these representations when determining that Canopy qualified for a small business credit garnering the 25% discount.[48]

205. These representations were false. The business decision of a bidding strategy fell to powers within the Large Business Defendants.

206. For Auction 107, the quiet period ran from September 22, 2020, to March 10, 2021. On information and belief—based on Relator's personal knowledge of the ways in which Defendants conducted business in past auctions, and based on Mandel's and Howard's substantial ownership of Canopy Spectrum and on Shamrock's investment in it—Canopy and its investors communicated with other applicants about bids or bidding strategy during the quiet period. They did not report those communications.

207. Canopy bid on licenses for spectrums complementary to those attained by Defendants in Auction 1002, including in the Rust Belt (e.g., PEA134, PEA123, PEA121, PEA191, PEA188).

**3. Auction 110**

208. In Auction 110, Cherry Wireless, LLC, managed by Moise (named CEO), with Moise and Jennifer M. Fritzsche as authorized bidders, sought a 25% very small business bidding credit. Cherry Wireless offered an $89,600,000 upfront payment.[49]

---

[46] Canopy Spectrum, LLC, FCC Form 175, Auction 107, Attachment 1: Indirect Ownership
[47] https://auctiondata.fcc.gov/public/projects/auction107
[48] https://auctiondata.fcc.gov/public/projects/auction107/reports/results_by_license
[49] https://aap.fcc.gov/search/results/80c91c60-2b19-4f1f-84ab-920d2ed9eb5f; https://aap.fcc.gov/search/results/c236b541-ff4d-491e-9607-b7b0d9342655?tab=ownership; https://auctiondata.fcc.gov/public/projects/auction110

209. Cherry Wireless reported an average annual income of $1,136,511.00.[50] It disclosed as interest holders of Peppertree Capital FVIII, LP, Peppertree Capital Fund VIII QP, LP, Cloverly entities, yet its Form 175 said that "LLC Agreement vests control of the Applicant in the Class A Members: Mr. Moise and Ms. Fritzsch" wherein "Mr. Moise has the tie-breaking vote in the event the Class A Members are unable to reach a unanimous decision." [51]

210. For Auction 110, the quiet period ran from July 21, 2021, to January 31, 2022. On information and belief—based on Relator's personal knowledge of the ways in which Defendants conducted business in past auctions, and based on the same overlapping ownership and investor relationships—Cherry Spectrum and Defendants' affiliated applicants and investors communicated about bids or bidding strategy during the quiet period. They did not report those communications.

211. In Auction 110, Cherry Wireless bid on many of the same markets that Defendants captured in Auction 1002, including in the Western United States (e.g., PEA257, PEA187, PEA364, PEA394)) and near the Great Lakes (e.g., PEA056, PEA068, PEA092, PEA061, PEA052, and PEA121).

**B. Defendants' Behavior Flouted the Pro-Consumer Purpose of the DE Program**

212. One purpose of the DE program was to promote consumer-friendly services through participation of small businesses.

213. Small businesses colluding to appease larger business interests is antithetical to the pro-competitive goal. Defendants' collusion through covering up the true larger-business control of a purportedly small business engenders monopolistic influence instead of options for

[50] https://aap.fcc.gov/search/results/80c91c60-2b19-4f1f-84ab-920d2ed9eb5f?tab=ownership
[51] Cherry Wireless, LLC FCC Form 175, Auction 110 Attachment 1: Indirect Ownership ("110_21249239").

consumers.

214. Likewise, Congress sought to incentivize small businesses to participate in the spectrum economy to provide diverse services to consumers from small businesses. Foundational to this goal is the premise that the entities will use the licenses. But these defendants did not. Instead, they sat on them and held the interest intending to trade once it could gain value by doing so.

## DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED FALSE CLAIMS OR STATEMENTS REGARDING THE "SMALL BUSINESS" STATUS OF BIDDING ENTITIES

215. To induce the FCC to allow "very small business" bidding credits, Defendants conspired to have the bidding entities file Short-Form and Long-Form applications with the FCC for the respective auctions that included numerous fraudulent statements and omissions.

216. The full disclosure of all instruments, agreements, or understandings between and among participants in an incentive auction are mandated by the FCC. These disclosures are a necessary precondition to obtaining any bidding credit, including in Auctions 78, 93, 103, 107, 110, and 1002.

217. Representations that none of the Large Business Defendants controlled or had the power to control the bidding entity were material facts upon which the FCC determined the bidding entity was eligible for the DE discount and bidding credits.

218. The bidding Defendants' Short-Form and Long-Form were false because the bidding Defendants and the other Defendants that controlled them knowingly failed to disclose all its instruments, agreements, and understandings with the Large Business Defendants. Had the bidding Defendants made those disclosures, which would have revealed that it was under the *de*

*facto* control of the Large Business Defendants, it would not have been eligible for any such bidding credits.

219. Not only were Defendants' omissions false, the bidding Defendants' affirmative disclosures to the FCC regarding the instruments, agreements, and understandings with the Large Business Defendants were also false.

220. Defendants Omega, Triad 700, Monarch, Canopy, and Cypress Cellular made false claims and submitted false records and statements to the FCC in the auction process. Glenmede, Shamrock, Peppertree Funds, 18th Street, and the John Does, by their agreement to allow M/C Partners and other undisclosed large businesses to control Omega, Cherry, Monarch, Cypress, and Canopy, caused these false representations to be made.

221. All Defendants assented to a scheme wherein it was reasonably expected that their co-conspirators would make such false claims and statements.

**DEFENDANTS MISREPRESENTED THAT THEY WOULD COMPLETE A BUILDOUT**

222. For each of Auctions 73, 97, 103, 107, 110, and 1002, the winning bidder is required to build out wireless functions within a specified time period, as follows:

- Auction 73: Initial buildout by June 2013, final buildout by June 2019. *See* FCC Public Notice DA 19-77.
- Auction 97: Initial buildout within 6 years; final buildout within 12 years. *See* 47 C.F.R. 27.14(s).
- Auction 103: Buildout within 10 years. *See* 47 C.F.R. 30.103-30.104.
- Auction 107: Initial buildout within 8 years; final buildout within 12 years. *See* 47 C.F.R. 27.14(v).
- Auction 110: Initial buildout within four years; final buildout within eight years.

*See* 47 C.F.R. 27.14(w).

- Auction 1002: Initial buildout within 6 years; final buildout within 12 years. *See* 47 C.F.R. 27.14(t).

223. For each of Auctions 73, 97, 103, 107, 110, and 1002, the winning bidder failed to complete the required buildout within the applicable time period.

224. For each of Auctions 73, 97, 107, 110, and 1002, the winning bidder knew at the time it made its bid that it would not complete the required buildout within the applicable time period.

225. Not only did Defendants, in fact, not complete any buildouts, each winning bidder was incapable of completing the buildouts. Instead, each winning bidder was a financial speculator and had no operational or construction capability.

## DEFENDANTS FRAUDULENTLY INDUCED THE GOVERNMENT TO ISSUE LICENSES TO THEIR CHOSEN BIDDING ENTITIES AND TO ALLOW THE DE DISCOUNT

226. Defendants' lies induced their licenses in at least three ways. First, but for Defendants' fraudulently obtained DE status, the FCC would not have selected Defendants in these auctions. Bidders set a bid at full price and then, once selected, the small business entities can take the discount and pay 25% less than their bidding price. DE entities bake in this accounting when they determine their bid price. Thus, a bidder would not have bid at a higher price had it not qualified for the DE discount.

227. Second, but for Defendants' misrepresentations about its compliance with FCC regulations that qualify an entity to bid in an auction, the government would not have permitted the bidding entity to bid at all, thus no licenses discussed herein would have been awarded to any Defendant.

228. Third, had the Government been aware that Defendants were not capable of and had no intention to buildout any wireless spectrum, the Government would not have selected any of the Defendants in these auctions and would not have granted any Defendant DE status or allowed any Defendant the DE discount.

**DEFENDANTS' FALSE CLAIMS CAUSED SUBSTANTIAL DAMAGE TO THE FEDERAL GOVERNMENT**

229. Defendants made these knowing omissions, false certifications, and other false statements and claims with the intention of inducing the FCC to allow "small business" bidding credits to Defendants' chosen bidding entity for the respective auction of 25% off of its high bids. Absent these false certifications, this bidding entity could not have qualified as a "small business," and thus could not have received the 25% discount.

230. Based upon these false statements and claims, the FCC gave Defendants' chosen bidding entities the benefit of those bidding credits totaling approximately $95.4 million. Specifically, in Auction 73, Triad 700 won approximately $22.7 million worth of license exclusivities for which it paid just over $17 million. In Auction 97, Cypress Cellular won approximately $13.6 million worth of license exclusivities for which it paid just over $10.1 million. In Auction 1002, Omega won $131 million worth of license exclusivities for which it paid just over $99 million. In Auction 103, Monarch Wireless won approximately $39.3 million worth of license exclusivities for which it paid approximately $29.5 million. In Auction 107, Canopy Spectrum won approximately $197 million worth of license exclusivities for which it paid approximately $172 million. In Auction 110, Cherry Spectrum won approximately $236 million worth of license exclusivities for which it paid approximately $211 million. Thus, for these exclusivities, Defendants benefited from bid credits in the aggregate amount of approximately

$95.4 million.

231. Without the bidding credits, Omega's obligation to the United States would have been $95.4 million larger. The lies concealed and decreased that obligation, and thus the United States never received the $32 million it is owed from Auction 1002, the $5.7 million it is owed from Auction 73, the $3.4 million it is owed from Auction 97, the $9.8 million it is owed from Auction 103, the $25 million it is owed from Auction 107, and the $25 million it is owed from Auction 110.

232. In addition, Defendants' false claims and statements permitted a bidding strategy that deterred participation by other bidders and otherwise undermined the integrity of the FCC's auction process, further causing damage to the federal Government.

**COUNT I**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))**

233. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

234. Defendants Omega, M/C Partners, Shamrock, Peppertree Capital Management, Inc., The Peppertree Funds, 18th Street Group, Glenmede, Cherry Wireless, Monarch Wireless, Canopy Spectrum, Triad 700, Triad 8, and Cypress Cellular, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and are still presenting or causing to be presented, to the United States of America false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A).

235. Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

**COUNT II**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))**

236. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

237. Defendants Omega, M/C Partners, Shamrock, Peppertree Capital Management, Inc., The Peppertree Funds, 18th Street Group, Glenmede, Cherry Wireless, Monarch Wireless, Canopy Spectrum, Triad 700, Triad 8, and Cypress Cellular, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and are still making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

238. The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay Defendants.

239. Because of Defendants' actions, the United States of America has been, and continues to be, severely damaged.

**COUNT III**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))**

240. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

241. Defendants Omega, M/C Partners, Shamrock, Peppertree Capital Management, Inc., The Peppertree Funds, 18th Street Group, Glenmede, Cherry Wireless, Monarch Wireless, Canopy Spectrum, Triad 700, Triad 8, Cypress Cellular and John Does Nos. 1-50, Fictitious Names knowingly conspired, and are still conspiring, to commit acts in violation of 31 U.S.C. §

3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). Defendants committed overt acts in furtherance of the conspiracy as described above.

242. Because of Defendants' actions, the United States of America has been and continues to be severely damaged.

**COUNT IV**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))**

243. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

244. As alleged in detail above, Defendants Omega, M/C Partners, Shamrock, Peppertree Capital Management, Inc., The Peppertree Funds, 18th Street Group, Glenmede, Cherry Wireless, Monarch Wireless, Canopy Spectrum, Triad 700, Triad 8, and Cypress Cellular knowingly avoided or decreased their obligation to pay or transmit money to the government. Specifically,: (i) Defendants made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) Defendants knew that the records or statements were false.

245. Because of Defendants' actions, the United States of America has been and continues to be severely damaged.

**PRAYER FOR RELIEF**

Relator prays for judgment against Defendants as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729–3733;

B. That judgment be entered against Defendants in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand six hundred sixty-five dollars ($11,665) and not more than twenty-three

thousand three hundred thirty-one dollars ($23,331) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3),[52] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

D. That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

E. That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged hereinp; and

F. That this Court award such further relief as it deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Dated: November 20, 2026

Respectfully submitted,

/s/ Dan Twetten
Dan Twetten

Dan Twetten*
Frank Newell*
Dominique Gilbert*
Maggie Filler
**LOEVY & LOEVY**
311 N. Aberdeen St., Third Floor
Chicago, Illinois 60607

[52] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

T: (312) 243-5900
F: (312) 243-5902
dan@loevy.com
frank@loevy.com
gilbert@loevy.com
maggie@loevy.com
*Attorneys for Relator*

* admitted *pro hac vice*